

COPY

1  William J. King, Esq. (Bar No. 199908)
2  Steven D. Baric, Esq. (Bar No. 200066)
   William C. Hoggard, Esq. (Bar No. 192329)
3  HORIZON LAW GROUP LLP
   1920 Main Street, Suite 210
4  Irvine, CA 92614
   Tel.: (949) 261-2500
5  Fax:  (949) 261-2515
6  Email:    wking@horizonlawgroup.com

7  JULIE A. AULT, Esq. (Bar No. 186914)
8  7 Corporate Plaza
   Newport Beach, CA 92660
9  Tel.: (949) 719-7212
   Fax:  (949) 719-7210
10 Email:    jault@olenproperties.com

11

FILED
2008 SEP 16 AM 10: 24
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
SANTA ANA
BY:___

12            **UNITED STATES DISTRICT COURT**

13        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14                  **SOUTHERN DIVISION**

15

16 | IGOR OLENICOFF, an individual; OLEN PROPERTIES CORP., a Florida corporation, | ) CASE NO.  **SACV08-01029 AG (RNBx)** |
| Plaintiff, | ) COMPLAINT FOR: |

17 corporation,                             ) COMPLAINT FOR:

18                                          )  1.  Fraudulent Misrepresentation and
                Plaintiff,                  )      Concealment
19                                          )  2.  Constructive Fraud
                                            )  3.  Negligent Misrepresentation
20       v.                                 )  4.  Fraudulent Misrepresentation and
                                            )      Concealment
21 UBS AG, a foreign Swiss corporation; UBS )  5.  Constructive Fraud
                                            )  6.  Negligent Misrepresentation
22 Bank USA, a federally regulated bank;    )  7.  Fraud in Connection with the
   BRADLEY BIRKENFELD, an individual;       )      Purchase or Sale of Securities –
23                                          )      Violations of Section 10(b) of the
   MICHEL GUIGNARD, an individual;          )      Exchange Act and Rule 10b-5
24 MARTIN LIECHTI, an individual; RAOUL     )  8.  Damages for Sale of Securities by
   WEIL, an individual; CHRISTIAN          )      Means of Communications
25 BOVAY, an individual; GILBERT BENZ,      )      Containing False Statements and
                                            )      Omissions [Cal. Corp §§ 25401 and
26 an individual, ROGER HARTMANN, an        )      25501]
   individual; JACQUES BEUCHAT, an          )  9.  Breach of Fiduciary Duty
27                                          ) 10.  Professional Malpractice
   individual, PETER KURER, an individual;  ) 11.  Disgorgement of Unethical
28 NEUE BANK, AG, a foreign business        )      Excessive & Illegal Fees
                                            ) 12.  Civil Conspiracy

- 1 -

1  entity, form unknown; GEORG VOGT, an                  ) 13.  Unfair Business Practices Act [Cal.
2  individual; HERMANN WILLE, an                         )       Bus. & Prof. Code §17200]
   individual; PAUL BUCHEL, an individual;               ) 14.  Breach of Contract
3  JEST PILGRIM, an individual; WILLE                    ) 15.  Breach of Contract
                                                          ) 16.  Conversion
4  WOLFINGER, an individual; DR.                         ) 17.  Unjust Enrichment
   STEPHAN LATERNSER, an individual;                     ) 18.  Accounting
5  ARNOLD WILLE, an individual; NEW                      ) 19.  Declaratory Relief
6  HAVEN TRUST COMPANY LIMITED, a                        )
   foreign business entity, form unknown;                )
7  MARIO STAGGL, an individual; DR. JUR.                 )
8  KLAUS BIEDERMANN, an individual;                      )
9  SCOTT MACAW, an individual; NEIL                      )
   SMITH, an individual; UNION CHARTER,                  )
10 LTD., a foreign business entity, form                 )
11 unknown; DAVID A. SCHWEDEL, an                        )
   individual; DAS FAMILY HOLDINGS, LP,                  )
12 a Florida limited partnership; SYNTHESIS              )
13 ENERGY SYSTEMS, INC., a Florida                       )
   corporation; MICHAEL STOREY, an                       )
14 individual; DANIEL F. GALLAHER, an                    )
15 individual, MARK BLYNDER, an                          )
16 individual, TIMOTHY VAIL, an individual;              )
   DAVID EICHINGER, an individual; and                   )
17 DOES 1 through 10 , inclusive;                        )
18                                                        )
19                            Defendants.                 )

20                          **INTRODUCTION**

21

22          1.      Between January 1, 2000 and December 31, 2007, Plaintiff Igor M.

23  Olenicoff ("Olenicoff"), a well-known and well-respected commercial real estate

24  developer, was targeted and subjected to a carefully crafted investment scheme

25  orchestrated by the world's largest investment company, UBS AG. This meticulously

26  thought out plan involved dozens of directors and employees and included the

27  cooperation of several entities located in the United States, Switzerland and

28  Liechtenstein. The design allowed these entities and individuals to defraud Olenicoff,

- 2 -

1    Olen Properties Corp. ("Olen Properties"), thousands of other investors, and the United
2    States Treasury Department ("U.S. Treasury") out of hundreds of millions of dollars in
3    fees, alleged costs, and taxes all to the benefit of UBS AG's bottom line and the pockets
4    of the individual culprits.

5        2.    The Defendants' plan was so egregious and performed with such
6    complete and utter disregard for Olenicoff's welfare that, for years, UBS AG acted
7    duplicitously as it secretly reported Olenicoff to the U.S. Treasury as a tax violator all
8    while concurrently taking control over the Olenicoff-controlled accounts and advising
9    him that his investments were proper and properly identified for tax purposes. In truth,
10   UBS AG withheld key information from Olenicoff and intentionally omitted sending
11   him proper tax documents for tax filing purposes in accordance with a 2001 agreement
12   UBS AG had signed with the U.S. Government mere months before developing its
13   scheme. This plan was so successful that it continued to be perpetuated by UBS AG's
14   employee, Bradley Birkenfeld, when he departed UBS AG to join another money
15   management entity.

16       3.    For Olenicoff, this scheme robbed him and Olen Properties of more
17   than just millions of dollars in unwarranted service fees and unnecessary "investments."
18   It placed him and his family under years of tremendous stress, criminal investigation, the
19   possibility of long-term incarceration and unnecessary scrutiny and audit by the Internal
20   Revenue Service and the U.S. Department of Justice. It further caused him to incur
21   millions of dollars in tax penalties, interest and professional fees while forever tarnishing
22   his good name and that of his business.

23

24   **JURISDICTION AND VENUE**

25       4.    This Court has jurisdiction over the subject matter of this action
26   pursuant to 28 U.S.C. §1332(d) because: (a) there is a federal question regarding
27   whether or not Defendants violated Rule 10(b) of the Exchange Act, and (b) the claims
28   of Plaintiff exceed $75,000.00 and Plaintiff is diverse from at least one Defendant.

1   Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of
2   the events giving rise to the claims asserted herein occurred and caused damages in this
3   district.

4                                        **THE PARTIES**

5          5.     Plaintiff Olenicoff is, and at all times relevant to this action was, a
6   Florida resident with homes and offices in the County of Orange, California, Las Vegas,
7   Nevada, and the State of Florida.  Further, Olenicoff is the President of Plaintiff Olen
8   Properties.

9          6.     Plaintiff Olen Properties, Corp. is, and at all times relevant to this
10  action was, a Florida corporation headquartered and conducting business in the County
11  of Orange, California ("Olenicoff" and "Olen Properties" shall sometimes collectively
12  be referred to as "Olenicoff" when referring to property and accounts.  Likewise, the
13  assets subject to this complaint shall sometimes hereinafter be collectively referred to as
14  "the Olen assets," "the Olen accounts," or "the Olen funds."  Such references are made
15  for ease of pleading only and shall not be construed or indicative of any commonality or
16  lack of separateness between the individual and the corporate entity).

17         7.     Plaintiff is informed and believes and thereon alleges that Defendant
18  UBS AG ("UBS AG") is, and at all relevant times was a foreign Swiss corporation, and
19  doing business in the United States of America ("U.S.") and within the County of
20  Orange, California.  UBS AG, is a foreign banking and investment firm located in
21  Switzerland, operating worldwide branches including in California, Connecticut, Illinois,
22  New York and Florida.  The California and Florida branches are federally licensed by
23  the Office of the Comptroller of the Currency.  Additionally, the Board of Governors of
24  the Federal Reserve System exercises examination and regulatory authority over UBS
25  AG's state-licensed U.S. branches.  On April 10, 2000, UBS AG was designated a
26  "financial holding company" under the Bank Holding Company Act of 1956.  Such
27  financial holding companies may engage in a broader spectrum of activities, including
28  underwriting and dealing in securities.  Regulations applicable to UBS AG and its

- 4 -

1  subsidiaries impose obligations to maintain appropriate policies, procedures and controls
2  to detect, prevent and report money laundering, terrorist financing and to verify the
3  identity of its customers.  Failure to maintain and implement such adequate programs
4  results in serious consequences for the firm, both legally and in terms of its reputation.

5          8.      UBS AG, UBS America, UBS Securities LLC and UBS Financial
6  Services, Inc., as well as UBS's other U.S. registered broker-dealer entities are subject to
7  regulations, by the Securities and Exchange Commission, the Financial Industry
8  Regulatory Authority, the New York Stock Exchange, Municipal Securities Rulemaking
9  Board, the U.S. Department of the Treasury, and the Commodities Futures Trading
10  Commission.

11          9.      Plaintiff is informed and believes and thereon alleges that Defendant
12  UBS Bank USA ("UBS America") is, and at all relevant times was, a federally charted
13  regulated bank chartered in Utah, doing business within the U.S. and within the County
14  of Orange, California.

15          10.     Plaintiff is informed and believes and thereon alleges that Defendant
16  Bradley Birkenfeld ("Birkenfeld") is, and at all relevant times was, a citizen of the U.S.,
17  and a director for UBS AG, and a director for Defendant Union Charter, who conducted
18  business in the U.S., and within the County of Orange, California.

19          11.     Plaintiff is informed and believes and thereon alleges that Defendant
20  Michel Guignard ("Guignard") is, and at all relevant times was, a citizen of Switzerland
21  and a senior UBS AG private bank official, who conducted business in the U.S., and
22  within the County of Orange, California.

23          12.     Plaintiff is informed and believes and thereon alleges that Defendant
24  Martin Liechti ("Liechti") is, and at all relevant times was, a citizen of Switzerland and a
25  senior UBS AG private bank official who was in charge of UBS AG's Wealth
26  Management Americas segment of its Global Wealth Management & Business Banking
27  Division, and who conducted business in the U.S., and within the County of Orange,
28  California.

- 5 -

13.    Plaintiff is informed and believes and thereon alleges that Defendant Raoul Weil ("Weil") is, and at all relevant times was, a citizen of an unknown county and the Chairman and CEO of UBS AG's Global Wealth Management & Business Banking Division, who conducted business in the U.S., and within the County of Orange, California.

14.    Plaintiff is informed and believes and thereon alleges that Defendant Christian Bovay ("Bovay") is, and at all relevant times was, a citizen of Switzerland and a Director of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

15.    Plaintiff is informed and believes and thereon alleges that Defendant Gilbert Benz ("Benz") is, and at all relevant times was, a citizen of an unknown country and a director, officer, or employee of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

16.    Plaintiff is informed and believes and thereon alleges that Defendant Roger Hartmann ("Hartmann") is, and at all relevant times was, a citizen of an unknown county and the Executive Director of UBS AG Private Banking, and who conducted business in the U.S., and within the County of Orange, California.

17.    Plaintiff is informed and believes and thereon alleges that Defendant Jacques Beuchat ("Beuchat") is, and at all relevant times was, a citizen of Switzerland, residing in the Country of Geneva, Switzerland and a director, officer, or employee of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

18.    Plaintiff is informed and believes and thereon alleges that Defendant Peter Kurer ("Kurer") is, and all relevant times was, a director, officer, employee and general counsel of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

///

///

- 6 -

1          19.    Defendants UBS AG, UBS America, Birkenfeld, Guignard, Liechti,

2  Weil, Bovay, Benz, Hartmann, Beuchat and Kurer are hereinafter referred to collectively

3  as the "UBS Defendants."

4          20.    Plaintiff is informed and believes and thereon alleges that Defendant

5  Neue Bank AG ("Neue Bank") is, and at all relevant times were, a foreign entity located

6  in the country of Liechtenstein and was conducting business within the U.S., including

7  the County of Orange, California.

8          21.    Plaintiff is informed and believes and thereon alleges that Defendant

9  Georg Vogt ("Vogt") is, and at all relevant times was, an individual residing in the

10  country of Liechtenstein, the Chairman of Neue Bank and was conducting business

11  within the U.S., including the County of Orange, California.

12          22.    Plaintiff is informed and believes and thereon alleges that Defendant

13  Hermann Wille ("Wille") is, and at all relevant times was, an individual residing in the

14  country of Liechtenstein, the Vice-Chairman of Neue Bank who conducted business in

15  the U.S., and within the County of Orange, California.

16          23.    Plaintiff is informed and believes and thereon alleges that Defendant

17  Paul Buchel ("Buchel") is, and at all relevant times was, an individual residing in the

18  country of Liechtenstein, an Account Executive for Neue Bank who conducted business

19  in the U.S., and within the County of Orange, California.

20          24.    Plaintiff is informed and believes and thereon alleges that Defendant

21  Jest Pilgrim ("Pilgrim") is, and at all relevant times was, an individual residing in the

22  country of Liechtenstein, a Director for Neue Bank and conducted business in the U.S.,

23  and within the County of Orange, California.

24          25.    Plaintiff is informed and believes and thereon alleges that Defendant

25  Wille Wolfinger ("Wolfinger") is, and at all relevant times was, an individual residing in

26  the country of Liechtenstein, an officer, director, or manager of Neue Bank who

27  conducted business in the U.S., and within the County of Orange, California.

28  / / /

1    26.    Plaintiff is informed and believes and thereon alleges that Defendant
2    Dr. Stephan Laternser ("Laternser") is, and at all relevant times was, an individual
3    residing in the country of Liechtenstein, an officer, director, or manager of Neue Bank
4    who conducted business in the U.S., and within the County of Orange, California.

5    27.    Plaintiff is informed and believes and thereon alleges that Defendant
6    Arnold Wille ("A. Wille") is, and at all relevant times was, an individual residing in the
7    country of Liechtenstein, and officer, director, or manager of Neue Bank who conducted
8    business in the U.S., and within the County of Orange, California.

9    28.    Defendants Neue Bank AG, Vogt, Wille, Buchel, Pilgrim, Wolfinger,
10    Laternser, and A. Willie are hereinafter referred to collectively as the "Neue
11    Defendants."

12    29.    Plaintiff is informed and believes and thereon alleges that Defendant
13    New Haven Trust Company Limited ("New Haven Trust") is, and at all relevant times
14    was, a foreign entity located in the country of Liechtenstein and conducted business with
15    customers in the United States, including the County of Orange, California.

16    30.    Plaintiff is informed and believes and thereon alleges that Defendant
17    Mario Staggl ("Staggl") is, and at all relevant times was, an individual residing in the
18    country of Liechtenstein, an officer, director, chairman or trustee of New Haven Trust
19    and conducted business in the U.S., including the County of Orange, California.

20    31.    Plaintiff is informed and believes and thereon alleges that Defendant
21    Dr. Jur. Klaus Biedermann ("Biedermann") is, and at all relevant times was, an
22    individual residing in the country of Liechtenstein, an officer, director, chairman or
23    trustee of New Haven Trust and conducted business in the U.S., including the County of
24    Orange, California and Palm Beach County, Florida, and Vaduz, Liechtenstein.

25    32.    Plaintiff is informed and believes and thereon alleges that Defendant
26    Scott Macaw ("Macaw") is, and at all relevant times was, an individual residing in
27    Copenhagen, Denmark, an officer, director, chairman or trustee and shareholder of New
28    Haven Trust-Denmark, a related company of New Haven-Liechtenstein, and conducted

- 8 -

1  business in the U.S., including the County of Orange, California, and Copenhagen,
2  Denmark.

3       33.    Plaintiff is informed and believes and thereon alleges that Defendant
4  Neil Smith ("Smith") is, and at all relevant times was, an individual residing in
5  Copenhagen, Denmark, an officer, director, or manager of New Haven Trust and
6  conducted business in the U.S., including the County of Orange, California, and
7  Copenhagen, Denmark.

8       34.    Defendants New Haven Trust, Staggl, Biedermann, Macaw and
9  Smith are hereinafter referred to collectively as the "New Haven Trust Defendants."

10       35.    Plaintiff is informed and believes and thereon alleges that Defendant
11  Union Charter, Ltd. is, and at all relevant times was, a foreign entity located in Miami,
12  Florida and the country of Switzerland and conducted business with customers in the
13  U.S., including the County of Orange, California.

14       36.    Plaintiff is informed and believes and thereon alleges that Defendant
15  David A. Schwedel ("Schwedel") is, and at all relevant times was, an individual residing
16  in Miami, Florida, and is, and was, a partner and Chairman of Union Charter, Ltd., the
17  General Partner of DAS Family Holdings, LP, and Director of Synthesis Energy
18  Systems, Inc. and conducted business in the U.S., including the County of Orange,
19  California and Coral Gables, Florida, and Geneva, Switzerland.

20       37.    Plaintiff is informed and believes and thereon alleges that Defendant
21  DAS Family Holdings, LP is , and at all relevant times was, a limited partnership located
22  in Coral Gable, Florida and conducted business with customers in the County of Orange,
23  California.

24       38.    Plaintiff is informed and believes and thereon alleges that Defendant
25  Synthesis Energy Systems, Inc. ("SES") is currently, a publicly traded corporation
26  located in Houston, Texas and conducting business throughout the U.S. and
27  internationally.

28  ///

-9-

39.    Plaintiff is informed and believes and thereon alleges that Defendant Michael Storey ("Storey") is, and at all relevant times was, an individual residing in Miami, Florida, and is, and was, a director and partner of Union Charter, Ltd. and a director of SES.

40.    Plaintiff is informed and believes and thereon alleges that Defendant Daniel F. Gallagher ("Gallagher") is, and at all relevant times was, an individual residing in Miami, Florida, and is, and was, a director and partner of Union Charter, Ltd.

41.    Plaintiff is informed and believes and thereon alleges that Defendant Mark Blynder ("Blynder") is, and at all relevant times was, an individual residing in Miami, Florida, and is, and was, a director and partner of Union Charter, Ltd.

42.    Plaintiff is informed and believes and thereon alleges that Defendant Timothy Vail ("Vail") is, and at all relevant times was, an individual residing in Houston, Texas, and is, and was, the President, Chief Executive Office and a Director of SES.

43.    Plaintiff is informed and believes and thereon alleges that Defendant David Eichinger ("Eichinger") is, and at all relevant times was, an individual residing in the State of Texas and is, and was, the Chief Financial Officer and Senior Vice President of Corporate Development of SES.

44.    Defendants Union Charter, Ltd., DAS Family Holdings, LP, Schwedel, SES, Storey, Gallagher, Blynder, Vail, Eichinger and Birkenfeld are hereinafter referred to collectively as the "Union Charter Defendants."

45.    Plaintiff is unaware of the true names, capacities, or basis for liability of defendants DOES 1 through 100, inclusive, and therefore sues said defendants by their fictitious names. Plaintiff will amend this complaint to allege their true names, capacities, or basis for liability when the same has been ascertained. Plaintiff is informed and believes and thereon alleges that defendants, DOES 1 through 100, inclusive, and each of them, are in some manner liable to plaintiff. Plaintiff is entitled to name DOE defendants pending discovery to identify additional defendants connected with the

1   already-identified corporation defendants. (*Johnson v. City of Erie, Pennsylvania*, 834

2   F. Supp. 873 (W.D.Pa.1993) and *Wilkins v. Bittenbender*, 2006 WL 860140.)  Indeed,

3   diversity jurisdiction is already established based on the residences of already-identified

4   defendants, hereinabove, and as set forth herein below.  Moreover, federal question

5   jurisdiction exists as more fully detailed in Paragraph 3, *supra*.

6

7                           **FACTUAL STATEMENT**

8           46.    Olenicoff is a successful businessman who had achieved the

9   American dream.  He went from being a college graduate in 1964 to running a multi-

10  million dollar real estate development company in the course of less than 20 years.

11  When the commercial real estate market declined in the late 1980s and early 1990s,

12  Olenicoff was fortunate to have made wise investments and be one of the few to escape

13  the savings and loan-related banking crisis.  He knew it was time to carefully preserve a

14  certain amount of his and his company's cash surplus by setting it aside in safe

15  institutions for posterity.

16          47.    Olenicoff was content with the assets he and his company had

17  amassed over his successful career and only sought to protect their value while

18  achieving very conservative growth.  He caused Olen Properties' profits to be placed in

19  several bank accounts, some in countries outside the U.S. due to Olenicoff's concern

20  over the U.S. banking instability of the time.  Olenicoff's objective was to earn a

21  conservative and absolutely safe 2% to 3% interest return on this money, after taxes.  All

22  told, the offshore bank deposits made at Barclays Bank were approximately $100

23  million dollars of U.S.-based earnings, all of which were fully declared and accounted

24  for with all U.S. taxes paid on these funds.  There were also U.S. and foreign-based

25  stock brokerage accounts with Smith Barney, comprised of U.S. earnings which were

26  fully tax-paid funds.

27          48.    In or around 1999, Olenicoff became acquainted with Defendant

28  Birkenfeld, who was an executive of Barclays Bank.  Birkenfeld, through unauthorized

1   means, and in violation of Barclays' strict employment conduct guidelines, took it upon
2   himself to copy and familiarize himself with Olenicoff's account balances held at
3   Barclays Bank.    Once armed with this information, Birkenfeld set out to befriend
4   Olenicoff for personal gain since he was not Olenicoff's banker at Barclays Bank. To
5   develop this lucrative friendship, with the intention of luring the Olen accounts
6   elsewhere, Birkenfeld contacted Olenicoff, stating that he wanted to share with
7   Olenicoff certain inside information regarding his employer, Barclays Bank. Further, he
8   claimed the inside information, unless heeded, would materially impact the safety of the
9   Olen accounts at Barclays Bank. Birkenfeld's statement naturally concerned Olenicoff
10   and he agreed to meet with Birkenfeld, who offered to fly to California. At the meeting
11   in the Olen Properties Orange County, California office, Birkenfeld told Olenicoff that a
12   divestiture transaction had been agreed to whereby Barclays Bank would sell its offshore
13   business to a newly created and inexperienced banking enterprise. Birkenfeld cautioned
14   Olenicoff to be wary of leaving the Olen accounts at Barclays once the sale was
15   completed.    In retrospect, Birkenfeld's description of the divestiture and acquiring
16   management was false and aimed solely to alarm Olenicoff. Birkenfeld's purported
17   "inside information disclosure" was nothing more than an attempt to alarm Olenicoff
18   and gain his trust, in clear violation of his employer's regulations against contacting
19   customers which were not his and disclosing such confidential company information.
20   Birkenfeld then offered to advise Olenicoff about the progress of this contemplated sale
21   and to assist him when the time was appropriate. Unknown to Olenicoff until within the
22   last twelve months, at the time Birkenfeld made his representations, he had already made
23   plans to leave Barclays Bank and join UBS AG. Further unknown to Olenicoff, the
24   UBS Defendants were conspiring with Birkenfeld regarding this approach toward
25   Barclays Bank's clients, including Olenicoff. Birkenfeld's befriending of Olenicoff and
26   possibly other Barclays Bank customers was simply a means of lining up future
27   customers for his new position at UBS AG and to bolster his compensation package and
28   worth to UBS AG.

1       49.    In early 2001, Birkenfeld contacted Olenicoff and told him that the
2  time had come to consider transferring his money to another institution and specifically
3  suggested that the safest institution would be UBS AG.  By then, Olenicoff had
4  confirmed through public information that Barclays Bank was indeed selling its branch
5  where Olenicoff conducted his banking. Birkenfeld introduced Olenicoff to Defendant
6  Christian Bovay, a director, private banker, and executive of UBS AG, at UBS AG's
7  Geneva offices and also in the U.S. for purposes of establishing a relationship with
8  Olenicoff at UBS AG.

9       50.    Unbeknownst to Olenicoff, at the time of Olenicoff's introduction to
10  Bovay, Birkenfeld had already reached an employment and compensation agreement
11  with UBS AG based in large part upon his ability to bring accounts from Barclays Bank
12  to UBS AG and, specifically, the Olenicoff account.  While still employed at Barclays
13  Bank, Birkenfeld pushed to have Olenicoff transfer the Olen funds to UBS AG, all under
14  the guise that he was Olenicoff's friend and looking out for him because Barclays
15  certainly was not, having failed to inform him of the pending divestiture to a new and
16  inexperienced banking enterprise.

17       51.    Further unknown to Olenicoff, an illegal plan had been hatched by
18  one of the largest banking and investment firms, UBS AG, to target wealthy U.S.
19  investors at any cost or potential criminal prosecution of the investors.

20       52.    For years leading up to January 2001, the United States Treasury
21  Department was tired of losing billions of dollars in taxes which it believed were owed
22  by U.S. citizens from their overseas investments. The U.S. Treasury believed that taxes
23  were not being paid because there was no way to track the assets and/or the profits made
24  on such assets.  So, the U.S. Treasury advised foreign banks, such as UBS AG and
25  others, that if they wanted to continue to conduct business in the U.S. and with U.S.
26  citizens, they would be required to enter into what became known as the Qualified
27  Intermediary ("QI") Agreement.

28  / / /

1        53.   Under the QI Agreement, the UBS AG Defendants agreed to have
2  their customers fill out IRS Forms W-8BEN or W-9, both of which required the
3  beneficial owner of a bank account in their institution to be identified on the form if they
4  believed or knew that person to be a U.S. citizen or resident.  This procedure would
5  ensure tracking of each U.S. citizens' "off-shore" investments for audit and taxation
6  purposes.  But there was more to the agreement.  If a client of U.S. origin was deemed to
7  have refused to be identified under the QI Agreement, UBS AG agreed to withhold and
8  pay over to the U.S. Treasury a twenty-eight percent (28%) withholding tax on U.S.
9  source payments and then bar the client from holding U.S. investments.  Additionally,
10  the sales proceeds, interest and dividends earned on non-U.S. investments, if the
11  purchase or sale of the investment was made as a result of contact (in person, via email,
12  telephone or facsimile) with a U.S. client in the U.S., they were subject to the Bank
13  issuing IRS Form 1099 reporting requirements or twenty-eight percent (28%)
14  withholding.

15        54.   Obviously, compliance with the QI requirements by UBS AG would
16  result in elimination of account secrecy, require taxation of its U.S. based customers and
17  result in a significant reduction in the investment returns for its U.S. clients.  Without
18  being able to offer greater returns on investment, U.S. clients would invest in U.S. based
19  banks and would thereby have significantly reduced the attraction of wealthy individuals
20  to UBS AG's investment management services.  Furthermore, this would cause UBS AG
21  to suffer a tremendous blow to its bottom line as well as a blow to the compensation to
22  its executives and directors in that UBS AG is a publicly traded company relying on
23  growth and positive results.

24        55.   UBS AG would not be so easily controlled by the U.S. Treasury
25  Department's demands.  UBS AG's executives and legal counsel devised an intricate
26  scheme involving the executives within UBS AG's walls as well as outside people and
27  professional service companies to unlawfully avoid the terms and reporting requirements
28  ///

1    of the QI Agreement, which placed its unsuspecting U.S. clients, including Olenicoff, in
2    the cross-hairs of a criminal investigation.

3            56.    UBS AG made a company-wide statement to its wealth management
4    executives that it was committed to providing absolutely secret private banking services
5    to U.S. citizens notwithstanding the QI Agreement. The message that the private wealth
6    management executives were to, and did, deliver to their U.S. clients, including
7    Olenicoff, was that they would continue to enjoy their privacy and secrecy the Swiss
8    bank had promoted because it was assured by Swiss Law. The UBS AG Defendants, its
9    Board of Directors and management, including Defendants Guignard, Liechti, Weil,
10   Bovay, Benz, Hartmann and Beuchat, established written policies and guidelines to
11   effectuate their dubious scheme in an effort to gain additional U.S. clients and
12   investments under the fraudulent promise of lawful tax planning strategies.

13           57.    Unbeknownst to their U.S. clients, including Olenicoff, UBS AG's
14   actions and promises were not lawful. Due to UBS AG's sheer size, purported expertise
15   and respectable worldwide position, however, they were able to manipulate their clients,
16   including Olenicoff, by their sales pitch regarding the legality of their program. Their
17   scheme and promises were the direct result of greed in that UBS AG managed
18   approximately $20 billion worth of assets for U.S. citizens, earning approximately $200
19   million per year for UBS AG. The UBS AG Defendants were eager to grow this
20   business and revenue stream from wealthy U.S. citizens at any expense, including
21   through unlawful and fraudulent means and methods.

22           58.    The UBS AG Defendants authorized, encouraged and instructed
23   Birkenfeld and their other wealth management executives to regularly travel to the U.S.
24   to solicit new clients while conducting banking for existing U.S. clients. Moreover,
25   UBS AG sponsored formal dinners and seminars, visiting art shows, sailing regattas, and
26   other such events to facilitate contact with wealthy citizens and instruct them in means
27   for transferring assets undetected by U.S. Taxing Authorities. The UBS AG Defendants
28   trained its executive bankers in techniques to avoid questioning by U.S. law enforcement

1   by falsely stating their purpose of travel to be recreational rather than business on U.S.
2   Customs entry forms.  Additionally, executives were instructed not to be tracked by
3   authorities while in the U.S. and on how to conceal and transfer clients' account funds
4   and assets overseas without detection.  The UBS AG Defendants also trained its wealth
5   management executives in how to present to, and swindle, prospective and existing
6   clients into believing that UBS AG's careful advice and account handling was legal and
7   within IRS regulations.  UBS AG management, Board of Directors and others, including
8   Defendants Guignard, Liechti, Weil, Bovay, Benz, Hartmann and Beuchat were aware
9   of, encouraged, directed, authorized and commanded that UBS AG employees, including
10  Birkenfeld, execute their fraudulent and unlawful scheme against U.S. citizens,
11  including Olenicoff.  In fact, Defendant Birkenfeld has testified that the UBS AG
12  Defendants' scheme and effort was the most extensive he had observed in his 12 years
13  working in the Swiss private banking industry.  Further, the UBS AG Defendants knew
14  that their executives and agents were not properly licensed to provide banking services,
15  offer investment advice and management of funds or solicit the purchase or sale of
16  securities to U.S. citizens and that its actions in soliciting and servicing U.S. clients,
17  including Plaintiff, were in violation of various laws of the U.S. and the State of
18  California.

19

20  **The Scheme to Defraud Olenicoff**

21          59.    As previously stated, in or around June 2001, Olenicoff was greeted
22  in Geneva, Switzerland by the UBS AG Defendants, and in particular Birkenfeld,
23  Bovey, Beuchat, and Hartmann. The UBS AG Defendants' presentation in large part
24  boasted about their expertise in Swiss banking, U.S. tax laws and the extensive
25  relationship and "full understanding" UBS AG had with the IRS regarding their clients'
26  U.S. income reporting requirements. The UBS AG Defendants stressed that it was fully
27  staffed with licensed and fully knowledgeable tax and legal professionals worldwide,
28  who would, as part of UBS AG's annual private banking fees, provide estate planning

1   and lawful tax savings advice.  Conversely, the UBS AG Defendants never mentioned
2   anything about the QI Agreement they had recently signed with the Department of the
3   Treasury and the tax reporting requirements therein.  The UBS AG Defendants further
4   stressed to Olenicoff that keeping the stock and bond investments with a U.S.-based firm
5   was detrimental to Olenicoff's "posterity money" and that UBS AG would put him on
6   the correct path with these investments as well as the cash investments that were already
7   on deposit  at UBS AG.  Further, the privacy pitch associated with a UBS AG, Swiss-
8   based account appealed to Olenicoff who was disinterested in the notoriety his net worth
9   was beginning to bring him.  Indeed, Hartmann, Bovay, Beuchat, and Birkenfeld assured
10  Olenicoff that UBS AG was the best and most knowledgeable institution in the world to
11  handle his estate and tax planning in a completely private and lawful manner.

12          60.     The pitch delivered to Olenicoff, as devised and presented by the
13  UBS AG Defendants was: "If you give us full unconditional and discretionary authority
14  over your cash and securities accounts, with an annual management fee paid to UBS
15  AG, we will invest them in non-U.S.-based interests and furthermore create non-U.S.
16  offshore entities or trusts that would hold title to the accounts as the beneficiaries.  They
17  informed Olenicoff that, "we will prepare and provide the necessary corporate and trust
18  entities, officers and directors, and advise you of any tax reporting requirements."

19          61.     Olenicoff was persuaded by the sheer global size, UBS AG's
20  presence, stated expertise and expressed promises relative to estate planning, investment
21  returns and lawful tax savings that would result, and agreed to additionally transfer his
22  U.S.-based securities portfolio to UBS AG.  The UBS AG Defendants prepared the
23  necessary account documentation and completed the transfer.  Once there, the monthly
24  reporting began with Birkenfeld, Beuchat, and Bovay promising that their management
25  of the Olen account's cash and stock portfolio was producing terrific results.

26          62.     For Olenicoff, the asset management was more than just about
27  promised returns and tax savings.  It was also about the fees that UBS AG would charge
28  for their services.  Upon hearing this, the UBS AG Defendants promised and agreed to a

1  "transparent system" where only one agreed upon fee was to be charged on the portfolio.
2  It was agreed that UBS AG would never charge Olenicoff for the purchase or sale of
3  securities, never charge for a transaction of securities to or from UBS AG-owned
4  inventory, and that all purchases and sale tickets would be provided with the monthly
5  statements.  As Olenicoff would later discover, neither Birkenfeld, UBS AG, nor any
6  Defendant had the proper licensure to trade the securities in his portfolio and the UBS
7  AG Defendants never intended to follow through on their promises.

8          63.     Upon transferring the portfolio in or around July 2001, Olenicoff
9  emphasized and received UBS AG's promise that the investments were to remain in
10  absolutely safe, prudent investments limited to publicly traded securities, rated AA or
11  better and in bank-issued fixed-income instruments.  Olenicoff received the assurances
12  of the UBS AG Defendants that they understood that capital preservation was the
13  primary objective for their investment criteria, as he intended to pass the assets onto
14  future generations and to charity.  The UBS AG Defendants assured him that they would
15  follow Olenicoff's investment parameters and it was then that they suggested they had
16  the expertise and would direct the process by which these funds could be directed to
17  future generations and charities pursuant to his wishes.  Specifically, they suggested that
18  they had the necessary professional contacts in Liechtenstein to accomplish this and that
19  Liechtenstein was the best venue in which to accomplish Olenicoff's goals, in a lawful
20  manner.

21          64.     With over $200 million in hand, and with full discretion to invest
22  said funds, UBS AG began to implement its plan against Olenicoff.  By July 2001, after
23  completing the asset transfers, the UBS AG Defendants sent Olenicoff authorizations for
24  creation of various companies and trusts in Liechtenstein and Denmark using New
25  Haven Trust as a vehicle for improving the privacy, purported legal U.S. tax deferment,
26  and estate planning for Olenicoff.  UBS AG introduced Olenicoff to Mario Staggl and
27  Dr. Jur. Klaus Biedermann who represented New Haven Trust and further had
28  affiliations with Neue Bank, all entities and persons which would come into play.

65.   To Olenicoff, New Haven was pitched by the UBS AG Defendants as the entity that would represent Olenicoff's investment interests in the "investment vehicles" of UBS AG and Neue Bank.  As part of the scheme, Staggl and Klaus Biedermann required Olenicoff's full authorization to allow them to handle the intricacies of the investments to be handled by New Haven on his behalf by making them signatories on the accounts and/or officers of the new entities.

66.   Documents were sent to Olenicoff at his California and Florida offices instructing him to sign forms to create new entities.  But what Olenicoff did not know was that Neue Bank and New Haven Trust were not "investment vehicles."  They were part of a meticulous plan concocted by the UBS AG Defendants and involving Neue Bank and New Haven Trust Defendants to breach the QI Agreement in a manner to keep Olenicoff, and thousands of others in the dark regarding the true tax requirements related to the investments. As with the UBS AG Defendants and unknown to Olenicoff, the Neue Bank Defendants and the New Haven Trust Defendants were not licensed to provide banking services, offer investment advice or solicit the purchase or sale of securities through contact with U.S. citizens. On information and belief, the UBS AG Defendants were fully aware that the Neue Bank Defendants and the New Haven Trust Defendants were not properly licensed.

67.   For the next year, Olenicoff enjoyed the peace of mind he had been sold that the posterity investments were safe and sound in the capable hands of UBS AG, Birkenfeld, Beuchat, Hartmann, and Staggl and the New Haven Defendants and Neue Bank Defendants. As tax season approached in the U.S., the UBS AG Defendants, Neue Bank Defendants and the New Haven Trust Defendants delivered on the seamless investment and tax services as promised.

68.   Importantly, throughout the relationship between the UBS AG Defendants and Olenicoff, the UBS Defendants repeatedly assured Olenicoff that the management scheme and structure of his investments had been reviewed by UBS AG attorneys and were authorized by and in compliance with U.S. reporting laws.

## Intentional Omissions and UBS AG's Duplicity

69.    Unknown to Olenicoff, Defendants knowingly prepared false documentation and correspondence advising Olenicoff to submit IRS Forms W-8BEN improperly and in violation of the IRS regulations and the QI Agreement the UBS AG Defendants had entered into with the U.S. Treasury.  They also failed to prepare and deliver the QI agreed IRS Forms W-9 which would have identified Olenicoff as someone who either needed to pay taxes on offshore assets or UBS AG would withhold 28% of the Olen fund profits if Olenicoff had chosen and informed them not to 'declare' these accounts.

70.    However, Olenicoff is now informed and believes UBS AG knowingly operated under the illegal proposition that it was not required to deliver such a W-9 form or otherwise withhold 28% because the accounts were owned by non-U.S. entities, the very entities created by UBS AG through Staggl and New Haven Trust! Olenicoff had been connived into giving authority to personnel affiliated with the Olen account "investment vehicles" so that they could set up "foreign" owners of these accounts all to avoid reporting and withholding so these firms could continue to enjoy the benefits of his $200-plus million portfolios, including, but not limited to, millions of dollars in yearly management fees.

71.    Meanwhile, every year came and went with the same omissions committed by the UBS AG Defendants and New Haven Trust Defendants and Neue Bank Defendants until 2007 when the IRS approached Olenicoff regarding his tax liabilities on these investments.  It was at that time that the elaborate scheme was revealed to Olenicoff and he uncovered the Defendants' secrets.

72.    Unknown to Olenicoff, in or around 2004, Birkenfeld was approached by the U.S. Department of Justice ("DOJ") which inquired into UBS AG's conduct with its U.S. clients and its apparent efforts to avoid compliance with the QI Agreement.  Birkenfeld disclosed to the DOJ detailed information regarding the Olen accounts and UBS AG's entire scheme related to Olenicoff and other U.S. clients.

1    Birkenfeld then became concerned that he and the UBS Defendants may be discovered
2    by law enforcement authorities in connection with the position taken and schemes
3    created by UBS AG relating to Olenicoff and other U.S. clients. So, he engaged a law
4    firm specializing in employment disputes to represent and advise him regarding his
5    connection to the UBS AG scheme. He further engaged a criminal defense firm in
6    Washington D.C. to protect him from the potential actions against him by the DOJ.
7    According to published newspaper reports, Birkenfeld wrote a letter to Peter Kurer, UBS
8    AG's general counsel, explaining the illegal nature of UBS AG's scheme, which Kurer
9    then shared with the executives of UBS AG. Following the advice of his attorney,
10    Birkenfeld resigned his position at UBS AG. However, shortly after leaving UBS AG,
11    Birkenfeld sued the company for monies owed related to the scheme and the Olenicoff
12    account fees collected by UBS AG owed to him under their fee-sharing agreement.

13         73.   Eventually, Birkenfeld collected a monetary settlement from UBS
14    AG claiming that UBS AG required him and others to continue the fraudulent business
15    practices against not only Olenicoff, but approximately 19,000 other customers and was,
16    therefore, due a substantial amount of money to have participated with them in the
17    illegal scheme. In short, he wanted to be paid for committing an illegal fraud and UBS
18    AG ultimately agreed and paid him a very substantial sum, essentially sharing their ill-
19    gotten spoils.

20         74.   Leading up to this, and thereafter, Birkenfeld regularly met with
21    Olenicoff, never mentioning his personal concerns, the illegality of UBS AG's scheme,
22    his disclosures to the IRS/DOJ the UBS AG-Birkenfeld dispute, any problems related to
23    the tax and investment advice, and/or the likelihood that Olenicoff would be subject to
24    tax penalties, interest, and criminal investigation as a result of UBS AG's scheme, all the
25    while continuing to manage Olenicoff's funds in accordance with the scheme set up by
26    UBS AG.

27    / / /
28    / / /

1           75.    By 2005, the IRS and the DOJ approached the UBS AG Defendants
2 about their scheme. In response to the U.S. investigation, the UBS AG Defendants
3 "reported" Olenicoff to the IRS as a "tax evader," all the while knowing that Birkenfeld
4 had already done so and, further, that he had sued UBS AG regarding the Olenicoff
5 accounts. Notwithstanding this "report," and in an effort to continue to generate fees
6 from his account, the UBS Defendants *never* advised Olenicoff of their notification to
7 the IRS and/or the likelihood that the IRS would likely deem him as not only owing
8 taxes on the Olen investments, but also facing a criminal investigation for the
9 management structure of his account set up by the UBS AG Defendants themselves.
10 Instead, said Defendants continued to manage the accounts as they had done since the
11 transfer of the accounts to UBS AG, continuing to enjoy the income from Olenicoff's
12 assets, thereby milking the proverbial cow.

13

14 **The Scheme is Perpetuated Post-UBS AG**

15           76.    Notwithstanding all that had occurred between Birkenfeld, the DOJ,
16 and UBS AG, and with the full knowledge of the illegal nature of the off-shore structure
17 previously set up for Olenicoff, a plan was devised by Birkenfeld, the Neue Bank
18 Defendants, the New Haven Defendants, and the Union Charter Defendants, to continue
19 with the previous UBS AG scheme. Upon leaving UBS AG, Birkenfeld joined Union
20 Charter, a corporate finance entity conducting business in Miami, New York, and
21 Geneva, in May 2005. On or about June 12, 2005, Birkenfeld and the Neue Bank and
22 New Haven Trust Defendants telephoned Olenicoff in his office in Orange County,
23 California and convinced Olenicoff to travel to Neue Bank, advising Olenicoff that
24 pursuant to their Trustee position and fiduciary responsibilities they were transferring all
25 of his UBS AG assets to Neue Bank. It was then explained that because Olenicoff had
26 granted them authority over the funds, his concurrence was not required and that they
27 were dealing with, and did deal with, the UBS AG executives in the transfer of assets to
28 Neue Bank/New Haven Trust. Birkenfeld, the UBS AG Defendants and the New Haven

1  Defendants never disclosed the rift between Birkenfeld and UBS AG or the potential of
2  criminal prosecution resulting from the scheme established and perpetrated by
3  Defendants that was well known to them at this time.

4          77.    Olenicoff was given no reason for the transfer other than Birkenfeld's
5  unspecified need and wish to sever the UBS AG relationship at that point. In fact, UBS
6  AG, Neue Bank and New Haven Trust did not require Olenicoff's approval for this
7  change since they had full discretionary use and control over the UBS AG accounts.
8  Instead, they merely assured Olenicoff that all of the benefits of privacy and investment
9  sophistication and safety would continue at Union Charter as had allegedly been the case
10 for years under UBS AG's management.    Olenicoff agreed to the transfer of
11 management to Union Charter based upon his trust and confidence in his financial
12 manager, Birkenfeld. In hindsight, it is apparent that both the UBS AG and New Haven
13 Defendants became concerned about what they had created and that the elaborate
14 scheme was about to unravel, specifically regarding the Olen account.

15         78.    Upon transferring funds to the Neue Bank and New Haven
16 Defendants, Olenicoff was specifically informed and received confirmation at his offices
17 in Orange County, California and Florida from the Neue Bank Defendants, the New
18 Haven Trust Defendants and the Union Charter Defendants that these Defendants were
19 now managing his assets under the same criteria and terms as UBS AG. Specifically,
20 that the assets were to remain in safe, readily liquid, prudent investments, in publicly
21 traded securities rated AA or better and in fixed-income instruments. Olenicoff advised
22 the Neue Bank, New Haven Trust and Union Charter Defendants that capital
23 preservation was his primary goal, as he intended to pass the money onto future
24 generations or to charity. The Neue Bank and New Haven Trust Defendants agreed to
25 follow Olenicoff's investment direction. In fact, said Defendants even went so far as to
26 expressly confirm that a New York tax firm had prepared a written opinion that the tax
27 and investment schemes were proper.

28 / / /

- 23 -

1    79.    Over the next two years, 2006 and 2007, Birkenfeld, Staggl, the Neue
2  Bank Defendants, the New Haven Trust Defendants, and the Union Charter Defendants
3  continued to advise Olenicoff exactly as they had done under the original UBS AG
4  scheme, thereby subjecting Olenicoff to further tax penalties and interest while engaging
5  in self-dealing as described below.    Birkenfeld continued manipulating Olenicoff,
6  keeping him in the dark about his impending tax problems while Olenicoff continued his
7  focus on his primary income-producing real estate enterprise which was ever growing
8  due to his expertise and successful reputation for high quality developments.    Even
9  worse, however, Birkenfeld, Staggl and the Neue Bank, New Haven Trust, and Union
10  Charter Defendants converted the Olen funds and made unauthorized investments
11  earning themselves seven-figure fees in both commissions and salaries taken from shell
12  companies set up with the Olen funds and which siphoned off the funds into worthless
13  offshore companies.

14    80.    Within the last year, upon Olenicoff's attempt to liquidate the
15  investments and move the assets back to the U.S. and out of the control of the New
16  Haven Trust, Neue Bank and the Union Charter Defendants, as a result of his settlement
17  plea agreement on a criminal charge brought by the DOJ, he discovered that the
18  investment portfolio was not invested in safe, secure, prudent publicly traded securities
19  rated AA or better.    To the contrary, each and all of the Defendants used the Olen
20  account to invest in speculative securities, some of which were not even publicly traded.
21  Moreover, each and all of the Defendants invested the Olen money in corporations
22  where they had a direct vested interest, in violation of not only the investment contracts
23  between Olenicoff and Defendants but also in violation of Defendants' separate and
24  collective fiduciary duties to Olenicoff.    Through a complex scheme between all of the
25  Defendants, Neue Bank, in concert with the direction of the New Haven Trust and Union
26  Charter Defendants, prepared fraudulent account statements showing substantial
27  investment returns, all intended to keep Olenicoff happy with their asset management,
28  while having full knowledge that they were committing fraud against him and earning

1  substantial annual seven-figure management fees, which were further inflated by the
2  fraudulent account statements.

3      81.   Olenicoff discovered that Union Charter, Birkenfeld, Staggl, the
4  Neue Bank Defendants and the New Haven Trust Defendants formed a shell
5  Panamanian company called Teflomi Investment and Trade, Inc., ("Teflomi") for $200.
6  The Neue Bank Defendants and the New Haven Trust Defendants, at the direction,
7  control, supervision and/or blessing of the UBS AG Defendants, and subsequently the
8  Union Charter Defendants, then transferred five million dollars from Olenicoff's Neue
9  Bank account to Teflomi.  Teflomi, at the direction of Defendants, then transferred the
10 five million dollars to Synthetic Energy Systems, Inc. ("SES"), a Texas corporation in
11 exchange for one million shares.  However, SES did not have publicly traded shares at
12 the time, and the stock certificate for the one million shares was a "lettered stock" that
13 could not be sold under Rule 144.

14     82.   In exchange for these transactions, Olenicoff is informed and
15 believes that SES paid Union Charter, Defendants Birkenfeld, Staggl, and others a
16 finder's fee of $1.4 million.  Defendants purposefully and intentionally hid its fraud and
17 self-dealing from Olenicoff by concealing the true name of the securities on periodic
18 statements sent to his Orange County, California office.  Olenicoff is still trying to
19 recover this "invested" money.

20     83.   By 2007, the IRS and Department of Justice approached Olenicoff
21 and advised him that the "investments" from 2001 forward were indeed subject to
22 taxation.  Olenicoff eventually faced criminal investigation relating to the shell company
23 structure set up by Defendants and agreed to pay tens of millions of dollars in tax
24 penalties, and interest on top of related costs and professional fees.  Although he was a
25 pawn and victim of a greedy scheme by the aforementioned Defendants, Olenicoff had
26 no choice but to take this course of action.  In the end, he would be labeled a "tax cheat"
27 by the media and would and still does find his name in news articles with this negative
28 moniker.

- 25 -

84.     On April 10, 2008, Defendants Birkenfeld and Staggl were indicted on charges of conspiracy to defraud the United States and the IRS in violation of Title 18, United States Code, Section 371. The indictment includes the following charges, which are incorporated herein, as follows:

a.   "It was part of the conspiracy that Birkenfeld, Staggl and others would and did market the advantages of Swiss and Liechtenstein bank secrecy to United States clients by claiming that said secrecy was impenetrable;

b.   Birkenfeld, Staggl, and others would and did travel to the United States to market investments including United States securities to United States clients which they were not licensed to market;

c.   That said marketing also took place via mail, emails and telephone calls to and from the United States;

d.   That said defendants would and did travel to the United States to conduct banking with United States clients, such as Olenicoff;

e.   That said defendants would and did conduct banking with United States clients from Switzerland, Liechtenstein, and elsewhere via mailings, emails, and telephone calls to and from the United States;

f.   That said defendants would and did prepare Swiss and Liechtenstein bank account applications, and IRS Forms W-8BEN, which falsely and fraudulently concealed that United States Taxpayers were the beneficial owners of offshore bank and financial accounts maintained in foreign countries, including Switzerland and Lichtenstein;

///

- 26 -

g. That said defendants would and did cause shell companies to be set up and used as the nominee owners for the Swiss Bank and Liechtenstein bank accounts in order to conceal United States citizens' beneficial ownership of the bank accounts;

h. That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently omitted income earned by United States clients from their Swiss bank and Liechtenstein bank accounts;

i. That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently reported that United States clients did not have an interest in, and a signature and authority over, financial accounts located in a foreign country."

85. Defendant Birkenfeld has admitted to each of the above indictment charges, while Defendant Staggl is avoiding capture by hiding in Liechtenstein.

86. While these admissions and revelations of UBS AG's misconduct begin the path of vindication for Olenicoff, his family name and reputation, and that of his business, have been irreversibly tarnished, subjecting him and his family to embarrassment. The actions of the Defendants have damaged his professional reputation and the damage stems to all areas of his business activities.

87. Based on the foregoing and as more fully detailed herein below, Olenicoff and Olen Properties are entitled to recover their respective lost and converted assets, all of the fraudulent and/or unnecessary fees, tax penalties and interest, compensatory damages for the loss of his personal and professional reputation and punitive damages from each and all of the Defendants who worked in concert for years to defraud Olenicoff and Olen Properties of millions of dollars, collectively causing hundreds of millions of dollars in damages.

- 27 -

**COUNT I**

(Fraudulent Misrepresentation and Concealment Against the UBS AG Defendants;

Neue Bank Defendants; New Haven Trust Defendants;

and DOES 1 through 50, inclusive)

88.     Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

89.     For the purposes of inducing Olenicoff to transfer the Olen account investments to UBS AG and to pay millions of dollars in aggregate fees while also allowing themselves to advertise and report higher account values and superior status versus competitors, Defendants made numerous knowingly false affirmative representations and intentional omissions/concealments of material facts to Olenicoff, including but not limited to:

        a.    That they would prepare proper and legal documentation for the formation of, and form, shell corporations with the representation that said formations were permitted by the IRS;

        b.    Representing that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy;

        c.    Representing that Olenicoff should follow the estate planning and tax opinions and advice rendered by Defendants pertaining to lawful requirements for report of his off-shore assets as required by the IRS from 2002 through 2007;

        d.    Representing to Olenicoff that the method by which Defendants titled the ownership of the accounts with Defendants would be fully compliant with all U.S. reporting requirements;

        e.    Representing that the Defendants would prepare all the necessary and proper forms to be submitted to the Internal

- 28 -

1                    Revenue Service to report all income and accounts required to

2                    be reported to the Internal Revenue Service to ensure Olenicoff

3                    would comply with all U.S. tax reporting requirements;

4         f.      Representing that his investments would be held in safe,

5                    conservative investments ensuring a prudent return in liquid

6                    investments;

7         g.      Representing that Olenicoff's financial information would be

8                    protected and held in confidence;

9         h.      Representing to Olenicoff that the Defendants would manage

10                   the assets in a lawful and prudent manner and use the care and

11                   expertise of a fiduciary with respect thereto; and

12         i.      Representing to Olenicoff that Defendants were properly

13                   licensed and thus, permitted to provide banking services, offer

14                   investment advice and management of funds and to solicit the

15                   purchase or sale of securities to U.S. citizens, including

16                   Olenicoff.

17       90.     The above intentional omissions of material fact and/or affirmative

18 misrepresentations and concealments made by each Defendant were false when made

19 and said Defendants knew these representations to be false when made and that said

20 concealments were necessary to disclose. Moreover, they were made with the intention

21 that Olenicoff would rely upon them in transferring funds to Defendants' accounts and

22 for Defendants' use so that Olenicoff would pay them millions of dollars in fees and

23 costs and so they would have access to his funds for their personal and collective profit

24 motives.

25    ///

26    ///

27    ///

28    ///

91.    The true facts are that:

    a.    The documentation prepared by the UBS AG Defendants for the formation of shell corporations was not a permissible tax deferment scheme under the QI Agreement nor under U.S. tax reporting laws;

    b.    The UBS AG Defendants, Neue Bank Defendants and New Haven Trust Defendants prepared documentation for opening off-shore bank and investment accounts, represented that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy, and then failed to report Olenicoff's information to the IRS pursuant to the QI agreement;

    c.    The UBS AG Defendants scheme, as described above, was not lawful and permitted by the IRS pursuant to the QI Agreement;

    d.    The UBS AG Defendants provided and/or caused to be provided erroneous legal and tax advice by, among other things, intentionally preparing wrongful and misleading documents and sending them to Olenicoff from 2002 through 2007;

    e.    The UBS AG Defendants concealed from Olenicoff that he not only owed taxes on his investments with the IRS but would face criminal investigation for the management structure of his account set up by the UBS AG Defendants;

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

- 30 -