William J. King, Esq. (Bar No. 199908)
William C. Hoggard, Esq. (Bar No. 192329)
HORIZON LAW GROUP LLP
1920 Main Street, Suite 210
Irvine, CA 92614
Tel.:   (949) 261-2500
Fax:   (949) 261-2515
Email:       wking@horizonlawgroup.com

Julie A. Ault, Esq. (Bar No. 186914)
7 Corporate Plaza
Newport Beach, CA 92660
Tel.:   (949) 719-7212
Fax:   (949) 719-7210
Email:       jault@olenproperties.com

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| IGOR OLENICOFF, an individual; OLEN PROPERTIES CORP., a Florida corporation,<br><br>            Plaintiff,<br><br>      v.<br><br>UBS AG, a foreign Swiss corporation; BRADLEY BIRKENFELD, an individual; MICHEL GUIGNARD, an individual; MARTIN LIECHTI, an individual; RAOUL WEIL, an individual; CHRISTIAN BOVAY, an individual; GILBERT BENZ, an individual, ROGER HARTMANN, an individual; JACQUES BEUCHAT, an individual, PETER KURER, an individual; RENE MARTY, an individual; NEUE BANK, AG, a foreign business entity, form unknown; GEORG VOGT, an individual; | CASE NO.  SACV08-01029 .AG (RNBx)<br><br>THIRD AMENDED COMPLAINT FOR:<br><br>1.  Fraudulent Misrepresentation and Concealment<br>2.  Constructive Fraud<br>3.  Negligent Misrepresentation<br>4.  Fraudulent Misrepresentation and Concealment<br>5.  Constructive Fraud<br>6.  Negligent Misrepresentation<br>7.  Fraud in Connection with the Purchase or Sale of Securities – Violations of Section 10(b) of the Exchange Act and Rule 10b-5<br>8.  Damages for Sale of Securities by Means of Communications Containing False Statements and Omissions [Cal. Corp §§ 25401 and 25501]<br>9.  Breach of Fiduciary Duties<br>10. Violation of U.S.C. § 1962 (c) – Federal RICO<br>11. Violation of 18 U.S.C. § 1962 (d) – Federal RICO Conspiracy<br>12. Professional Malpractice<br>13. Disgorgement of Unethical |

- 1 -

THIRD AMENDED COMPLAINT

| | |
|---|---|
| 1 | HERMANN WILLE, an individual; PAUL |
| 2 | BUCHEL, an individual; JOST PILGRIM, an individual; WILLI WOLFINGER, an |
| 3 | individual; DR. STEPHAN LATERNSER, |
| 4 | an individual; ARNOLD WILLE, an individual; NEW HAVEN TRUST |
| 5 | COMPANY LIMITED, a foreign business |
| 6 | entity, form unknown; MARIO STAGGL, an individual; DR. JUR. KLAUS |
| 7 | BIEDERMANN, an individual; SCOTT |
| 8 | MACAW, an individual; NEIL SMITH, an individual; UNION CHARTER, LTD., a |
| 9 | foreign business entity, form unknown; |
| 10 | DAVID A. SCHWEDEL, an individual; |
| 11 | SYNTHESIS ENERGY SYSTEMS, INC., a Florida corporation; MICHAEL STOREY, |
| 12 | an individual; TIMOTHY VAIL, an |
| 13 | individual; DAVID EICHINGER, an individual; JAMES ALEXANDER |
| 14 | MICHIE, an individual; GM CAPITAL |
| 15 | PARTNERS, LTD., a foreign Canadian |
| 16 | business entity; ROBERT KNIGHT, an individual; KNIGHT FINANCIAL, LTD., a |
| 17 | foreign Canadian business entity; MARC |
| 18 | ANGST, an individual; GESTRUST SA, a foreign Swiss business entity; MARTIN |
| 19 | HOCHSCHORNER, an individual; JASON |
| 20 | SUNDAR, an individual; HERB LUSTIG, an individual; and DOES 1 through 10, |
| 21 | inclusive; |
| 22 | |
| 23 | Defendants. |

Excessive & Illegal Fees
14. Civil Conspiracy
15. Unfair Business Practices Act [Cal. Bus. & Prof. Code §17200]
16. Breach of Contract
17. Breach of Contract
18. Conversion
19. Breach of Duty to Timely Register Securities Transaction [U.C.C. § 8-401]
20. Accounting
21. Declaratory Relief

24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

- 2 -

**THIRD AMENDED COMPLAINT**

## INTRODUCTION

1.     Between January 1, 2000 and December 31, 2007, Plaintiff Igor M. Olenicoff ("Olenicoff"), a well-known and well-respected commercial real estate developer, was targeted in and subjected to a carefully crafted investment scheme orchestrated by the world's largest investment company, UBS AG.  This meticulously thought out plan involved dozens of directors and employees and included the cooperation of several entities located in the United States, Switzerland and Liechtenstein.  The design allowed these entities and individuals to defraud Olenicoff, Olen Properties Corp. ("Olen Properties"), thousands of other investors, and the United States Treasury Department ("U.S. Treasury") out of hundreds of millions of dollars in fees, alleged costs, and taxes all to the benefit of UBS AG's bottom line and the pockets of the individual culprits.

2.     The Defendants' plan was so egregious and performed with such complete and utter disregard for Olenicoff's welfare that, for years, UBS AG acted duplicitously as it secretly reported Olenicoff to the U.S. Treasury as a tax violator all while concurrently taking control over the Olenicoff-controlled accounts and advising him that his investments were proper and properly identified for tax purposes.  In truth, UBS AG withheld key information from Olenicoff, intentionally omitted sending him proper tax documents for tax filing purposes, and in fact sent him documents in direct contravention to U.S. reporting requirements in accordance with a 2001 agreement UBS AG had signed with the U.S. Government mere months before carrying out its scheme. This plan was so successful that it continued to be perpetuated by UBS AG's employee, Bradley Birkenfeld, when he departed UBS AG to join another money management entity.  Moreover, in 2009 UBS AG has admitted publicly on several occasions, and in testimony before the U.S. Senate, its scheme to defraud the IRS while its former CEO, Defendant Raoul Weil, has been indicted as a result of his direct involvement in UBS AG's scheme, and one of its bankers, Bradley Birkenfeld, has been sentenced to 40 months in prison for his active role.

**THIRD AMENDED COMPLAINT**

3.     For Olenicoff, this scheme robbed him and Olen Properties of more than just millions of dollars in unwarranted service fees and unnecessary "investments." It placed him and his family under years of tremendous stress, criminal investigation, the possibility of long-term incarceration and unnecessary scrutiny and audit by the Internal Revenue Service and the U.S. Department of Justice.  It further caused him to incur millions of dollars in tax penalties, interest and professional fees while forever tarnishing his good name and that of his business.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d) because: (a) there is a federal question regarding whether or not Defendants violated  Rule 10(b) of the Exchange Act and/or 18 U.S.C. § 1962(c) (Civil RICO), (b) the claims of Plaintiffs exceed $75,000.00 and Plaintiffs are diverse from at least one Defendant, and (c) the Court maintains pendent jurisdiction over the state statutory and common law causes of action.  Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims asserted herein occurred and caused damages in this district.

## THE PARTIES

5.     Plaintiff Olenicoff is, and at all times relevant to this action was, a Florida resident with a secondary primary residence and office headquarters in the County of Orange, California.  Further, Olenicoff is the President of Plaintiff Olen Properties, Corp.

6.     Plaintiff Olen Properties, Corp. is, and at all times relevant to this action was, a Florida corporation qualified, headquartered and primarily conducting business in the County of Orange, California ("Olenicoff" and "Olen Properties" shall sometimes collectively be referred to as "Olenicoff" when referring to property and accounts.  Likewise, the assets subject to this complaint shall sometimes hereinafter be collectively referred to as "the Olen assets," "the Olen accounts," or "the Olen funds." Such references are made for ease of pleading only and shall not be construed or

1  indicative of any commonality or lack of separateness between the individual and the
2  corporate entity).

3          7.     Plaintiff is informed and believes and thereon alleges that Defendant
4  UBS AG ("UBS AG") is, and at all relevant times was a foreign Swiss corporation, and
5  doing business in the United States of America ("U.S.") and within the County of
6  Orange, California.   UBS AG, is a foreign banking and investment firm located in
7  Switzerland, operating worldwide branches including in California, Connecticut, Illinois,
8  New York and Florida.   The California and Florida branches are federally licensed by
9  the Office of the Comptroller of the Currency.   Additionally, the Board of Governors of
10  the Federal Reserve System exercises examination and regulatory authority over UBS
11  AG's state-licensed U.S. branches.   On April 10, 2000, UBS AG was designated a
12  "financial holding company" under the Bank Holding Company Act of 1956.   Such
13  financial holding companies may engage in a broader spectrum of activities, including
14  underwriting and dealing in securities.   Regulations applicable to UBS AG and its
15  subsidiaries impose obligations to maintain appropriate policies, procedures and controls
16  to detect, prevent and report money laundering, terrorist financing and to verify the
17  identity of its customers.   Failure to maintain and implement such adequate programs
18  results in serious consequences for the firm, both legally and in terms of its reputation.

19          8.     UBS AG, UBS Securities LLC and UBS Financial Services, Inc., as
20  well as UBS's other U.S. registered broker-dealer entities are subject to regulations, by
21  the Securities and Exchange Commission, the Financial Industry Regulatory Authority,
22  the New York Stock Exchange, Municipal Securities Rulemaking Board, the U.S.
23  Department of the Treasury, and the Commodities Futures Trading Commission.

24          9.     Plaintiff is informed and believes and thereon alleges that Defendant
25  Bradley Birkenfeld ("Birkenfeld") is, and at all relevant times was, a citizen of the U.S.,
26  and an employee for UBS AG, an agent of Defendant Neue Bank AG, an agent of New
27  Haven Trust, and at times, a director for Defendant Union Charter, and an agent for SES,
28  who conducted business in the U.S., and within the County of Orange, California.

10.     Plaintiff is informed and believes and thereon alleges that Defendant Michel Guignard ("Guignard") is, and at all relevant times was, a citizen of Switzerland and a senior UBS AG private bank official, who conducted business in the U.S., and within the County of Orange, California.

11.     Plaintiff is informed and believes and thereon alleges that Defendant Martin Liechti ("Liechti") is, and at all relevant times was, a citizen of Switzerland and a senior UBS AG private bank official who was in charge of UBS AG's Wealth Management Americas segment of its Global Wealth Management & Business Banking Division, and who conducted business in the U.S., and within the County of Orange, California.

12.     Plaintiff is informed and believes and thereon alleges that Defendant Raoul Weil ("Weil") is, and at all relevant times was, a citizen of an unknown country and the Chairman and CEO of UBS AG's Global Wealth Management & Business Banking Division, who conducted business in the U.S., and within the County of Orange, California.

13.     Plaintiff is informed and believes and thereon alleges that Defendant Christian Bovay ("Bovay") is, and at all relevant times was, a citizen of Switzerland and a Director of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

14.     Plaintiff is informed and believes and thereon alleges that Defendant Gilbert Benz ("Benz") is, and at all relevant times was, a citizen of an unknown country and a director, officer, or employee of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

15.     Plaintiff is informed and believes and thereon alleges that Defendant Roger Hartmann ("Hartmann") is, and at all relevant times was, a citizen of an unknown county and the Executive Director of UBS AG Private Banking, and who conducted business in the U.S., and within the County of Orange, California.

16.     Plaintiff is informed and believes and thereon alleges that Defendant Jacques Beuchat ("Beuchat") is, and at all relevant times was, a citizen of Switzerland, residing in the City of Geneva, Switzerland and a director, officer, or employee of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

17.     Plaintiff is informed and believes and thereon alleges that Defendant Peter Kurer ("Kurer") is, and all relevant times was, a director, officer, employee and general counsel of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

18.     Plaintiff is informed and believes and thereon alleges that Defendant Rene Marty ("Marty") is, and all relevant times was, a director, officer, or employee of UBS AG, and who conducted business in the U.S., and within the County of Orange, California.

19.     Defendants UBS AG, Birkenfeld, Guignard, Liechti, Weil, Bovay, Benz, Hartmann, Beuchat, Kurer, and Marty are hereinafter referred to collectively as the "UBS Defendants."

20.     Plaintiff is informed and believes and thereon alleges that Defendant Neue Bank AG ("Neue Bank") is, and at all relevant times were, a foreign entity located in the country of Liechtenstein and was conducting business within the U.S., including the County of Orange, California.

21.     Plaintiff is informed and believes and thereon alleges that Defendant Georg Vogt ("Vogt") is, and at all relevant times was, an individual residing in the country of Liechtenstein, the Chairman of Neue Bank and was conducting business within the U.S., including the County of Orange, California.

22.     Plaintiff is informed and believes and thereon alleges that Defendant Hermann Wille ("H. Wille") is, and at all relevant times was, an individual residing in the country of Liechtenstein, the Vice-Chairman of Neue Bank who conducted business in the U.S., and within the County of Orange, California.

- 7 -

23.     Plaintiff is informed and believes and thereon alleges that Defendant Paul Buchel ("Buchel") is, and at all relevant times was, an individual residing in the country of Liechtenstein, an Account Executive for Neue Bank who conducted business in the U.S., and within the County of Orange, California.

24.     Plaintiff is informed and believes and thereon alleges that Defendant Jost Pilgrim ("Pilgrim") is, and at all relevant times was, an individual residing in the country of Liechtenstein, a Director for Neue Bank and conducted business in the U.S., and within the County of Orange, California.

25.     Plaintiff is informed and believes and thereon alleges that Defendant Willi Wolfinger ("Wolfinger") is, and at all relevant times was, an individual residing in the country of Liechtenstein, an officer, director, or manager of Neue Bank who conducted business in the U.S., and within the County of Orange, California.

26.     Plaintiff is informed and believes and thereon alleges that Defendant Dr. Stephan Laternser ("Laternser") is, and at all relevant times was, an individual residing in the country of Liechtenstein, an officer, director, or manager of Neue Bank who conducted business in the U.S., and within the County of Orange, California.

27.     Plaintiff is informed and believes and thereon alleges that Defendant Arnold Wille ("A. Wille") is, and at all relevant times was, an individual residing in the country of Liechtenstein, and officer, director, or manager of Neue Bank who conducted business in the U.S., and within the County of Orange, California.

28.     Defendants Neue Bank AG, Vogt, H. Wille, Buchel, Pilgrim, Wolfinger, Laternser, A. Wille, and Birkenfeld are hereinafter referred to collectively as the "Neue Bank Defendants."

29.     Plaintiff is informed and believes and thereon alleges that Defendant New Haven Trust Company Limited ("New Haven Trust") is, and at all relevant times was, a foreign entity located in the country of Liechtenstein and conducted business with customers in the United States, including the County of Orange, California.

30.     Plaintiff is informed and believes and thereon alleges that Defendant Mario Staggl ("Staggl") is, and at all relevant times was, an individual residing in the country of Liechtenstein, an officer, director, chairman or trustee of New Haven Trust and conducted business in the U.S., including the County of Orange, California.

31.     Plaintiff is informed and believes and thereon alleges that Defendant Dr. Jur. Klaus Biedermann ("Biedermann") is, and at all relevant times was, an individual residing in the country of Liechtenstein, an officer, director, chairman or trustee of New Haven Trust and conducted business in the U.S., including the County of Orange, California and Palm Beach County, Florida, and Vaduz, Liechtenstein.

32.     Plaintiff is informed and believes and thereon alleges that Defendant Scott Macaw ("Macaw") is, and at all relevant times was, an individual residing in Copenhagen, Denmark, an officer, director, chairman or trustee and shareholder of New Haven Trust-Denmark, a related company of New Haven-Liechtenstein, and conducted business in the U.S., including the County of Orange, California, and Copenhagen, Denmark.

33.     Plaintiff is informed and believes and thereon alleges that Defendant Neil Smith ("Smith") is, and at all relevant times was, an individual residing in Copenhagen, Denmark, an officer, director, or manager of New Haven Trust and conducted business in the U.S., including the County of Orange, California, and Copenhagen, Denmark.

34.     Defendants New Haven Trust, Staggl, Biedermann, Macaw, Smith and Birkenfeld are hereinafter referred to collectively as the "New Haven Trust Defendants."

35.     Plaintiff is informed and believes and thereon alleges that Defendant Union Charter, Ltd. is, and at all relevant times was, a foreign entity located in Miami, Florida and the country of Switzerland and conducted business with customers in the U.S., including the County of Orange, California.

**THIRD AMENDED COMPLAINT**

36.     Plaintiff is informed and believes and thereon alleges that Defendant David A. Schwedel ("Schwedel") is, and at all relevant times was, an individual residing in Miami, Florida, and is, and was, a partner and Chairman of Union Charter, Ltd., and Director of Synthesis Energy Systems, Inc. and conducted business in the U.S., including the County of Orange, California, Coral Gables, Florida, and Geneva, Switzerland.

37.     Defendants Union Charter, Ltd., Schwedel, and Birkenfeld are hereinafter referred to collectively as the "Union Charter Defendants."

38.     Plaintiff is informed and believes and thereon alleges that Defendant Synthesis Energy Systems, Inc. ("SES") is currently, a publicly traded corporation located in Houston, Texas and conducting business throughout the U.S. and internationally.

39.     Plaintiff is informed and believes and thereon alleges that Defendant Michael Storey ("Storey") is, and at all relevant times was, an individual residing in Miami, Florida, and is, and was, a director and partner of Union Charter, Ltd. and a director of SES.

40.     Plaintiff is informed and believes and thereon alleges that Defendant Timothy Vail ("Vail") is, and at all relevant times was, an individual residing in Houston, Texas, and is, and was, the President, Chief Executive Office and a Director of SES.

41.     Plaintiff is informed and believes and thereon alleges that Defendant David Eichinger ("Eichinger") is, and at all relevant times was, an individual residing in the State of Texas and is, and was, the Chief Financial Officer and Senior Vice President of Corporate Development of SES.

42.     Defendants SES, Storey, Vail, Schwedel, and Eichinger are hereinafter referred to collectively as "the SES Defendants."

43.     Plaintiff is informed and believes and thereon alleges that Defendant James Alexander Michie ("Michie") is, and at all relevant times was, an individual

**THIRD AMENDED COMPLAINT**

residing in Vancouver, Canada, and is, and was, the Managing Director of GM Capital Partners, Ltd. doing business in Canada, the United States, and Switzerland.

44. Plaintiff is informed and believes and thereon alleges that Defendant GM Capital Partners, Ltd. ("GM Capital") is, and at all relevant times was, a Vancouver, Canada business doing business in Canada, the United States and Switzerland.

45. Plaintiff is informed and believes and thereon alleges that Defendant Robert Knight ("Knight") is, and at all relevant times was, an individual residing in the province of Vancouver, Canada, and is, and was, the Managing Director of Knight Financial, Ltd. and doing business in Canada and the United States.

46. Plaintiff is informed and believes and thereon alleges that Defendant Knight Financial, Ltd. ("Knight Financial") is, and at all relevant times was, a Vancouver, Canada business, doing business in Canada and holding an office in Bellingham, Washington and also serving as President of various shell investment companies, including Navitrak Int'l and Vectr Systems.

47. Plaintiff is informed and believes and thereon alleges that Defendant Marc Angst ("Angst") is, and at all relevant times was, an individual residing in Geneva, Switzerland and is, and was, the Managing Director of GESTRUST SA, a Swiss Trust and Fiduciary Company based in Geneva, Switzerland.

48. Plaintiff is informed and believes and thereon alleges that Defendant GESTRUST SA ("GESTRUST") is, and at all relevant times was, a Swiss business entity doing business in Switzerland, Canada and the United States.

49. Plaintiff is informed and believes and thereon alleges that Defendant Martin Hochschorner ("Hochschorner") is, and at all relevant times was, an individual residing in Zurich, Switzerland, and is, and was, the Managing Director of the European office for GM Capital.

50. Plaintiff is informed and believes and thereon alleges that Defendant Jason Sundar ("Sundar") is, and at all relevant times was, an individual residing in the

**THIRD AMENDED COMPLAINT**

1 | province of Vancouver, Canada, and is, and was, the Managing Director of GM Capital

2 | Partners, Ltd.

3 |     51.    Plaintiff is informed and believes and thereon alleges that Defendant

4 | Herb Lustig ("Lustig") is, and at all relevant times was, an individual residing in the

5 | Virginia, and is, and was, the President of shell company Vectr Systems.

6 |     52.    Defendants Michie, GM Capital, Knight, Knight Financial, Angst,

7 | GESTRUST, Hochschorner, Sundar, Lustig, and Birkenfeld are herein sometimes

8 | collectively referred to as the "Michie Defendants."

9 |     53.    Plaintiff is unaware of the true names, capacities, or basis for liability

10 | of defendants DOES 1 through 10, inclusive, and therefore sues said defendants by their

11 | fictitious names.  Plaintiff will amend this complaint to allege their true names,

12 | capacities, or basis for liability when the same has been ascertained. Plaintiff is informed

13 | and believes and thereon alleges that defendants, DOES 1 through 10, inclusive, and

14 | each of them, are in some manner liable to plaintiff.  Plaintiff is entitled to name DOE

15 | defendants pending discovery to identify additional defendants connected with the

16 | already-identified corporation defendants.  (*Johnson v. City of Erie, Pennsylvania*, 834

17 | F. Supp. 873 (W.D.Pa.1993) and *Wilkins v. Bittenbender*, 2006 WL 860140.)  Indeed,

18 | diversity jurisdiction is already established based on the residences of already-identified

19 | defendants, hereinabove, and as set forth herein below.  Moreover, federal question

20 | jurisdiction exists as more fully detailed in Paragraph 3, *supra*.

21 | **FACTUAL STATEMENT**

22 |     54.    Olenicoff is a successful businessman who had achieved the

23 | American dream.  He went from being a college graduate in 1964 to running a multi-

24 | million dollar real estate development company in the course of less than 20 years.

25 | When the commercial real estate market declined in the late 1980s and early 1990s,

26 | Olenicoff was fortunate to have made wise investments and be one of the few to escape

27 | the savings and loan-related banking crisis.  He knew it was time to carefully preserve a

28 |

1  certain amount of his and his company's cash surplus by setting it aside in safe
2  institutions for posterity.

3       55.   Olenicoff was content with the assets he and his company had
4  amassed over his successful career and only sought to protect their value while
5  achieving very conservative growth.  He caused Olen Properties' profits to be placed in
6  several bank accounts, some in countries outside the U.S. due to Olenicoff's concern
7  over the U.S. banking instability of the time.  Olenicoff's objective was to earn a
8  conservative and absolutely safe 2% to 3% interest return on this money, after taxes.  All
9  told, the offshore bank deposits made at Barclays Bank were approximately $100
10 million dollars of U.S.-based earnings, all of which were fully declared and accounted
11 for with all U.S. taxes paid on these funds.  There were also U.S. and foreign-based
12 stock brokerage accounts with Smith Barney, comprised of U.S. earnings which were
13 fully tax-paid funds.

14      56.   In or around 1999, Olenicoff became acquainted with Defendant
15 Birkenfeld, who was an executive of Barclays Bank.  Birkenfeld, through unauthorized
16 means, and in violation of Barclays' strict employment conduct guidelines, took it upon
17 himself to copy and familiarize himself with Olenicoff's account balances held at
18 Barclays Bank.  Once armed with this information, Birkenfeld set out to befriend
19 Olenicoff for personal gain since he was not Olenicoff's banker at Barclays Bank.  To
20 develop this lucrative friendship, with the intention of luring the Olen accounts
21 elsewhere, Birkenfeld contacted Olenicoff, stating that he wanted to share with
22 Olenicoff certain inside information regarding his employer, Barclays Bank.  Further, he
23 claimed the inside information, unless heeded, would materially impact the safety of the
24 Olen accounts at Barclays Bank.  Birkenfeld's statement naturally concerned Olenicoff
25 and he agreed to meet with Birkenfeld, who offered to fly to California.  At the meeting
26 in the Olen Properties Orange County, California office, Birkenfeld told Olenicoff that a
27 divestiture transaction had been agreed to whereby Barclays Bank would sell its offshore
28 business to a newly created and inexperienced banking enterprise.  Birkenfeld cautioned

- 13 -

Olenicoff to be wary of leaving the Olen accounts at Barclays once the sale was completed.   In retrospect, Birkenfeld's description of the divestiture and acquiring management was false and aimed solely to alarm Olenicoff.   Birkenfeld's purported "inside information disclosure" was nothing more than an attempt to alarm Olenicoff and gain his trust, in clear violation of his employer's regulations against contacting customers which were not his and disclosing such confidential company information. Birkenfeld then offered to advise Olenicoff about the progress of this contemplated sale and to assist him when the time was appropriate.   Unknown to Olenicoff until within the last twelve months, at the time Birkenfeld made his representations, he had already made plans to leave Barclays Bank and join UBS AG.   Further unknown to Olenicoff, the UBS Defendants were conspiring with Birkenfeld regarding this approach toward Barclays Bank's clients, including Olenicoff.   Birkenfeld's befriending of Olenicoff and possibly other Barclays Bank customers was simply a means of lining up future customers for his new position at UBS AG and to bolster his compensation package and worth to UBS AG.

57.   In early 2001, Birkenfeld contacted Olenicoff and told him that the time had come to consider transferring his money to another institution and specifically suggested that the safest institution would be UBS AG.   By then, Olenicoff had confirmed through public information that Barclays Bank was indeed selling its branch where Olenicoff conducted his banking. Birkenfeld introduced Olenicoff to Defendant Christian Bovay, a director, private banker, and executive of UBS AG, at UBS AG's Geneva offices and also in the U.S. for purposes of establishing a relationship with Olenicoff at UBS AG.

58.   Unbeknownst to Olenicoff, at the time of Olenicoff's introduction to Bovay, Birkenfeld had already reached an employment and compensation agreement with UBS AG based in large part upon his ability to bring accounts from Barclays Bank to UBS AG and, specifically, the Olenicoff account.   While still employed at Barclays Bank, Birkenfeld pushed to have Olenicoff transfer the Olen funds to UBS AG, all under

the guise that he was Olenicoff's trusted advisor and friend and looking out for him because Barclays certainly was not, having failed to inform him of the pending divestiture to a new and inexperienced banking enterprise.

59.   Further unknown to Olenicoff, an illegal plan had been hatched by one of the largest banking and investment firms, UBS AG, to target wealthy U.S. investors at any cost or potential criminal prosecution of the investors.

60.   For years leading up to January 2001, the United States Treasury Department was tired of losing billions of dollars in taxes which it believed were owed by U.S. citizens from their overseas investments. The U.S. Treasury believed that taxes were not being paid because there was no way to track the assets and/or the profits made on such assets. So, the U.S. Treasury advised foreign banks, such as UBS AG and others, that if they wanted to continue to conduct business in the U.S. and with U.S. citizens, they would be required to enter into what became known as the Qualified Intermediary ("QI") Agreement.

61.   Under the QI Agreement, the UBS AG Defendants agreed to have their customers fill out IRS Forms W-8BEN or W-9, both of which required the beneficial owner of a bank account in their institution to be identified on the form if they believed or knew that person to be a U.S. citizen or resident. This procedure would ensure tracking of each U.S. citizens' "off-shore" investments for audit and taxation purposes. But there was more to the agreement. If a client of U.S. origin was deemed to have refused to be identified under the QI Agreement, UBS AG agreed to withhold and pay over to the U.S. Treasury a twenty-eight percent (28%) withholding tax on U.S. source payments and then bar the client from holding U.S. investments. Additionally, the sales proceeds, interest and dividends earned on non-U.S. investments, if the purchase or sale of the investment was made as a result of contact (in person, via email, telephone or facsimile) with a U.S. client in the U.S., they were subject to the Bank issuing IRS Form 1099 reporting requirements or twenty-eight percent (28%) withholding.

**THIRD AMENDED COMPLAINT**

62.    Obviously, compliance with the QI requirements by UBS AG would result in elimination of account secrecy, require taxation of its U.S. based customers and result in a significant reduction in the investment returns for its U.S. clients.  Without being able to offer greater returns on investment, U.S. clients would invest in U.S. based banks and would thereby have significantly reduced the attraction of wealthy individuals to UBS AG's investment management services.  Furthermore, this would cause UBS AG to suffer a tremendous blow to its bottom line as well as a blow to the compensation to its executives and directors in that UBS AG is a publicly traded company relying on growth and positive results.  UBS AG would not be so easily controlled by the U.S. Treasury Department's demands.  UBS AG's executives and legal counsel, specifically the UBS Defendants, devised an intricate scheme involving the executives within UBS AG's walls as well as outside people and professional service companies to unlawfully avoid the terms and reporting requirements of the QI Agreement, which placed its unsuspecting U.S. clients, including Olenicoff, in the cross-hairs of a criminal investigation.

63.    UBS AG made a company-wide statement to its wealth management executives that it was committed to providing absolutely secret private banking services to U.S. citizens notwithstanding the QI Agreement.  The message that the private wealth management executives were directed to, and did, deliver to their U.S. clients, including Olenicoff, was that they would continue to enjoy their privacy and secrecy the Swiss bank had promoted because it was assured by Swiss Law.  The UBS AG Defendants, its Board of Directors and management, including Defendants Guignard, Liechti, Weil, Bovay, Benz, Hartmann, Beuchat, Kurer, and Marty, established written policies and guidelines to effectuate their dubious scheme in an effort to gain additional U.S. clients and investments under the fraudulent promise of lawful tax planning strategies.

64.    Unbeknownst to their U.S. clients, including Olenicoff, UBS AG's actions and promises were not lawful as the UBS Defendants had presented them to be.  Due to UBS AG's sheer size, purported expertise and respectable worldwide position,

however, they were able to manipulate their clients, including Olenicoff, by their sales pitch regarding the legality of their program. Their scheme and promises were the direct result of greed in that UBS AG managed approximately $20 billion worth of assets for U.S. citizens, earning approximately $200 million per year for UBS AG. The UBS AG Defendants were eager to grow this business and revenue stream from wealthy U.S. citizens at any expense, including through unlawful and fraudulent means and methods which knowingly damaged its clients, including Olenicoff.

65.     Beginning in 2001 and continuing for the next several years, the UBS AG Defendants, including, but not limited to, Weil, Guignard, Bovay, Liechti, Beuchat, Kurer, and Marty directly authorized, encouraged and instructed Birkenfeld and their other wealth management executives to regularly travel to the U.S. to solicit new clients while conducting banking for existing U.S. clients. Moreover, UBS AG sponsored formal dinners and seminars, visiting art shows, sailing regattas, and other such events to facilitate contact with wealthy citizens and instruct them in means for transferring assets undetected by U.S. Taxing Authorities. The UBS AG Defendants trained its executive bankers in techniques to avoid questioning by U.S. law enforcement by falsely stating their purpose of travel to be recreational rather than business on U.S. Customs entry forms. Additionally, executives were instructed not to be tracked by authorities while in the U.S. and on how to conceal and transfer clients' account funds and assets overseas without detection. The UBS AG Defendants also trained its wealth management executives in how to present to, and swindle, prospective and existing clients into believing that UBS AG's careful advice and account handling was legal and within IRS regulations. UBS AG management, Board of Directors and others, including Defendants Guignard, Liechti, Weil, Bovay, Benz, Hartmann, Beuchat, Kurer, and Marty were aware of, encouraged, directed, authorized and commanded that UBS AG employees, including Birkenfeld, execute their fraudulent and unlawful scheme against U.S. citizens, including Olenicoff. In fact, Defendant Birkenfeld has testified that the UBS

AG Defendants' scheme and effort was the most extensive he had observed in his 12 years working in the Swiss private banking industry.

66.    Further, the UBS AG Defendants knew that their executives and agents were not properly licensed to provide banking services, offer tax and investment advice, manage funds and/or solicit the purchase or sale of securities to U.S. citizens and that its actions in soliciting and servicing U.S. clients, including Plaintiff, were in violation of 15 U.S.C. §§ 78o(a) and 80b-3(a)[1] and California Corp. Code §25004(a)(4). UBS's foreign employees appear to have deliberately defied their obligations to register with the federal and state regulators and/or become a member of FINRA, as required under federal law because they recognized that such registration would subject UBS and such employees to detailed record-keeping, examination, and reporting requirements, something that would prove problematic for UBS if it wanted to avoid disclosing its clients' identities to the Internal Revenue Service; the same reporting that UBS specifically instructed Olenicoff he was exempt from complying with under their investment model. While engaging in the secret brokerage and investment advisory services, UBS continued to feign compliance with the IRS QI Agreement, but failed to disclose this illegal activity to Plaintiffs or any of its clients. This, as described below, constituted a material omission in violation of the federal securities anti-fraud statute.

67.    Indeed, in or around November 6, 2008, the DOJ filed an indictment against UBS AG Chief Executive Officer Raoul Weil for his active role in the above-described activities.  The indictment further identifies a multitude of involved, but yet-to-be-named executives, managers, "desk heads," and bankers and corroborates Plaintiffs' allegations.  The indictment further notes that these personnel maintained positions on committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business.  It further notes that the reporting chain traveled from the bankers to the desk heads to the managers to the executives,

---

[1] Secs. 15(a) of the Securities Exchange Act of 1934 and 203(a) of the Investment Advisers Act of 1940.

**THIRD AMENDED COMPLAINT**

including Defendant Weil. Notwithstanding the anonymous code terms used by the DOJ, Defendants Guignard, Liechti, Bovay, Benz, Hartmann, Beuchat, Kurer, and Marty each served in the functions of executive, manager, and/or desk head as described by the DOJ in the indictment in their management and handling of Plaintiffs' assets.

**The Scheme to Defraud Olenicoff**

68.     As previously stated, in or around June 2001, Olenicoff was greeted in Geneva, Switzerland by the UBS AG Defendants, and in particular Birkenfeld, Guignard, Bovay, Beuchat, Marty and Hartmann.  The UBS AG Defendants' presentation in large part boasted about their expertise in Swiss banking, U.S. tax laws and the extensive relationship and "full understanding" UBS AG had with the IRS regarding their clients' U.S. income reporting requirements. Each of these UBS AG Defendants stressed that UBS AG was fully staffed with licensed and fully knowledgeable tax and legal professionals worldwide, who would, as part of UBS AG's annual private banking fees, provide estate planning and lawful tax savings advice. Conversely, during their conversations with Olenicoff, these UBS AG Defendants intentionally never mentioned anything about the QI Agreement they had recently signed with the Department of the Treasury and the tax reporting requirements therein. The UBS AG Defendants further stressed to Olenicoff that keeping the stock and bond investments with a U.S.-based firm was detrimental to Olenicoff's "posterity money" and that UBS AG would put him on the correct path with these investments as well as the cash investments that were already on deposit  at UBS AG.  Further, the privacy pitch associated with a UBS AG, Swiss-based account appealed to Olenicoff who was disinterested in the notoriety his net worth was beginning to bring him.  Indeed, during his visit, Guignard, Hartmann, Bovay, Beuchat, Marty and Birkenfeld assured Olenicoff that UBS AG was the best and most knowledgeable institution in the world to handle his estate and tax planning in a completely private and lawful manner.

69.     The pitch delivered to Olenicoff, as devised and presented by these UBS AG Defendants during this June 2001 meeting was:   "If you give us full

**THIRD AMENDED COMPLAINT**

unconditional and discretionary authority over your cash and securities accounts, with an annual management fee paid to UBS AG, we will invest them in non-U.S.-based interests and furthermore create non-U.S. entities or trusts that would hold title to the accounts as the beneficiaries. They each informed Olenicoff that, "we will prepare and provide the necessary corporate and trust entities, officers and directors, and advise you of any tax reporting requirements."

70.   Olenicoff was persuaded by the sheer global size, UBS AG's presence, stated expertise and expressed promises relative to estate planning, investment returns and lawful tax savings that would result, and agreed to additionally transfer his U.S.-based securities portfolio to UBS AG.  The UBS AG Defendants prepared the necessary account documentation and completed the transfer.  In or around July 2001, once the Olen Properties funds were transferred, the monthly reporting began with Birkenfeld, Beuchat, Bovay, and Marty promising that their management of the Olen account's cash and stock portfolio was producing terrific results.

71.   For Olenicoff, the asset management was more than just about promised returns and tax savings. It was also about the fees that UBS AG would charge for their services. Upon hearing this, the UBS AG Defendants promised and agreed to a "transparent system" where only one agreed upon fee was to be charged on the portfolio. It was agreed that UBS AG would never charge Olenicoff for the purchase or sale of securities, never charge for a transaction of securities to or from UBS AG-owned inventory, and that all purchases and sale tickets would be provided with the monthly statements.  As Olenicoff would later discover, neither Birkenfeld, UBS AG, nor any UBS AG Defendant had the proper licensure to trade the securities in his portfolio and the UBS AG Defendants never intended to follow through on their promises.

72.   Upon transferring the portfolio in or around July 2001, Olenicoff emphasized and received promises by Birkenfeld, Guignard, Beuchat, Bovay and Marty that the investments were to remain in absolutely safe, prudent investments limited to publicly traded securities, which were to be conservative, low-risk liquid equities and

**THIRD AMENDED COMPLAINT**

AA debt investment or better and in bank-issued fixed-income instruments.  Olenicoff received the assurances of the UBS AG Defendants that they understood that capital preservation was the primary objective for their investment criteria, as he intended to pass the assets onto future generations and to charity.  During these conversations, the UBS AG Defendants assured him that they would follow Olenicoff's investment parameters and it was then that they suggested they had the expertise and would direct the process by which these funds could be directed to future generations and charities pursuant to his wishes.  Specifically, they suggested that they had the necessary professional contacts in Liechtenstein to accomplish this and that Liechtenstein was the best venue in which to accomplish Olenicoff's privacy goals, in a lawful manner.

73.    With over $200 million in hand, and with full discretion to invest said funds, UBS AG began to implement its plan against Olenicoff.  By July 2001, after completing the asset transfers, the UBS AG Defendants continued their scheme by following the firm-wide practice of sending Olenicoff authorizations for creation of various companies and trusts in Liechtenstein and Denmark, using New Haven Trust as a vehicle for improving the privacy, purported legal U.S. tax deferment, and estate planning for Olenicoff.  Under UBS AG's direction, with its authority, and as part of the scheme to convince Olenicoff that they were setting his accounts up in approved, lawful structures, in or around October 2001, Birkenfeld introduced Olenicoff to Mario Staggl and Dr. Jur. Klaus Biedermann who represented New Haven Trust and worked in concert with Neue Bank, all entities and persons which would come into play as the UBS AG Defendants set up the illicit account structure.

74.    Still in 2001, New Haven was pitched to Olenicoff by the UBS AG Defendants, namely Birkenfeld, Bovay, and Beuchat, as the entity that would represent Olenicoff's investment interests in the "investment vehicles" at both UBS AG and Neue Bank.  As part of the scheme, Staggl and Klaus Biedermann required Olenicoff's full authorization to allow them to handle the intricacies of the investments to be handled by New Haven on his behalf by making them signatories on the accounts and/or officers of

- 21 -

**THIRD AMENDED COMPLAINT**

the new entities.  In or around January 23, 2002, both Staggl and Biedermann exercised powers appointing others, including Macaw, with powers and directives related to setting up shell companies, which further placed Staggl, Biedermann, and SES defendant Storey in one instance, as paid directors of said shell companies.

75.    On or about April 25, 2002, Staggl, in connection with Birkenfeld and UBS AG, provided a tax letter from Shelton Tax regarding the viability and legality of the proposed investment plans regarding Olenicoff's assets.  This included an acknowledgment that the investment was to be held in long-term, secure vehicles, as opposed to high-yield vehicles.

76.    Shortly thereafter, documents were sent to Olenicoff at his California and Florida offices with instructions for him to sign forms to create new entities.  But what Olenicoff did not know was that Neue Bank and New Haven Trust were not "investment vehicles."  They were part of a meticulous plan concocted by the UBS AG Defendants and involving Neue Bank and New Haven Trust Defendants to breach the QI Agreement in a manner to keep Olenicoff, and thousands of others in the dark regarding the true tax requirements related to the investments.  As with the UBS AG Defendants, and unknown to Olenicoff, the Neue Bank Defendants and the New Haven Trust Defendants were not licensed to provide banking services, offer investment advice or solicit the purchase or sale of securities through contact with U.S. citizens.  Under Swiss Law, the UBS AG Defendants were fully aware, or were required to be aware, that the Neue Bank Defendants and the New Haven Trust Defendants were not properly licensed.

77.    As it turned out, between 2001 and 2007, UBS and Neue Bank were both holding Plaintiffs' assets and trading securities illegally.  UBS traded in primarily foreign securities, with lesser holdings in US securities, in the UBS-managed portfolio.  UBS would either send monthly statements to Plaintiffs at their Orange County, California location or Birkenfeld would hand-deliver them during one of his many regular visits to Plaintiffs in California.  Similarly, between 2001 and 2007, Birkenfeld,

Staggl and Biedermann were jointly directing transactions with the Neue Bank Defendants to trade all types of securities, including frequently U.S. stocks. The Neue Bank Defendants had full knowledge that they were managing Plaintiffs' portfolio due to the laws in Liechtenstein, which required bankers to know the beneficiary of any trust as well as their in person meetings with Mr. Olenicoff.

78.   For the next year, Olenicoff enjoyed the peace of mind he had been sold that the posterity investments were safe and sound in the capable hands of UBS AG, Birkenfeld, Beuchat, Hartmann, and Staggl and the New Haven Defendants and Neue Bank Defendants. Olenicoff was routinely assured by these Defendants that all of these defendant entities and individuals were in constant communication pertaining to the management of the Olen accounts.

79.   Starting out with Plaintiffs' assets held in general accounts, UBS AG and Neue Bank regularly traded securities on behalf of Plaintiffs. In each instance, said Defendants misrepresented their proper licensure to make each transaction legally prior to and at the time of each transaction. Because their employees were not properly licensed, each of these transactions was improper at the time of transacting and in violation of U.S. Securities Regulations as well as California state statutes. Additionally, both UBS AG, between 2001 and 2005, and Neue Bank, between 2001 and 2008, consistently and regularly sent statements to Plaintiffs at their Orange County, California location and at times delivered these statements personally to Orange County by their agents. The volume of said transactions and statements would be burdensome for the purposes of this complaint. Accordingly, the following is a sample of the securities purchased and corresponding statements sent for the purposes of adequately pleading specific conduct:

> a.   UBS AG sent a statement from Switzerland on July 30, 2002 via facsimile to Plaintiffs in Orange County, California at 5:48 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:  2,300 shares

**THIRD AMENDED COMPLAINT**

of UBS (CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV- USA Value; 7,000 shares of UBS (LUX) Equity Fund-Technology; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

b. UBS AG sent a statement from Switzerland on  March 5, 2003 via facsimile to Plaintiffs in Orange County, California at 6:34 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 17 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, Nokia, Carrefour, St Microelectronics, 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

c. UBS AG sent a statement from Switzerland on  July 9, 2003 via facsimile to Plaintiffs in Orange County, California at 4:52 p.m. (CET) detailing the account status and showing holdings and dividends in numerous stocks, including 19.22 per cent holdings in U.S. stocks and funds, and including, but not limited to: Daimler Chrysler, BNP Paribas, and Veolia Environmental; 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

d. UBS AG sent a statement from Switzerland on August 5, 2003 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:   130,000

THIRD AMENDED COMPLAINT

shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

e. UBS AG sent a statement from Switzerland on January 13, 2004 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 22.58% holdings in U.S. stocks and funds: 130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

f. Neue Bank sent a Statement of Assets on March 26, 2002 from Liechtenstein to Orange County, California via facsimile at 11:04 a.m. (CET) detailing purchases of U.S. stocks including:

1. 1,000,000 shares of Lehman Brothers at $103.813 per share
2. 2,000,000 shares of Freddie Mac at $103.656 per share
3. 1,000,000 shares of Unilever at $104.896 per share
4. 1,000,000 shares of Countrywide Home Loans at $101.962 per share
5. 2,000,000 shares of MBNA Master Credit Card Trust II Class 1 at $100.487 per share
6. 1,000,000 shares of Vodafone Airtouch at $106.183 per share
7. 1,000,000 shares of Ford Motor Credit Co. at $103.777 per share
8. 2,000,000 shares of American Express Credit Card at $101.548 per share
9. 1,000,000 shares of American Express Co. at $101.642 per share

**THIRD AMENDED COMPLAINT**

10. 1,000,000 shares of Bank of America Corp. at $99.201 per share

11. 1,000,000 shares of Wells Fargo & Co. global at $99.983 per share

12. 2,000,000 shares of Fannie Mae at $104.781 per share

13. 1,000,000 shares of AT&T Corp at $84 per share[2]

g. Neue Bank sent a Statement of Assets on May 31, 2002 from Liechtenstein to Orange County, California via facsimile at 5:27 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

h. Neue Bank sent Statement of Assets sent on September 25, 2002 from Liechtenstein to UBS AG in Geneva, Switzerland to be forwarded to Plaintiffs in Orange County, California via facsimile on October 2, 2002 at 4:33 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

i. November 30, 2007 Statement of Assets apparently faxed from Neue Bank to New Haven Trust on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

j. December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Orange County, California via facsimile at 5:58 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

---

[22] An additional 19 holdings are listed, including U.S. Treasury Notes; however, the foregoing list should suffice for purposes of this pleading.

**THIRD AMENDED COMPLAINT**

80.    As tax season approached in the U.S., in or around April 2002, and each year thereafter, the UBS AG Defendants, Neue Bank Defendants and the New Haven Trust Defendants delivered what appeared to Plaintiffs to be the seamless investment and tax services as promised.

81.    Importantly, throughout the relationship between the UBS AG Defendants and Olenicoff, the UBS Defendants, namely Birkenfeld and Bovay, repeatedly assured Olenicoff that the management scheme and structure of his investments had been reviewed by UBS AG attorneys and were authorized by and in compliance with U.S. reporting laws.

**Intentional Omissions and UBS AG's Duplicity**

82.    Unknown to Olenicoff, in or around April 2002, the UBS AG Defendants knowingly prepared false documentation and correspondence, with the assistance of the Neue Bank and New Haven Defendants advising Olenicoff to submit IRS Forms W-8BEN improperly and in violation of the IRS regulations and the QI Agreement the UBS AG Defendants had entered into with the U.S. Treasury. They also failed to prepare and deliver the QI agreed IRS Forms W-9 which would have identified Olenicoff as someone who either needed to pay taxes on offshore assets or UBS AG would withhold 28% of the Olen fund profits if Olenicoff had chosen and informed them not to 'declare' these accounts.

83.    However, Olenicoff is now informed and believes UBS AG knowingly operated under the illegal proposition that it was not required to deliver such a W-9 form or otherwise withhold 28% because the accounts were owned by non-U.S. entities, the very entities created by UBS AG through Staggl and New Haven Trust! Olenicoff had been connived into giving authority to agents of UBS affiliated with the Olen account "investment vehicles" so that they could set up "foreign" owners of these accounts all to avoid reporting and withholding so these firms could continue to enjoy

**THIRD AMENDED COMPLAINT**

the benefits of his $200-plus million portfolios, including, but not limited to, millions of dollars in yearly management fees.

84.     Meanwhile, each and every year, from 2002 through 2006, the same misrepresentations and omissions were being committed by the UBS AG Defendants, New Haven Trust Defendants and Neue Bank Defendants and, subsequently, the Union Charter, New Haven Trust, and Neue Bank Defendants from 2006 through 2007, until 2007 when the IRS approached Olenicoff regarding his tax liabilities on these investments. It was at that time that the elaborate scheme was revealed to Olenicoff and he uncovered the Defendants' secrets.

85.     Unknown to Olenicoff, in or around 2004, Birkenfeld was approached by the U.S. Department of Justice ("DOJ") which inquired into UBS AG's conduct with its U.S. clients and its apparent efforts to avoid compliance with the QI Agreement. Birkenfeld disclosed to the DOJ detailed information regarding the Olen accounts and UBS AG's entire scheme related to Olenicoff and other U.S. clients. Birkenfeld then became concerned that he and the UBS Defendants may be discovered by law enforcement authorities in connection with the position taken and schemes created by UBS AG relating to Olenicoff and other U.S. clients. So, he engaged a law firm specializing in employment disputes to represent and advise him regarding his connection to the UBS AG scheme. He further engaged a criminal defense firm in Washington D.C. to protect him from the potential actions against him by the DOJ. According to published newspaper reports, Birkenfeld wrote a letter to Peter Kurer, UBS AG's general counsel, explaining the illegal nature of UBS AG's scheme, which Kurer then shared with the executives of UBS AG, including defendants herein. Following the advice of his attorney, Birkenfeld resigned his position at UBS AG. However, shortly after leaving UBS AG, Birkenfeld sued the company for monies owed related to the scheme and the Olenicoff account fees collected by UBS AG owed to him under their fee-sharing agreement.

**THIRD AMENDED COMPLAINT**

86.   It has been revealed that Birkenfeld, while employed by UBS AG, applied to receive a "whistleblower" reward for providing details to the DOJ about UBS AG's scheme and statutory violations.  Indeed, Birkenfeld used Plaintiffs' information for personal gain in the following manner:  revealing confidential information to the IRS and Department of Justice in an effort to gain a reward for statutory violations which he helped orchestrate, conceal from UBS AG clients, including Olenicoff and eventually cause statutory violations subjecting said clients, including Plaintiffs, to penalties.

87.   In the midst of the overall UBS AG scheme in or around 2005 Birkenfeld, seeing a possible end to the realization of profits from the illegal investment structure UBS AG and he had set up for Olenicoff, seized the opportunity to blame UBS AG while potentially fashioning himself a whistleblower in order to avoid punishment and also to realize a financial gain in the form of the whistleblower reward for reporting the very scheme he had ensnared Olenicoff in.

88.   Eventually, Birkenfeld collected a monetary settlement from UBS AG claiming that UBS AG required him and others to continue the fraudulent business practices against not only Olenicoff, but up to 52,000 other customers and was, therefore, due a substantial amount of money to have participated with them in the illegal scheme.  In short, he wanted to be paid for committing an illegal fraud and UBS AG ultimately agreed and paid him a very substantial sum, essentially sharing their ill-gotten spoils.

89.   Leading up to this, and thereafter, Birkenfeld and other UBS AG Defendants, including, but not limited to, Guignard, Beuchat, Bovay and Marty, regularly met with Olenicoff, with Birkenfeld never mentioning his personal concerns, the illegality of UBS AG's scheme, his disclosures to the IRS/DOJ the UBS AG-Birkenfeld dispute, any problems related to the tax and investment advice, and/or the likelihood that Olenicoff would be subject to tax penalties, interest, and criminal investigation as a result of UBS AG's scheme, all the while continuing to manage Olenicoff's funds in accordance with the scheme set up by UBS AG.

THIRD AMENDED COMPLAINT

90.     By 2005, the IRS and the DOJ approached the UBS AG Defendants about their scheme.   In response to the U.S. investigation, the UBS AG Defendants "reported" Olenicoff to the IRS as a "tax evader," all the while knowing that Birkenfeld had already done so and, further, that he had sued UBS AG regarding the Olenicoff accounts.   Notwithstanding this "report," and in an effort to continue to generate fees from his account, the UBS Defendants *never* advised Olenicoff of their notification to the IRS and/or the likelihood that the IRS would likely deem him as not only owing taxes on the Olen investments, but also facing a criminal investigation for the management structure of his account set up by the UBS AG Defendants themselves by and through the New Haven and Neue Bank Defendants acting as agents for each other and UBS.   Instead, said Defendants continued to manage the accounts as they had done since the transfer of the accounts to UBS AG, continuing to enjoy the income from Olenicoff's assets, thereby milking the proverbial cow.

## ADMISSIONS BY UBS TO DATE

91.     As has been widely publicized over the past year, since the date of the initial filing of this Complaint on September 17, 2008, UBS has been engaged in a heated battle with the IRS and DOJ regarding UBS's intentional acts dating back to the QI Agreement in 2001 and continuing through 2009.   The following is a brief chronology of the events and admissions by UBS and/or its directors and officers:

      a. In November 2008, the U.S. filed an indictment against Weil further outlining Executives, Managers, Desk Heads, and Bankers as knowing participants in the scheme to defraud the IRS of taxes due by its customers.   Attached hereto as **Exhibit "A"** is a true and correct copy of the Weil Indictment;

      b. On February 18, 2009, UBS and the U.S. entered a Deferred Prosecution Agreement ("DPA") in which UBS admitted, among other things, that beginning in 2000 and continuing until 2007 it had "participated in a scheme to defraud the United States and its

- 30 -

agency, the IRS by actively assisting or otherwise facilitating a number of United States individual taxpayers in establishing accounts at UBS in a manner designed to conceal the United States taxpayers' ownership or beneficial interest in these accounts." Attached hereto as **Exhibit "B"** is a true and correct copy of said DPA, including Exhibit C to the DPA;

c. On or about February 18, 2009, UBS's acting Chairman, and former General Counsel during the 2000 – 2007 period, Peter Kurer publicly stated that "UBS sincerely regrets the compliance failures in its U.S. cross-border business that have been identified by the various government investigations in Switzerland and the U.S., as well as our own internal review. We accept full responsibility for these improper activities." Marcel Rohner, group chief executive of UBS AG added, "it is apparent that as an organization we made mistakes and that our control systems were inadequate." Attached hereto as **Exhibit "C"** is a true and correct copy of the NY Times article quoting Messrs. Kurer and Rohner;

d. On February 18, 2009 the Securities Exchange Commission ("SEC") filed a complaint against UBS for acting as an unregistered broker-dealer and investment adviser to thousands of U.S. cross-border clients. Attached hereto as **Exhibit "D"** is a true and correct copy of said complaint.

e. On February 19, 2009, the IRS filed a civil action against UBS to enforce a "John Doe" summons seeking names of UBS's U.S. customers. Attached hereto as **Exhibit "E"** are relevant portions of said summons;

f. On March 4, 2009, at a U.S. Senate Subcommittee hearing, UBS's Chief Financial Officer, Mark Branson, admitted UBS AG was

**THIRD AMENDED COMPLAINT**

intent on keeping wealthy investors with UBS while scheming to defraud the IRS of taxes. Attached hereto as **Exhibit "F"** is a true and correct copy of the relevant portion of the transcript of the Senate Hearing Dated March 4, 2009 re IRS Investigation of UBS, at 1:43:08; Indictment of Raoul Weil, Pp. 4-7, Par(s). 11-24);

g. Between April and July 2009, UBS and the DOJ, as well as U.S. and Swiss politicians, wrangled over the privacy/secrecy issues as trial approaches in July 2009;

h. On June 30, 2009, the IRS filed a Memorandum of Law in Support of Petition to Enforce "John Doe" Summons which details UBS's violations, its acknowledgment that it would be subject to U.S. jurisdiction and the scheme as provided in the instant Complaint. Attached hereto as **Exhibit "G"** is a true and correct copy of the relevant portions of said Memorandum;

i. On July 12, 2009, the U.S. District Court in Miami suspended the July 13, 2009 hearing on the Motion to Enforce for 30 days, anticipating a settlement between UBS and the IRS/DOJ;

j. On August 12, 2009, the U.S. and UBS reached an agreement in principle the terms of which include the revelation of approximately 4,450 UBS customer names.

Additionally, on or about July 29, 2009, it was revealed that documents exist to show that UBS tried to entice wealthy Latin Americans to use a program designed to result in tax evasion problems for these Latin Americans, some of whom were taxable in the U.S. The "Referral Program," cited to a "success model" showing $200 million to be moved to Switzerland, referring to Olenicoff's account.

Further, on August 21, 2009, Birkenfeld was sentenced to 40 months in prison for his participation in the scheme that cost the IRS billions in tax losses. Notably, this was

- 32 -

1   a reduction in the 60-month term he would have received had he not admitted to his
2   illegal conduct and given the DOJ information that corroborates the facts and charges
3   against UBS AG by the IRS, DOJ, as well as Plaintiffs in this complaint.

4   **The Scheme is Perpetuated Post-UBS AG**

5              92.   Notwithstanding all that had occurred between Birkenfeld, the DOJ,
6   and UBS AG, and with the full knowledge of the illegal nature of the off-shore structure
7   previously set up for Olenicoff, a plan was devised by Birkenfeld, the Neue Bank
8   Defendants, the New Haven Defendants, and the Union Charter Defendants, to continue
9   with the previous UBS AG scheme.

10             93.   Upon leaving UBS AG, in May 2005 Birkenfeld joined Union
11  Charter, a corporate finance entity with business offices in Miami, New York, and
12  Geneva.  At this time, SES Defendant Storey was serving as a director of Union Charter
13  and did so until approximately November 2005.  On or about June 12, 2005, Birkenfeld
14  and Staggl and Biedermann of New Haven Trust and a representative from Neue Bank
15  telephoned Olenicoff in his office in Orange County, California and convinced Olenicoff
16  to travel to Neue Bank, advising Olenicoff that pursuant to their Trustee position and
17  fiduciary responsibilities they were transferring all of his UBS AG assets to Neue Bank
18  to be managed in collaboration with Union Charter and New Haven Trust.  It was then
19  explained that because Olenicoff had granted them authority over the funds, his
20  concurrence was not required and that they were dealing with, and did deal with, the
21  UBS AG executives, including, but not limited to, Bovay, Guignard, Beuchat and Kurer,
22  in the transfer of assets to Neue Bank/New Haven Trust.  Birkenfeld, the UBS AG
23  Defendants, the Neue Bank Defendants and the New Haven Defendants never disclosed
24  the rift between Birkenfeld and UBS AG or the potential of criminal prosecution
25  resulting from the scheme established and perpetrated by Defendants that was well
26  known to each of them at the time.

27             94.   Olenicoff was given no reason for the transfer other than Birkenfeld's
28  unspecified need and wish to sever the UBS AG relationship at that point.  In fact, UBS

- 33 -

**THIRD AMENDED COMPLAINT**

AG, Neue Bank and New Haven Trust did not require Olenicoff's approval for this change since they had full discretionary use and control over the UBS AG accounts. Instead, they merely assured Olenicoff that all of the benefits of privacy and investment sophistication and safety would continue at Union Charter as had allegedly been the case for years under UBS AG's management.   Olenicoff agreed to the transfer of management to Union Charter based upon his trust and confidence in his financial manager, Birkenfeld. In hindsight, it is apparent that both the UBS AG and New Haven Defendants became concerned about what they had participated in creating with the UBS AG Defendants and that the elaborate scheme was about to unravel, specifically regarding the Olen account.

95.   Upon transferring all of the Plaintiffs' funds remaining at UBS to the Neue Bank, New Haven and Union Charter Defendants, Olenicoff was specifically informed and received confirmation at his offices in Orange County, California and Florida from the Neue Bank Defendants, the New Haven Trust Defendants and the Union Charter Defendants that these Defendants were now managing his assets under the same criteria and terms as UBS AG. Specifically, the assets were to remain in safe, readily liquid, prudent investments, in publicly traded securities which were to be conservative, low-risk liquid equities and AA debt investment or better and in fixed-income instruments. This was further represented to Olenicoff in a December 6, 2005 "Proposal for Investment Architecture" presented to Olenicoff by the Neue Bank Defendants, specifically Laternser, A.Wille, Buchel, and Vogt.   Included in the brochure is a page which states "9 Reasons for transferring assets to Liechtenstein: High degree of privacy and banking secrecy, Liberal corporate law that provides for a wide range of structuring possibilities, Low level of tax rates, Swiss franc currency area, Political, social and economical stability, High standard of service, Access to all international financial centres, Member of the European Economic Area (EEA)." The brochure included an additional marketing page entitled "Target portfolio" with bullet points reading: "Income generating portfolio on an opportunistic basis with absolute

- 34 -

return orientation, Taking special consideration that instruments must have a capital guarantee." These and other financial strategy documents were designed to gain Olenicoff's trust and to make him reasonably believe they had his best interests in mind. Moreover, Neue Bank acknowledged its continuing fiduciary duty to serve as more than just a depository. Indeed, throughout 2001 to 2005, Neue Bank provided investment statements that demonstrated funds and investments transferred fluidly between Neue Bank's Olen accounts and those provided by UBS AG. To clarify, both banks were sending information related to the stocks held in the Birkenfeld managed accounts, confirming Neue Bank was serving as a subsidiary of UBS AG, providing its information to UBS AG so that UBS AG could present Plaintiffs' holdings in one reporting by Birkenfeld to demonstrate the account management structure. As such, Neue Bank, at the direction and in concert with UBS Defendants, appeared to be investing on behalf of "foreign entities" for purpose of perpetuating UBS AG's scheme to avoid its obligations under the QI Agreement with the IRS and its scheme against its customers, including Plaintiffs.

96. Olenicoff advised Laternser, A. Wille, Vogt, and Buchel, at Neue Bank, Staggl, Macaw, and Biedermann, at New Haven Trust, and Birkenfeld and Schwedel, at Union Charter, that capital preservation was his primary goal, as he intended to pass the money onto future generations or to charity. These individuals at Neue Bank and New Haven Trust, on behalf of said entities, agreed to follow Olenicoff's investment direction. In fact, on or about April 14, 2005, Scott Macaw and Staggl even went so far as to expressly confirm that a New York tax firm had prepared a written opinion that the tax and investment schemes were proper. Neue Bank had already been managing Plaintiffs' assets since 2001 in concert with UBS and were already aware of their duties.

97. From approximately June 2005 through mid-2008, Birkenfeld, Staggl, the Neue Bank Defendants, the New Haven Trust Defendants, as then joined by Union Charter Defendants, continuously managed and transacted the assets and advised

**THIRD AMENDED COMPLAINT**

Olenicoff exactly as had been done under the original UBS AG scheme, thereby subjecting Olenicoff to further tax penalties and interest while engaging in self-dealing as described below.  Birkenfeld continued manipulating Olenicoff, keeping him in the dark about his impending tax problems while Olenicoff continued his focus on his primary income-producing real estate enterprise which was ever growing due to his expertise and successful reputation for high quality developments.   Even worse, however, Birkenfeld, Staggl and the Neue Bank, New Haven Trust, and Union Charter Defendants converted the Olen funds and made unauthorized investments earning themselves seven-figure fees in both commissions and salaries taken from shell companies set up with the Olen funds and which siphoned off the funds into worthless offshore companies.

98.   Within the last year, upon Olenicoff's attempt to liquidate the investments and move the Olen assets back to the U.S. and out of the control of the New Haven Trust, Neue Bank and the Union Charter Defendants, as a result of his settlement plea agreement on a criminal charge brought by the DOJ, he discovered that the investment portfolio was not, and from 2001 until that time had not been,  invested in safe, secure, prudent publicly traded securities which were to be conservative, low-risk liquid equities and AA debt investment, or better.  To the contrary, between 2001 and 2008, each and all of the Defendants, including UBS AG used the Olen account to invest in speculative securities, some of which were not even publicly traded.  On information and belief, this includes, but is not limited to, purchases of Mexoro Minerals, Ltd. on 11/9/07, Navitrak International Corporation (Restricted) on 7/19/06, Synova Healthcare Group, Inc. on 7/4/06, Vectr Systems, Inc. and Vectr Systems, Inc. (Restricted) on 5/24/06, and Teflomi on 6/7/06, which securities have subsequently become worthless.

99.   These worthless securities were called "pump and dumps" and, in addition to the aforementioned conspiratorial conduct of the UBS AG Defendants, Neue Bank Defendants, Union Charter Defendants and New Haven Trust Defendants, involved the additional orchestration of Michie, GM Capital, Knight, Knight Financial,

Angst, GESTRUST, Hochschorner, Sundar, and Lustig.   Between 2001 and 2008, Michie and Knight, using GM Capital and Knight Financial as storefronts, engaged in the scheme of taking penny stocks and pink sheet companies and "pumping" up their development and growth potential by fabricating office locations, development status, third-party financial support and viability.   This included fabricating websites with photos and technical information and setting up "dummy" offices to make the companies appear viable.   Angst served as the trustee and entity-developer related to these shell companies, created numerous offshore companies, and fabricated the legal documentation to allow Michie, GM Capital, Knight and Knight Financial to appear legitimate to the public.   Angst also took market-orders for these fabricated offshore companies.   Additionally, Hochschorner served as the European representative of GM Partners working closely with Michie in developing these shell companies and participating in the scheme to artificially inflate the values of these penny stock and pink sheet companies with the intent of selling off their own personal investment in these companies at a large profit.   Upon realizing such profit, the stock price would become worthless and the companies would eventually be worthless.

100.   As part of the "pump and dump" scheme, during the purchase time periods described above, Sundar would then engage in what was called the "Investor Awareness Campaign" by conducting mass-marketing spam emails through his own company Sundar Group.   These emails used false information designed to trick investors into investing their funds into these companies by showing promising historical growth and presenting a promising long-term future.   In truth, this "growth" was the result of manipulation by the Michie Defendants using their own money and that of UBS and Neue Bank customers, including Plaintiffs.

101.   Meanwhile, between 2001 and 2008, these defendants paid UBS bankers, including Birkenfeld and at least one other DOE banker to invest UBS customer assets in exchange for a "kickback" at the rate of 10 to 20%.   Said kickbacks were, and are, illegal in both Switzerland and Liechtenstein, and against the policy of

UBS AG. As a result, securities related to start-up companies and/or "pump and dumps", including, but not limited to, the aforementioned shell companies identified in Par. 94 on the dates indicated, above, were all sold to Plaintiffs and other third-party customers, including other UBS AG customers, without Plaintiffs' knowledge.

102. Both Knight and Lustig served as the "Presidents" of the shell companies, which include, but are not limited to, Navitrak Intl. and Vectr Systems. Their function was to assist in misleading the public with the feigned legitimacy of the company while the other co-conspirators performed their functions to increase the share price.

103. With all the pieces in place, Michie and Knight, and others, would place their own money into the stock and wait for the price to go up. Between Sundar's mass-marketing campaign and Birkenfeld and other UBS AG employees placing their unknowing clients' assets in these pink sheet stocks, the prices of these stocks would increase up to one thousand per cent and sometimes even more. When the price reached their goal price, Michie and Knight would sell all of their shares thereby causing the stock to plummet, or "dump." Michie and Knight would gain millions of dollars in profit and share the proceeds with their co-conspirators, including Angst, GESTRUST, Hochschorner, Sundar, and Lustig. On information and belief, this profit occurred with respect to Navitrak Intl, Mexoro Minerals, Vectr Systems, and Synova Healthcare.

104. Repeatedly, innocent third party customers would lose their holdings as the companies would become worthless. For UBS AG and Neue Bank customers, their portfolios would suffer losses. Ironically, UBS AG and Neue Bank would continue to profit from these transactions made on their customers' behalf, including to the detriment of Plaintiffs. As such, their own compliance departments failed to protect their customers, including Plaintiffs.

105. Regarding Plaintiffs, their assets never should have been placed into these stocks given the directives of only investing in conservative, low-risk liquid equities and AA debt investments, or better. Further, UBS AG and Neue Bank violated

**THIRD AMENDED COMPLAINT**

Swiss and Liechtenstein law by allowing transactions to take place at all because they had a due diligence duty to confirm that GM Capital and Knight were licensed entities, which they were not.  Accordingly, even if the stocks were not fabricated and manipulated, UBS AG and Neue Bank were not permitted to approve such purchases and their respective compliance departments were required to determine this prior to any sale.  Accordingly, UBS AG and Neue Bank were working in concert with Birkenfeld and other UBS employees, as well as the New Haven Trust and Michie Defendants to allow their customers' assets to be used in the illegal manipulation of these "pump and dump" stocks.

106.   As described above, and in addition to these facts, each and all of the Union Charter, Neue Bank, and New Haven Trust Defendants invested the Olen money in corporations where they had a direct vested interest, in violation of not only the investment contracts between Olenicoff and Defendants but also in violation of said Defendants' separate and collective fiduciary duties to Olenicoff.  Through a complex scheme between all of such Defendants, Neue Bank, in concert with the direction of Bradley Birkenfeld, at Union Charter, and Staggl and Biedermann, at New Haven Trust, prepared fraudulent account statements showing substantial investment returns, all intended to keep Olenicoff happy with their asset management, while having full knowledge that they were committing fraud against him and earning substantial annual seven-figure management fees, which were further inflated by the fraudulent account statements.

107.   These statements contained all investment information relating to Plaintiffs' account, including bonds, foreign securities and U.S. start-up, or "pump and dump" securities, equity funds, structured products and even warrants.  Said statements were prepared by the Neue Bank Defendants, based on information provided by the Michie Defendants, Birkenfeld, and New Haven Trust, and delivered to Olen Properties, at its Orange County headquarters, on a monthly basis beginning approximately June

2005 and continuing through at least January 2008.  Said statements were sent by Neue Bank as follows:[3]

    a. October 27, 2006 Statement of Assets sent on October 31, 2006 from Liechtenstein to Orange County, California via facsimile at 6:13 p.m. (CET);

    b. November 11, 2006 Statement of Assets sent on December 5, 2006 from Liechtenstein to Orange County, California via facsimile at 4:48 p.m. (CET);

    c. December 31, 2006 Statement of Assets sent on January 7, 2007 from Liechtenstein to Orange County, California via facsimile at 5:34 p.m. (CET);

    d. July 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Orange County, California via facsimile at 5:46 p.m. (CET);

    e. August 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Orange County, California via facsimile at 5:48 p.m. (CET);

    f. October 31, 2007 Statement of Assets apparently faxed from Neue Bank to New Haven Trust on November 6, 2007 at 11:07 a.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 8:12 p.m. (CET);

    g. November 30, 2007 Statement of Assets apparently faxed from Neue Bank to New Haven Trust on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET);

---

[3] The following facts are based on Statements of Assets between June 2006 and June 2008 to the extent Plaintiffs are in possession of copies of said statements.  Plaintiffs are informed and believe that statements exist.  All statements were delivered to Orange County, California via, facsimile, email communication as well as in person at regular intervals throughout the entire time period cited.

**THIRD AMENDED COMPLAINT**

h. December 31, 2007 Statement of Assets sent on January 10, 2008
from Liechtenstein to Orange County, California via facsimile at
5:58 p.m. (CET).

**The SES Scheme**

108.  Defendants SES and Michael Storey had direct relationships with
Union Charter as Defendants David Schwedel and Michael Storey both served as
directors of Union Charter between at least May 2005 and November 2005 alongside
defendant Bradley Birkenfeld who became affiliated with Union Charter in May 2005
through approximately April 2008.  As previously provided, Birkenfeld and the Union
Charter Defendants were managing Plaintiffs' assets from approximately June 2005
through mid-2008.  At the time SES was created, and while both Storey and Schwedel
were at Union Charter with Birkenfeld controlling the Olen accounts, Union Charter
helped issue 2,000,000 shares of common stock in private placements for the benefit of
SES.  In fact, on or about June 9, 2006, Birkenfeld forged the signature of New Haven
Trust's Staggl on a Subscription Agreement entered into between Union Charter and
SES, with the full knowledge of, and participation by, Timothy Vail and David
Schwedel, who also signed said agreement.  Both Defendants Timothy Vail and David
Eichinger were directors of SES by late 2005, as was Michael Storey by November
2005.  Defendant Vail is also the President and Chief Executive Officer of SES and
Eichinger is SES's CFO and Sr. Vice President of Corporate Development, both since
May 2006.  Each of these defendants owns at least 1 million shares of SES and is, as
their respective titles indicate, an integral part of the company's operations.

109.  In 2008, Olenicoff discovered that Union Charter, Schwedel,
Birkenfeld, Staggl, the Neue Bank Defendants, the New Haven Trust Defendants, and
the SES Defendants devised a plan to benefit the SES Defendants while concurrently
benefiting all parties involved.  Armed with the knowledge about the Olenicoff assets,
gained in their capacities as officers and directors of Union Charter, Defendants
Schwedel and Storey agreed to forego the investment parameters governing the Olen

accounts acknowledged by Union Charter to provide SES with much-needed investment capital.  This was significant for Storey because he was joining SES as a Director and would directly benefit from a cash infusion using the Olen assets.  As part of the plan, in or around June 2006, each of the aforementioned Defendants conspired together and caused to be formed a shell Panamanian company called Teflomi Investment and Trade, Inc., ("Teflomi"), which was set up with a mere $200.

110.   In or around, June 2006, the Neue Bank Defendants, specifically, Laternser, Buchel and A. Wille, and the New Haven Trust Defendants, specifically, Staggl and Biedermann, at the direction, control, supervision and/or blessing of the Union Charter Defendants, specifically, Birkenfeld, Schwedel and Storey, and with the full knowledge of each of the SES Defendants, Vail and Eichinger, then caused to be transferred five million, two hundred and fifty thousand dollars from Olenicoff's Neue Bank account to Teflomi.  Still in or around June 2006, as part of the conspiracy, a "subscription agreement" was entered between Union Charter and SES, executed by Schwedel and Storey, respectively, for the purposes of Union Charter obtaining funding for SES.

111.   As part of the scheme, and with the full knowledge of Storey, Vail and Eichinger –on SES's behalf--, Teflomi, at the direction of Birkenfeld and Schwedel, on behalf of Union Charter, and Staggl, on behalf of New Haven Trust, and in jointly-conspired active concealment from Plaintiffs, then transferred from Neue Bank the $5.25 million dollars to SES, in exchange for one million shares.  However, SES did not have publicly traded shares at the time, and the stock certificate for the one million shares was a "lettered stock" that could not be sold under Rule 144. At the time of the transaction, SES had successfully worked in concert with Birkenfeld and Union Charter to conceal from Plaintiffs, prior to and at the time of the transaction, the utilization of Olen Account funds for the financing of the SES operation including funding salaries of individual defendants all without the knowledge or approval of Plaintiffs.  Although the New Haven Trust Defendants had knowledge of the scheme, SES's conduct amounted to a

contemporaneous misrepresentation of the initial stock sale to Plaintiffs since New Haven acted as Plaintiffs' attorney-in-fact.

112.    In exchange for these transactions, SES paid Union Charter, Defendants Birkenfeld, Staggl, and others a finder's fee of $1.4 million.  Defendants purposefully and intentionally hid their fraud and self-dealing from Olenicoff by concealing the true name of the securities on periodic statements sent to his Orange County, California office.  Indeed, SES manipulated their own stock price from at least June 2006 through May 2008 in an effort to increase its value in order that it and its co-conspirators could present to Plaintiffs, and other investors, fabricated gains, which said co-conspirators sent on a monthly basis using statements.  Specifically, said manipulated values were provided by the SES Defendants to Neue Bank and New Haven Trust on or about the dates provided below.  Account statements were then prepared by the Neue Bank Defendants based on information provided by SES and the Union Charter Defendants, then sent directly to Plaintiffs and/or to New Haven Trust for monthly delivery to Plaintiffs in their Orange County, California location on or about the dates provided below.  Said statements reported fictitious gains in the value of the bogus 'Teflomi' stock to mask the actual position in untradeable SES stock.  Said monthly delivery was typically made via facsimile.  This manipulation constituted consistent monthly misrepresentations of the stock's true value and liquidity with the full knowledge of the SES Defendants, the Union Charter Defendants, the Neue Bank Defendants and the New Haven Trust Defendants.  They further corroborate the concealment and misrepresentations propounded against Plaintiffs at the time of the purchase of the SES stocks.  Said statements were sent as follows:[4]

        a. October 27, 2006 Statement of Assets sent by Neue Bank on October 31, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to

---

[4] The following facts are based on Statements of Assets between June 2006 and June 2008 to the extent Plaintiffs have copies of said statements.  Several gaps exist in the monthly periods; however, there are sufficient statements to show specific details.

**THIRD AMENDED COMPLAINT**

be sent to Plaintiffs in Orange County, California via facsimile at 6:13 p.m. (CET);

b. November 11, 2006 Statement of Assets sent by Neue Bank on December 5, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 4:48 p.m. (CET);

c. December 31, 2006 Statement of Assets sent on January 7, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:34 p.m. (CET);

d. July 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:46 p.m. (CET);

e. August 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:48 p.m. (CET);

f. October 31, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on November 6, 2007 at 11:07 a.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 8:12 p.m. (CET);

g. November 30, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein

- 44 -

to Orange County, California on the same date via facsimile at 6:34 p.m. (CET);

h.  December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:58 p.m. (CET).

It is noteworthy that each one of the aforementioned statements listed the fictitious Teflomi holding at a fluctuating value as if it was a trading stock, which was simply the front for the SES holding designed by the co-conspirators to ensure Plaintiffs were unaware of the conversion of their funds.

113.  In or around May 2008, upon learning that the Teflomi shares were non-existent, Plaintiffs communicated directly with the SES defendants from the Orange County Olen Properties office, to demand return of the converted funds.  The SES defendants failed and refused to return Plaintiffs' funds that had been diverted to SES. Instead the SES Defendants improperly facilitated a reissuance of SES shares in the name of Igor Olenicoff.  This re-issuance of stock happened informally and no documentation was requested by anyone at SES of anyone at Olen to demonstrate that Olen or Mr. Olenicoff had ownership rights to the shares.  Further, Plaintiffs received correspondence from SES and/or its counsel indicating that they had contacted defendant Staggl regarding the shares.  Notably, at no time had Plaintiffs discussed any connection between the Olen Accounts and Mr. Staggl with anyone at SES.  The shares that had previously been registered in the name of Teflomi were re-issued in Mr. Olenicoff's name as free-trading stock and delivered to the Olen offices in Newport Beach, California.

### Criminal Liability for Defendants' Scheme

114.  By 2007, the IRS and Department of Justice approached Olenicoff and advised him that the "investments" from 2001 forward were indeed subject to taxation.  Olenicoff eventually faced criminal investigation relating to the shell company

- 45 -

structure set up and carried out by Defendants. He agreed to pay tens of millions of dollars in tax penalties, and interest on top of related costs and professional fees. Although he was a pawn and victim of a greedy scheme by the aforementioned Defendants, Olenicoff had no choice but to take this course of action.  In the end, he would be labeled a "tax cheat" by the media and would and still does find his name in news articles with this negative moniker.

115.  On April 10, 2008, Defendants Birkenfeld and Staggl were indicted on charges of conspiracy to defraud the United States and the IRS in violation of Title 18, United States Code, Section 371.  The indictment includes the following charges, which are incorporated herein, as follows:

a.  "It was part of the conspiracy that Birkenfeld, Staggl and others would and did market the advantages of Swiss and Liechtenstein bank secrecy to United States clients by claiming that said secrecy was impenetrable;

b.  Birkenfeld, Staggl, and others would and did travel to the United States to market investments including United States securities to United States clients which they were not licensed to market;

c.  That said marketing also took place via mail, emails and telephone calls to and from the United States;

d.  That said defendants would and did travel to the United States to conduct banking with United States clients, such as Olenicoff;

e.  That said defendants would and did conduct banking with United States clients from Switzerland, Liechtenstein, and elsewhere via mailings, emails, and telephone calls to and from the United States;

THIRD AMENDED COMPLAINT

f. That said defendants would and did prepare Swiss and Liechtenstein bank account applications, and IRS Forms W-8BEN, which falsely and fraudulently concealed that United States Taxpayers were the beneficial owners of offshore bank and financial accounts maintained in foreign countries, including Switzerland and Lichtenstein;

g. That said defendants would and did cause shell companies to be set up and used as the nominee owners for the Swiss Bank and Liechtenstein bank accounts in order to conceal United States citizens' beneficial ownership of the bank accounts;

h. That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently omitted income earned by United States clients from their Swiss bank and Liechtenstein bank accounts;

i. That said defendants would and did cause to be prepared and filed with the IRS income tax returns that purposefully and intentionally falsely and fraudulently reported that United States clients did not have an interest in, and a signature and authority over, financial accounts located in a foreign country."

116. As evidenced in the April 10, 2006 indictment and the June 19, 2008 plea agreement of Defendant Birkenfeld, and his August 21, 2009 sentencing, he has admitted to each of the above indictment charges stemming out of his activities as an agent of UBS AG and Union Charter, while Defendant Staggl is avoiding capture by hiding in Liechtenstein. On or about November 13, 2008, the DOJ indicted Defendant Weil for his conduct as an executive of UBS AG in defrauding the IRS through the scheme alleged in this complaint.

THIRD AMENDED COMPLAINT

117.   Additionally, the Michie Defendants are under investigation by the Federal Swiss Banking Commission due to their unauthorized activity as a financial intermediary.

118.   While these admissions and revelations of UBS AG's, Birkenfeld's, Staggl's, and the Michie Defendants' misconduct begin the path of vindication for Olenicoff, his family name and reputation, and that of his business, have been irreversibly tarnished, subjecting him and his family to embarrassment.  The actions of the Defendants have damaged his professional reputation and the damage stems to all areas of his business activities and that of Olen Properties.

119.   Based on the foregoing, and as more fully detailed herein below, Olenicoff and Olen Properties are entitled to recover their respective lost and converted assets, all of the fraudulent and/or unnecessary fees, tax penalties and interest, compensatory damages for the loss of personal and professional reputation and punitive damages from each and all of the Defendants who worked in concert for years to defraud Olenicoff and Olen Properties of millions of dollars, collectively causing hundreds of millions of dollars in damages.

## COUNT I

(Fraudulent Misrepresentation and Concealment Against the UBS AG Defendants;

Neue Bank Defendants; New Haven Trust Defendants;

and DOES 1 through 5, inclusive)

120.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

121.   For the purposes of inducing Olenicoff to transfer the Olen account investments to UBS AG and to pay millions of dollars in aggregate fees while also allowing themselves to advertise and report higher account values and superior status versus competitors, each of the previously specifically identified individual Defendants made numerous knowingly false affirmative representations and/or intentional

- 48 -

omissions/concealments of material facts to Olenicoff, continuously between 2001 and 2005, including but not limited to:

    a.    That Birkenfeld, UBS AG, Neue Bank, and New Haven Trust would prepare proper and legal documentation for the formation of, and form, shell corporations with the representation that said formations were permitted by the IRS;

    b.    Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti and Kurer, Staggl, Biedermann, and the Neue Bank Defendants representing that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy;

    c.    Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants, repeatedly representing that Olenicoff should follow the estate planning and tax opinions and advice rendered by Defendants pertaining to lawful requirements for report of his off-shore assets as required by the IRS from 2002 through 2007;

    d.    Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti and Kurer, Staggl, Biedermann, and the Neue Bank Defendants repeatedly representing to Olenicoff that the method by which Defendants titled the ownership of the accounts with Defendants would be fully compliant with all U.S. reporting requirements while repeatedly omitting what the actual requirements were;

    e.    Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti and Kurer, Staggl, Biedermann, and the Neue Bank Defendants representing that the Defendants would prepare all the necessary and proper forms to be

**THIRD AMENDED COMPLAINT**

submitted to the Internal Revenue Service to report all income and accounts required to be reported to the Internal Revenue Service to ensure Olenicoff would comply with all U.S. tax reporting requirements;

f.     Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti and Kurer, Staggl, Biedermann, and the Neue Bank Defendants repeatedly representing that his investments would be held in safe, conservative investments ensuring a prudent return in liquid investments;

g.     Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti and Kurer, Staggl, Biedermann, and the Neue Bank Defendants, Laternser, A. Wille and Buchel, representing that Olenicoff's financial information would be protected and held in confidence;

h.     Birkenfeld, Bovay, and Liechti, with the approval and encouragement of such superiors as Weil and Kurer, Staggl, Biedermann, and the Neue Bank Defendants, Laternser, A. Wille and Buchel, repeatedly representing to Olenicoff that the Defendants would manage the Olen assets in a lawful and prudent manner and use the care and expertise of a fiduciary with respect thereto; and

i.     Birkenfeld, with the approval and encouragement of such superiors as Weil, Liechti, Bovay and Kurer, Staggl, Biedermann, and the Neue Bank Defendants, Laternser, A. Wille and Buchel, repeatedly representing to Olenicoff that Defendants were properly licensed, or repeatedly omitting the fact that they were not licensed, and thus, permitted to provide banking services, offer investment advice and management of

- 50 -

**THIRD AMENDED COMPLAINT**

funds and to solicit the purchase or sale of securities to U.S. citizens, including Olenicoff;

    j.    Birkenfeld, Weil, Kurer, Liechti and Bovay, Staggl, Biedermann, Laternser, A. Wille and Buchel, concealing the fact that Plaintiffs' investments would be used for investing in start-up companies and/or "pump and dump" stocks at various times between 2001 and 2008, including, but not limited to, Navitrak International Corporation purchased July 19, 2006; Mexoro Minerals, Ltd. purchased November 9, 2007; Synova Healthcare Group, Inc. purchased July 4, 2006; Vectr Systems purchased May 24, 2006; and Teflomi purchased June 7, 2006 in contrast to the acknowledged directives of Plaintiffs and concealing the fact that the Michie Defendants were not properly licensed to sell these risky securities.

122. The above intentional omissions of material fact and/or affirmative misrepresentations and concealments made by each Defendant were false when made and said Defendants knew these representations to be false when made and that said concealments were necessary to disclose. Moreover, they were made with the intention that Olenicoff would rely upon them in transferring funds to Defendants' accounts and for Defendants' use so that Olenicoff would pay them millions of dollars in fees and costs and so they would have access to his funds for their personal and collective profit motives.

123. The true facts are that:

    a.    The documentation prepared by the UBS AG Defendants for the formation of shell corporations was not a permissible tax deferment scheme under the QI Agreement nor under U.S. tax reporting laws;

b.     The UBS AG Defendants, Neue Bank Defendants and New Haven Trust Defendants prepared documentation for opening off-shore bank and investment accounts, represented that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy, and then failed to report Olenicoff's information to the IRS pursuant to the QI agreement;

c.     The UBS AG Defendants scheme, as described above, was not lawful and permitted by the IRS pursuant to the QI Agreement;

d.     The UBS AG Defendants provided and/or caused to be provided erroneous legal and tax advice by, among other things, intentionally preparing wrongful and misleading documents and sending them to Olenicoff from 2002 through 2007;

e.     The UBS AG Defendants concealed from Olenicoff that he not only owed taxes on his investments with the IRS but would face criminal investigation for the management structure of his account set up by the UBS AG Defendants;

f.     The UBS AG Defendants, Neue Bank Defendants, and New Haven Trust Defendants did not and had no intention to invest the Olen funds in safe, conservative investments, ensuring a prudent return on liquid investments, and instead intended to and did use the Olen funds to form and/or cause to be formed shell corporations without Olenicoff's prior approval or knowledge;

g.     The Neue Bank Defendants, Union Charter Defendants, New Haven Trust Defendants, including but not limited to Birkenfeld, Staggl, Biedermann, Storey and Schwedel, intended to serve and did serve on the board for shell corporations and/or

- 52 -

**THIRD AMENDED COMPLAINT**

other companies that were illiquid or that did not meet Olenicoff's investment direction, so that said Defendants could help themselves to fabricated salaries and finder's fees, using the Olen funds; and

h. The UBS AG, Neue Bank, New Haven Trust, and Union Charter Defendants were not properly licensed and thus, not permitted to provide banking services, offer investment advice manage funds and/or solicit the purchase or sale of securities to U.S. citizens, including Olenicoff.

124. In reasonable reliance on said Defendants' false affirmative representations and intentional omissions of material facts regarding taxes, rules, liabilities, proceeds, privacy and investment results, Olenicoff paid millions of dollars to Defendants for flawed tax and investment advice, paid millions of dollars to execute transactions, purchased unnecessary "investments" to effectuate the useless transactions, did not avail himself of legitimate investment and/or tax savings opportunities, and filed tax returns that reflected control and beneficial ownership of his assets were held by the offshore entities created by the Defendants.

125. But for Defendants' intentional misrepresentations and material omissions described above, Olenicoff would never have participated in the transfers of funds and transactions, purchased unnecessary investments, allowed the opening of shell corporations and/or failed to avail himself of legitimate investment and/or tax savings opportunities, nor would he have incurred millions in penalties, and interest.

126. As a result of Defendants' conduct, described above, Olenicoff has suffered injury in that Olenicoff:

a. Paid Defendants millions of dollars in fees and costs which he should not have paid;

b. Had millions of dollars converted by all Defendants;

THIRD AMENDED COMPLAINT

c.   Purchased unnecessary investments to effectuate the recommended transactions;

d.   Incurred tax penalties and interest;

e.   Has suffered personal and professional embarrassment and a tarnished family and business name; and

f.   Has consequently missed legitimate investment and/or tax savings opportunities.

127.   As a proximate cause of the foregoing, Olenicoff has been injured in an actual amount of at least $500 million, or in an amount to conform to proof at trial.

128.   The aforementioned actions and omissions of Defendants and DOES 1 through 5, and each of them, were committed with the intent to misrepresent, deceive, and/or conceal material facts known to each of the defendants so that the Defendants, and each of them, could deprive Olenicoff of property or legal rights or otherwise cause injury to Olenicoff.   The aforementioned actions and omissions of Defendants and DOES 1 through 5, and each of them, amounted to despicable conduct that subjected Olenicoff to cruel and unjust hardship and all in a conscious disregard of Olenicoff's rights, so as to justify an award of exemplary and punitive damages.   Further, Plaintiffs are entitled to rescind any contract and/or transaction and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT II

(Constructive Fraud Against the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants; and DOES 1 through 5, inclusive)

129.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

130.   Defendants, and each of them, maintained a confidential and fiduciary relationship in their capacities as advisors and even signatories to the Olen accounts or created "investments."

- 54 -

**THIRD AMENDED COMPLAINT**

131.   As such, all Defendants, and each of them, owed a duty to manage the Olen assets properly, to advise him of any IRS requirements, report and withhold taxes consistent with IRS requirements and the QI Agreement, to avoid Olenicoff's suffering of any U.S. tax related penalties, interest, and criminal investigation related thereto, to invest his assets in proper vehicles such that all costs and fees were minimized and in accordance with their promised fee structure, to invest the Olen assets in a reasonably prudent manner within the scope of the promised goals and return rate, to ensure proper licensure of all persons soliciting and/or conducting transactions with Olenicoff, and to avoid unauthorized usage of funds and payments to themselves vis-à-vis corporate shells and other third party companies, plus other conversions of money.

132.   Each Defendant owed Olenicoff an additional duty of confidentiality and privacy, which served as the other main basis for investing with said Defendants.

133.   Olenicoff reasonably relied on the misrepresentations and omissions of Defendants as the purpose of the account transfers was to ensure better and lawful savings than he was already achieving with funds already accounted for with the IRS and the acknowledged purpose of confidentiality and privacy.  Such reliance is actually presumed pursuant to *Edmunds v. Valley Circle Estates*, 16 Cal.App.4th 1290, 1302, 20 Cal.Rptr.2d 701, 708 (1993).

134.   As previously alleged, said duties were breached when Defendants: prepared documentation for the formation of, and did so form, shell corporations with the representation that said formations were permitted by the IRS; prepared documentation for and opened off-shore bank and investment accounts, including the fact that they were not properly licensed to do so; represented that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy; failed to properly report Olenicoff's information to the IRS or withhold taxes pursuant to the QI agreement; knowingly provided erroneous tax opinions; concealed from Olenicoff that he would face criminal investigation for the management structure of his account set up by the UBS AG Defendants; formed shell

1  corporations and/or invested in corporations utilizing the Olen assets without advising
2  Olenicoff; further served on the board for these aforementioned corporations such that
3  they helped themselves to fabricated salaries and finder's fees using the Olen funds, all
4  of which were caused by Defendants advice and proactive misrepresentations and
5  concealments.

6       135.   Additionally, Defendants Birkenfeld and UBS AG breached their
7  respective duties of confidentiality by providing information to the IRS and others in
8  secret from approximately 2004 to 2006 with suggestions and/or overt misstatements of
9  fact that Olenicoff was intentionally setting up the aforementioned UBS shell company
10 scheme himself, which was completely untrue.

11      136.   Within the last three years of the date of this complaint, Olenicoff
12 became aware of the aforementioned breaches of fiduciary and confidentiality duties.

13      137.   As a result of said breaches of fiduciary duties and confidentiality,
14 each Defendant gained an advantage by receiving millions of dollars in fees, costs, and
15 converted funds from Olenicoff from 2001 through 2008.

16      138.   Based on the foregoing breaches of fiduciary and confidentiality
17 duties, Olenicoff has been damaged by the amounts improperly gained by Defendants in
18 the amount of at least $500 million dollars, subject to proof.  Olenicoff is further entitled
19 to recoup out-of-pocket damages, including all fees, costs, tax penalties, and interest,
20 plus attorneys' fees and costs.

21      139.   The aforementioned conduct of Defendants and DOES 1 through 10,
22 and each of them, was an intentional misrepresentation, deceit, or concealment of a
23 material fact known to each of the Defendants with the intention on the part of the
24 Defendants of thereby depriving Olenicoff of property or legal rights or otherwise
25 causing injury, and was despicable conduct that subjected Olenicoff to a cruel and unjust
26 hardship and all in a conscious disregard of Olenicoff's rights, so as to justify an award
27 of exemplary and punitive damages.   Further, Plaintiffs are entitled to rescind any
28

**THIRD AMENDED COMPLAINT**

contract and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT III

(Negligent Misrepresentation Against the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants; and DOES 1 through 5, inclusive)

140.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

141.   The representations described above were false or misleading when made by Defendants, as described above, were made without a reasonable basis for believing it to be true, and were made with intent to mislead and deceive Olenicoff. The representations were made with the intent to induce Olenicoff's reliance and to invest in the investment schemes as herein alleged.

142.   Each of the Defendants had a duty to disclose the true information and documentation on the grounds that said information and documentation were material to the asset transfers and investments alleged herein and that Defendants were required to abide by the QI Agreement.

143.   Defendants' failures to disclose these material facts and present proper documentation to Olenicoff, therefore, constitute fraud and/or negligent misrepresentation.

144.   Had Olenicoff known of the true facts, that Defendants were manipulating him to open accounts with their respective institutions, intending to and did breach the QI Agreement, failing to present proper documentation to Olenicoff, charging unnecessary fees, causing Olenicoff to incur tax penalties and interest for failing to properly file documents with the IRS, converting the Olen assets, and perpetuating this scheme against the IRS and 19,000 other customers, Olenicoff would not have transferred the assets into UBS AG and Neue Bank accounts, engaged with New Haven Trust, or otherwise dealt with Birkenfeld and Staggl.

**THIRD AMENDED COMPLAINT**

145. As a proximate result of the fraudulent conduct of Defendants as herein alleged, Olenicoff has incurred damages in that Olenicoff was induced to invest with UBS AG and Neue Bank as an ignorant pawn in Defendants' collective schemes to reap millions of dollars annually, maintain their superior reputations in the industry and convert millions of dollars, all by reason of which Olenicoff has been damaged in at least a sum in excess of $500 million dollars, and additional amounts according to proof at time of trial, including interest, attorneys' fees and costs. Further, Plaintiffs are entitled to rescind any contract and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT IV

(Fraudulent Misrepresentation and Concealment Against the Union Charter Defendants, Neue Bank Defendants, New Haven Trust Defendants; Michael Storey; and DOES 6 through 10, inclusive)

146. Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

147. For the purposes of inducing Olenicoff to transfer his investments from UBS AG and pay millions of dollars in aggregate fees, each of the Union Charter Defendants, including Michael Storey, the New Haven Trust and Neue Bank Defendants perpetuated the same false affirmative representations and intentional omissions/concealments of material facts to Olenicoff that the UBS AG Defendants did, including but not limited to:

    a.    That Birkenfeld, Neue Bank, and New Haven Trust would prepare proper and legal documentation for the formation of, and form, shell corporations with the representation that said formations were permitted by the IRS;

    b.    Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that Olenicoff would not need to be a

- 58 -

named signatory on certain accounts due to the need to maintain the high level of legal privacy;

c.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants, representing that Olenicoff should follow the estate planning and tax opinions and advice rendered by Defendants pertaining to lawful requirements for report of his off-shore assets as required by the IRS from 2002 through 2007;

d.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing to Olenicoff that the method by which Defendants titled the ownership of the accounts with Defendants would be fully compliant with all U.S. reporting requirements;

e.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that the Defendants would prepare all the necessary and proper forms to be submitted to the Internal Revenue Service to report all income and accounts required to be reported to the Internal Revenue Service to ensure Olenicoff would comply with all U.S. tax reporting requirements;

f.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that his investments would be held in safe, conservative investments ensuring a prudent return in liquid investments;

g.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that Olenicoff's financial information would be protected and held in confidence;

h.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing to Olenicoff that the Defendants

THIRD AMENDED COMPLAINT

would manage the Olen assets in a lawful and prudent manner and use the care and expertise of a fiduciary with respect thereto; and

i.  Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants Laternser, A. Wille and Buchel representing to Olenicoff that Defendants were properly licensed and thus, permitted to provide banking services, offer investment advice and management of funds and to solicit the purchase or sale of securities to U.S. citizens, including Olenicoff;

j.  Birkenfeld, Storey, Schwedel, Staggl, Biedermann, Laternser, A. Wille and Buchel concealing the fact that Plaintiffs' investments would be used for investing in highly speculative and/or shell start-up companies and/or "pump and dump" stocks, including, but not limited to, Navitrak International Corporation purchased July 19, 2006; Mexoro Minerals, Ltd. purchased November 9, 2007; Synova Healthcare Group, Inc. purchased July 4, 2006; Vectr Systems purchased May 24, 2006; and Teflomi purchased June 7, 2006 in contrast to the acknowledged directives of Plaintiffs and concealing the fact that the Michie Defendants were not properly licensed to sell these risky securities;

k.  Birkenfeld, Storey, and Schwedel further concealed from Plaintiffs at all times during 2005 through 2008 that Union Charter had no experience or licensure to manage stock accounts and that Union Charter was simply a promoter of private stock offerings in shell corporations and/or start-up companies.

148.   The above intentional omissions of material fact and/or affirmative misrepresentations and concealments made by each Defendant were false when made and said Defendants knew these representations to be false when made and that said concealments were necessary to disclose.  Moreover, they were made with the intention that Olenicoff would rely upon them in transferring funds to Defendants' accounts and for Defendants' use so that Olenicoff would pay them millions of dollars in fees, costs, and so they would have access to his funds for their personal and collective profit motives.

149.   The true facts are that:

a.   The documentation prepared by the UBS AG Defendants for the formation of shell corporations was not a permissible tax deferment scheme under the QI Agreement nor under U.S. tax reporting laws;

b.   The Union Charter Defendants, Neue Bank Defendants and New Haven Trust Defendants prepared and/or maintained documentation for opening off-shore bank and investment accounts, represented that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy, and then failed to report Olenicoff's information to the IRS pursuant to the QI agreement;

c.   The Union Charter Defendants intentionally perpetuated the previously-devised system to avoid reporting to the IRS pursuant to the QI Agreement and for the substantial personal benefit and gain of retaining management and control of the Olenicoff accounts;

    d.    The Union Charter, Neue Bank, and New Haven Trust Defendants provided and/or caused to be provided erroneous legal and tax advice;

    e.    The Union Charter and New Haven Trust Defendants concealed from Olenicoff that he was not only owing taxes on the investments with the IRS but would face criminal investigation for the management structure of his account set up by the UBS AG Defendants;

    f.    The Union Charter Defendants, Neue Bank Defendants, and New Haven Trust Defendants formed and/or caused to be formed shell corporations and/or invested in start-up or "pump and dump" companies utilizing Olenicoff's assets without advising Olenicoff;

    g.    The Neue Bank and New Haven Trust Defendants, namely Birkenfeld and Staggl, and Storey with respect to SES, further served on the board for these aforementioned corporations such that they helped themselves to fabricated salaries and finder's fees; and

    h.    Birkenfeld, the Neue Bank and New Haven Trust Defendants Union Charter were not properly licensed and thus, not permitted to provide banking services, offer investment advice and management of funds and to solicit the purchase or sale of securities to U.S. citizens, including Olenicoff.

150.   In reasonable reliance on said Defendants' false affirmative representations and intentional omissions of material facts regarding taxes, rules, liabilities, proceeds, privacy and investment results, Olenicoff paid millions of dollars to Defendants for tax and investment advice, paid millions of dollars to execute

**THIRD AMENDED COMPLAINT**

transactions, purchased unnecessary "investments" to effectuate the transactions, and did not avail himself of legitimate investment and/or tax savings opportunities.

151.  But for Defendants' intentional misrepresentations and material omissions described above, Olenicoff would never have participated in the transfers of funds and transactions, purchased unnecessary investments, allowed Defendants to open shell corporations, caused misleading documents containing omissions to be filed with the IRS, and/or failed to avail himself of legitimate investment and/or tax savings opportunities, nor would he have incurred millions in penalties and interest.

152.  As a result of Defendants' conduct, described above, Olenicoff has suffered injury in that Olenicoff:

     a.   Paid the Union Charter Defendants millions of dollars in fees and costs which he should not have paid;

     b.   Had millions of dollars converted by the Union Charter Defendants;

     c.   Purchased unnecessary investments to effectuate the recommended transactions;

     d.   Now owns worthless or extremely value-diminished stock in corporations for which he did not authorize investment;

     e.   Incurred tax penalties and interest;

     f.   Underwent criminal investigation arising from the shell corporation scheme devised and effectuated by Defendants thereby having his future business affected;

     g.   Has suffered personal and professional embarrassment and a tarnished family and business name; and

     h.   Has consequently missed legitimate investment and/or tax savings opportunities.

153.  As a proximate cause of the foregoing, Olenicoff has been injured in an actual amount of at least $500 million, to be proven at trial, and should be awarded

1  punitive damages in accordance with the evidence, plus attorneys' fees and costs.
2  Further, Plaintiffs are entitled to rescind any contract and to recover restitution for all
3  fees paid to Defendants, plus reasonable attorney's fees and costs.

### COUNT V

5  (Constructive Fraud Against the Union Charter Defendants, Neue Bank Defendants,
6  New Haven Trust Defendants; Michael Storey; the Michie Defendants; and DOES 6
7  through 10, inclusive)

8  154.   Plaintiffs repeat and reallege each and every prior allegation, as if
9  fully set forth herein.

10  155.   Defendants, and each of them, maintained a confidential and
11  fiduciary relationship in their capacities as advisors and even signatories to the Olen
12  accounts or created "investments."

13  156.   As such, the Union Charter Defendants, and each of them, owed a
14  duty to manage the Olen funds, to advise him of any IRS requirements,  to avoid
15  Olenicoff's suffering of any U.S. tax related penalties, interest, and criminal
16  investigation related thereto, to invest his assets in proper vehicles such that all costs and
17  fees were minimized and in accordance with their promised fee structure, to invest
18  Olenicoff's assets in a reasonably prudent manner within the scope of the promised
19  goals and return rate, to ensure proper licensure of all persons soliciting and/or
20  conducting transactions with Olenicoff, and to avoid unauthorized usage of funds and
21  payments to themselves vis-à-vis corporate shells and other third party companies, plus
22  other conversions of money.

23  157.   Each Defendant owed Olenicoff an additional duty of confidentiality
24  and privacy, which served as the other main basis for investing with said Defendants.

25  158.   Olenicoff reasonably relied on the misrepresentations and omissions
26  of Defendants as the purpose of the account transfers was to ensure better savings than
27  he was already achieving with funds already accounted for with the IRS and the
28  acknowledged purpose of confidentiality and privacy.   Such reliance is actually

**THIRD AMENDED COMPLAINT**

presumed pursuant to *Edmunds v. Valley Circle Estates*, 16Cal.App.4th 1290, 1302, 20 Cal.Rptr.2d 701, 708 (1993).

159.   As previously alleged, said duties were breached when Defendants: prepared documentation for the formation of, and did so form, shell corporations with the representation that said formations were permitted by the IRS; prepared documentation for and opened off-shore bank and investment accounts, including the fact that they were not properly licensed to do so; represented that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy; failed to properly report Olenicoff's information to the IRS pursuant to the QI agreement; knowingly failed to report his off-shore assets as required by the IRS QI Agreement; provided erroneous tax opinions; concealed from Olenicoff that he would face criminal investigation for the management structure of his account set up by the UBS AG Defendants; formed shell corporations and/or invested in corporations utilizing the Olen assets without advising Olenicoff; further served on the board for these aforementioned corporations such that they helped themselves to fabricated salaries and finder's fees with the Olen funds, all of which were caused by Defendants advice and proactive misrepresentations and concealments.

160.   Additionally, Defendants Birkenfeld and Union Charter breached their respective duties of confidentiality by providing information to the IRS in secret in 2006 with suggestions that Olenicoff was intentionally defrauding the IRS all of which were completely untrue instead of openly reporting and/or withholding taxes in compliance with U.S. tax laws.

161.   Within the last three years of the date of this complaint, Olenicoff became aware of the aforementioned breaches of fiduciary and confidentiality duties.

162.   As a result of said breaches of fiduciary duties and confidentiality, each Defendant gained an advantage by receiving millions of dollars in fees, costs, and converted funds from Olenicoff from 2006 through 2008.

THIRD AMENDED COMPLAINT

163.   Based on the foregoing breaches of fiduciary and confidentiality duties, Olenicoff has been damaged by the amounts improperly gained by Defendants in the amount of at least $500 million dollars, subject to proof.  Olenicoff is further entitled to recoup out-of-pocket damages, including all fees, costs, tax penalties, and interest, plus attorneys' fees and costs.

164.   The aforementioned conduct of the Union Charter Defendants, the Neue Bank Defendants, and the New Haven Trust Defendants, the Michie Defendants, and DOES 6 through 10, and each of them, was an intentional misrepresentation, deceit, or concealment of a material fact known to each of the Defendants with the intention on the part of the Defendants of thereby depriving Olenicoff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Olenicoff to a cruel and unjust hardship and all in a conscious disregard of Olenicoff's rights, so as to justify an award of exemplary and punitive damages.  Further, Plaintiffs are entitled to rescind any contract and to recover restitution for all fees paid to Defendants, plus reasonable attorney's fees and costs.

## COUNT VI

(Negligent Misrepresentation Against the Neue Bank Defendants; New Haven Trust Defendants; Union Charter Defendants; Michael Storey;

and DOES 6 through 10, inclusive)

165.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

166.   The representations described above were false or misleading when made by the Union Charter Defendants, as described above, were made without a reasonable basis for believing them to be true, and were made with intent to mislead and deceive Olenicoff.  The representations were made with the intent to induce Olenicoff's reliance and to invest in the investment schemes as herein alleged.

167.   Each of the Defendants had a duty to disclose the true information and documentation on the grounds that said information and documentation was material

- 66 -

**THIRD AMENDED COMPLAINT**

1  to the asset transfers and investments alleged herein and that Defendants were required

2  to abide by U.S. tax laws.

3       168.   Defendants' failures to disclose these material facts and abide by the

4  requirements of U.S. tax laws and present proper documentation to Olenicoff, therefore,

5  constitute fraud and/or negligent misrepresentation.

6       169.   Had Olenicoff known of the true facts, that Defendants were

7  manipulating him to open accounts with their respective institutions, intending to violate

8  U.S. tax laws, failing to present proper documentation to Olenicoff and to the IRS,

9  charging unnecessary fees, causing Olenicoff to incur tax penalties and interest for

10  failing to properly file documents with the IRS, converting the Olen assets, and

11  perpetuating this scheme against the IRS and 52,000 other customers, Olenicoff would

12  not have transferred the assets into Union Charter and Neue Bank accounts, engaged

13  with New Haven Trust, or otherwise dealt with Birkenfeld, Staggl, or any of the other

14  individual representatives of Union Charter, Neue Bank, or New Haven Trust.

15       170.   As a proximate result of the fraudulent conduct of Defendants as

16  herein alleged, Olenicoff has incurred damages in that Olenicoff was induced to invest

17  with Union Charter and Neue Bank as an ignorant pawn in Defendants' collective

18  schemes to reap millions of dollars annually, maintain their superior reputations in the

19  industry and convert millions of dollars, all by reason of which Olenicoff has been

20  damaged in at least a sum in excess of $500 million dollars, and additional amounts

21  according to proof at time of trial, including interest, attorneys' fees and costs.  Further,

22  Plaintiffs are entitled to rescind any contract and to recover restitution for all fees paid to

23  Defendants, plus reasonable attorney's fees and costs.

24  ///

25  ///

26  ///

27  ///

28  ///

**THIRD AMENDED COMPLAINT**

## COUNT VII

(Fraud in Connection With the Purchase or Sale of Securities Violations of Section 10(b)
of the Exchange Act and Rule 10b-5 There under Rule 10(b) 5 Against All Defendants;
and DOES 1 through 10, inclusive)

171.   Plaintiffs repeat, reallege and reincorporate each and every allegation contained in the General Allegations and all previous paragraphs of all previous sections and Causes of Action this Complaint, inclusive, as though fully set forth herein.

172.   Throughout Years 2001 through 2006, Defendants Birkenfeld, Guignard, Liechti, Weil, Bovay, Benz, Hartmann, Beauchat, Kurer, Marty, Vogt, H. Wille, Buchel, Pilgrim, Wolfinger, Laternser, A. Wille, Staggl, Biedermann, Macaw, Smith, Michie, Knight, Hochschorner, Angst, Sundar and Lustig each by engaging in the conspiratorial conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (1) employed the previously described conspiratorial devices, schemes, or artifices to defraud; (2) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon Olenicoff, and as time will reveal, many others. This was then continuously and intentionally perpetuated throughout Years 2005 through 2008 by Defendants Birkenfeld, Schwedel, Storey, Vogt, H. Wille, Buchel, Pilgrim, Wolfinger, Laternser, A. Wille, Staggl, Biedermann, Macaw, Smith, Michie, Knight, Hochschorner, Angst, Sundar and Lustig as they continued to make the aforementioned misrepresentations and omissions while also trading securities without proper licensure. The volume of said transactions and statements would be burdensome for the purposes of this complaint. Accordingly, the following is a sample of the securities and statements:

- 68 -

**THIRD AMENDED COMPLAINT**

a. UBS AG sent a statement from Switzerland on July 30, 2002 via facsimile to Plaintiffs in Orange County, California at 5:48 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:  2,300 shares of UBS (CH) Equity Fund-USA, 7,000 shares of UBS 9LUX) Equity SICAV- USA Value; 7,000 shares of UBS (LUX) Equity Fund-Technology; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

b. UBS AG sent a statement from Switzerland on  March 5, 2003 via facsimile to Plaintiffs in Orange County, California at 6:34 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 17 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, Nokia, Carrefour, St Microelectronics, 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

c. UBS AG sent a statement from Switzerland on  July 9, 2003 via facsimile to Plaintiffs in Orange County, California at 4:52 p.m. (CET) detailing the account status and showing holdings and dividends in numerous stocks, including 19.22 per cent holdings in U.S. stocks and funds, and including, but not limited to: Daimler Chrysler, BNP Paribas, and Veolia Environmental; 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

THIRD AMENDED COMPLAINT

d. UBS AG sent a statement from Switzerland on August 5, 2003 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds: 130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

e. UBS AG sent a statement from Switzerland on January 13, 2004 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 22.58% holdings in U.S. stocks and funds: 130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

f. Neue Bank sent a Statement of Assets on March 26, 2002 from Liechtenstein to Orange County, California via facsimile at 11:04 a.m. (CET) detailing purchases of U.S. stocks including:

    1. 1,000,000 shares of Lehman Brothers at $103.813 per share

    2. 2,000,000 shares of Freddie Mac at $103.656 per share

    3. 1,000,000 shares of Unilever at $104.896 per share

    4. 1,000,000 shares of Countrywide Home Loans at $101.962 per share

    5. 2,000,000 shares of MBNA Master Credit Card Trust II Class 1 at $100.487 per share

    6. 1,000,000 shares of Vodafone Airtouch at $106.183 per share

    7. 1,000,000 shares of Ford Motor Credit Co. at $103.777 per share

THIRD AMENDED COMPLAINT

8. 2,000,000 shares of American Express Credit Card at $101.548 per share

9. 1,000,000 shares of American Express Co. at $101.642 per share

10. 1,000,000 shares of Bank of America Corp. at $99.201 per share

11. 1,000,000 shares of Wells Fargo & Co. global at $99.983 per share

12. 2,000,000 shares of Fannie Mae at $104.781 per share

13. 1,000,000 shares of AT&T Corp at $84 per share

g. Neue Bank sent a Statement of Assets on May 31, 2002 from Liechtenstein to Orange County, California via facsimile at 5:27 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

h. Neue Bank sent Statement of Assets sent on September 25, 2002 from Liechtenstein to UBS AG in Geneva, Switzerland to be forwarded to Plaintiffs in Orange County, California via facsimile on October 2, 2002 at 4:33 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

i. November 30, 2007 Statement of Assets apparently faxed from Neue Bank to New Haven Trust on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

173. December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Orange County, California via facsimile at 5:58 p.m. (CET) detailing purchases and holdings of the same U.S. securities identified above.

**THIRD AMENDED COMPLAINT**

174.   Additionally, as previously described, in and around June 2006, Birkenfeld, Staggl, Schwedel, and Storey, with the full knowledge of Vail and Eichinger, conspired and assented to the scheme involving the intricate misappropriation of the Olen funds for the benefit of SES and each of these individuals, plus Union Charter, Neue Bank and New Haven Trust.

175.   By engaging in the conduct described above, Defendants, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 there under, 17 C.F.R. § 240.10b-5.

176.   As a proximate result of the fraudulent conduct of Defendants as herein alleged, Olenicoff has incurred damages in that he was induced to transfer assets and invest in the above-described scheme, has been saddled with investments in non-tradable securities, has suffered losses in the values of improper and unauthorized securities purchased and held, has incurred millions in self-dealing fees and costs, and been subjected to transactions for which none of the Defendants were properly licensed. Accordingly Plaintiffs have been damaged in at least the sum in excess of $500 million dollars, and additional amounts according to proof at time of trial, including interest, attorneys' fees and costs.

## COUNT VIII

(Damages for Sales of Securities by Means of Communications Containing False Statements and Omissions - Violations Of Section 25401 and 25501 of California Corporations Code Against All Defendants; And DOES 1 through 10, Inclusive)

177.   Plaintiffs repeat, reallege and reincorporate each and every allegation contained in the General Allegations and all previous paragraphs of all previous sections and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

178.   Defendants, and each of them, by engaging in the conspiratorial conduct described above, offered and sold securities, without proper licensure, in the state of California, continuously between 2001 and 2007, by means of both written and

**THIRD AMENDED COMPLAINT**

oral communications which included untrue statement of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   The false affirmative representations and intentional omissions/concealments of material facts to Olenicoff that the UBS AG Defendants did, including but not limited to:

     a. That Birkenfeld, Neue Bank, and New Haven Trust would prepare proper and legal documentation for the formation of, and form, shell corporations with the representation that said formations were permitted by the IRS;

     b. Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that Olenicoff would not need to be a named signatory on certain accounts due to the need to maintain the high level of legal privacy;

     c. Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants, representing that Olenicoff should follow the estate planning and tax opinions and advice rendered by Defendants pertaining to lawful requirements for report of his off-shore assets as required by the IRS from 2002 through 2007;

     d. Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing to Olenicoff that the method by which Defendants titled the ownership of the accounts with Defendants would be fully compliant with all U.S. reporting requirements;

     e. Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that the Defendants would prepare all the necessary and proper forms to be submitted to the Internal Revenue Service to report all income and accounts required to

THIRD AMENDED COMPLAINT

be reported to the Internal Revenue Service to ensure Olenicoff would comply with all U.S. tax reporting requirements;

f.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that his investments would be held in safe, conservative investments ensuring a prudent return in liquid investments;

g.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing that Olenicoff's financial information would be protected and held in confidence;

h.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants representing to Olenicoff that the Defendants would manage the Olen assets in a lawful and prudent manner and use the care and expertise of a fiduciary with respect thereto; and

i.   Birkenfeld, Staggl, Biedermann, and the Neue Bank Defendants Laternser, A. Wille and Buchel representing to Olenicoff that Defendants were properly licensed and thus, permitted to provide banking services, offer investment advice and management of funds and to solicit the purchase or sale of securities to U.S. citizens, including Olenicoff;

j.   Birkenfeld, Storey, Schwedel, Staggl, Biedermann, Laternser, A. Wille and Buchel concealing the fact that Plaintiffs' investments would be used for investing in highly speculative and/or shell start-up companies and/or "pump and dump" stocks, including, but not limited to, Navitrak International Corporation purchased July 19, 2006; Mexoro Minerals, Ltd. purchased November 9, 2007; Synova Healthcare Group, Inc. purchased July 4, 2006; Vectr Systems purchased May 24,

**THIRD AMENDED COMPLAINT**

2006; and Teflomi purchased June 7, 2006 in contrast to the acknowledged directives of Plaintiffs and concealing the fact that the Michie Defendants were not properly licensed to sell these risky securities;

k. Birkenfeld, Storey, and Schwedel further concealed from Plaintiffs at all times during 2005 through 2008 that Union Charter had no experience or licensure to manage stock accounts and that Union Charter was simply a promoter of private stock offerings in shell corporations and/or start-up companies.

179. As a proximate result of the fraudulent conduct of Defendants as herein alleged, Olenicoff has incurred damages in that he was induced to transfer assets and invest in the above-described scheme, has been saddled with investments in non-tradable securities, has suffered losses in the values of securities purchased and held, has incurred millions in self-dealing fees and costs, and been subjected to transactions for which none of the Defendants were properly licensed. Accordingly Plaintiffs have been damaged in at least the sum in excess of $500 million dollars, and additional amounts according to proof at time of trial, including interest, attorneys' fees and costs.

180. The aforementioned conduct of Defendants, and each of them, was an intentional misrepresentation, deceit, or concealment of material facts known to each of the Defendants with the intention on the part of the Defendants of thereby depriving Olenicoff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Olenicoff to a cruel and unjust hardship and conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

///
///
///
///

**THIRD AMENDED COMPLAINT**

## COUNT IX

(Breach of Fiduciary Duty Against the UBS Defendants; Union Charter Defendants; New Haven Trust Defendants; Neue Bank Defendants; Michael Storey ; and DOES 1 through 10, inclusive)

181. Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

182. Defendants held and continue to hold themselves out to the public, and held themselves out to Olenicoff, as experts with particular competence in investment and tax matters, who were properly licensed to provide banking services, offer investment advice, manage funds and solicit and execute the purchase and sale of securities to and for U.S. citizens. Defendants each made promises of return rates on investments and further opined and directed Olenicoff, verbally and in writing, regarding his tax filing requirements and asset disclosure requirements.

183. Defendants further "managed" the Olen assets by opening accounts, creating entities, investing in stocks, bonds, funds, and corporate entities. Moreover, each Defendant charged fees and otherwise converted the Olen assets such that the assets did not grow as they would have had they managed his assets in a reasonably prudent manner within the scope of authority provided to Defendants. Indeed, Olenicoff suffered losses of millions of dollars on an annual basis, including a suspicious $40 million dollar loss immediately prior to his transfer of assets back to the U.S.

184. In connection with the investment scheme, each Defendant was one of Olenicoff's fiduciaries and, thus, owed him the undivided duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility. Olenicoff relied on each Defendant to act as Plaintiffs' respective fiduciary and to advise Olenicoff as to the legitimacy of his transactions and the propriety of the tax disclosures and claims related to the ownership scheme.

185. In truth, the investment scheme lacked economic substance, was designed to generate millions in revenue to Defendants and was contrary to the Internal

THIRD AMENDED COMPLAINT

Revenue Code, Treasury Regulations, policies of the IRS, and the QI Agreement, all of which were known to each Defendant, or which should have been known to each of them upon the exercise of reasonable professional research and judgment.

186.   Defendants breached their respective fiduciary duties to Olenicoff by, *inter alia*, the following acts and/or omissions:

        a.    Taking advantage of a relationship of trust and confidence and using their respective and collective knowledge of Olenicoff's confidential information to solicit him to transfer assets to UBS AG and Neue Bank and give control to the UBS AG Defendants, the Neue Bank Defendants, the New Haven Trust Defendants and Union Charter ;

        b.    Charging and collecting unreasonable, excessive, and unethical fees;

        c.    Failing to disclose and comply with the QI Agreement and other disclosure and tax law requirements;

        d.    Breaching the QI Agreement;

        e.    Planning and implementing a scheme by which Defendants could manipulate and trick their clients, including Olenicoff, into keeping their assets in UBS AG and Neue Bank, and held by New Haven Trust;

        f.    Advising Olenicoff that the transactions were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

        g.    Failing to advise Olenicoff that the Defendants were not properly licensed to provide banking services, offer investment advice, manage funds and solicit and execute the purchase and sale of securities to and for U.S. citizens which said licensing was specifically avoided so that the illegal activities of the

- 77 -

1   Defendants would go undetected by U.S. regulating
2   authorities.

3   h.   Recommending, advising, instructing, and assisting Olenicoff
4        in the formation of unnecessary business entities and incurring
5        unnecessary fees and criminal investigation related thereto;

6   i.   Transferring assets to the names of said "shell" entities thereby
7        causing additional unnecessary fees;

8   j.   Investing Olenicoff's money in corporations controlled and
9        operated for the benefit of Defendants without authority and
10       without advising Olenicoff of said investments;

11  k.   Serving on the boards of said entities in direct conflict to the
12       interest of their client to whom they owed a fiduciary duty;

13  l.   While serving on the board of the self-created entities,
14       unilaterally awarding themselves large salaries comprised of
15       Olenicoff's "investments," to serve as board members of said
16       entities;

17  m.   Promoting and selling unregistered and ineffective tax shelters;

18  n.   Failing to obtain and ensure licensure of Birkenfeld, Staggl,
19       and others regarding the provision of banking services,
20       investment advice and/or soliciting the purchase or sale of
21       securities through contact with clients in the U.S.;

22  o.   Failing to ensure that the advised transactions complied with
23       applicable federal rules and regulations;

24  p.   Failing to comply with their respective ethical obligations to
25       Olenicoff and violating their respective professional rules of
26       conduct;

27  q.   Providing erroneous legal and tax opinions and advice;

28

**THIRD AMENDED COMPLAINT**

r.   Providing personal financial information as well as erroneous financial information to third parties while maintaining that such information would be held in strict confidence and/or that Olenicoff would be advised of any intent to disclose such information;

s.   Defendant Birkenfeld breached his fiduciary duties to Olenicoff by, *inter alia*, taking advantage of a relationship of trust and confidence and using his respective and collective knowledge of Olenicoff's confidential information by providing personal financial information, as well as erroneous financial information, to the IRS and DOJ while maintaining that the structure of the Olenicoff accounts was fully compliant with all U.S. laws, such information would be held in strict confidence and/or that Olenicoff would be advised of any intent to disclose such information;

t.   Defendant UBS AG breached its fiduciary duties to Olenicoff by, *inter alia*, failing to properly manage and supervise its representatives in an appropriate manner including, but not limited to failure secure the confidential information of Plaintiffs at the time of Birkenfeld's departure, thereby allowing him to utilize such confidential information for his own personal gain and benefit.

187.   As a result of Defendants' conduct, Olenicoff has suffered injury in that, among other things, Olenicoff:

a.   Paid Defendants millions of dollars annually in unearned management fees and transaction fees which amounts should not have been charged to him;

THIRD AMENDED COMPLAINT

b.   Incurred and paid tens of millions of dollars in tax penalties and interest for ignorantly failing to pay taxes on profits over an approximate 5-year period;

c.   Has incurred, and will continue to incur, substantial additional costs in hiring tax and legal advisors to address his injuries;

d.   Has lost the opportunity to engage in legitimate tax savings opportunities;

e.   Was criminally investigated by the Department of Justice for the tax shelter scheme devised by Defendants ; and

f.   Has suffered, and will continue to suffer, constant and relentless negative press associated with the Defendant's scheme causing Olenicoff and his family great personal and professional embarrassment and affecting his business reputation.

188.   As a proximate cause of the foregoing, Olenicoff has been injured in an actual amount to be proven at trial, but at least $500 million dollars, and should further be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT X

(Violation of 18 U.S.C. § 1962(c) – Federal RICO Against All Defendants; and DOES 1 through 10, inclusive)

189.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

190.   At all times relevant to this complaint, all Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

191.   At all times relevant to this complaint, the foregoing Defendants directly or indirectly maintained an interest in or participated in the operation of UBS AG, Neue Bank, New Haven Trust, Union Charter, SES, GM Capital, Knight Financial,

- 80 -

**THIRD AMENDED COMPLAINT**

Navitrak Intl., Synova, Mexoro, and Vectr Systems, which are "enterprises" within the meaning of 18 U.S.C. § 1961(4).

192.   As set forth more fully above in the factual allegations, the foregoing Defendants corrupted each of the entities and enterprises and caused Plaintiffs damage through a pattern of racketeering activity.   At all times relevant to this Complaint, the foregoing Defendants conducted or participated, directly or indirectly, in the operation and management of the numerous entity defendants through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and § 1962(c).   As set forth in detail in the factual allegations, and incorporated herein by reference, this pattern of racketeering activity entailed at least two of the following predicate acts of racketeering activity per each of the foregoing Defendants:

a. Bribery between the Michie Defendants and the UBS AG, Neue Bank Defendants and New Haven Trust Defendants for the transactions occurring between 2001 and 2008, including, but not limited to purchases that occurred on 11/9/07, 7/19/06, 7/4/06, 5/24/06, and 6/7/06;

b. Bribery between the SES Defendants and the Union Charter Defendants and New Haven Trust Defendants in or around June 2006 for illegally funding SES;

c. Embezzlement by the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants, and Union Charter Defendants continuously and repeatedly between 2001 and 2008;

d. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG, Neue Bank, New Haven Trust, Union Charter and SES continuously and repeatedly between 2001 and 2008 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, intention to invest in conservative, low-risk liquid equities and AA debt investment securities, and true use of assets;

e. Securities fraud continuously and repeatedly between 2001 and 2008, including intentional statutory and governmental violations of selling securities without proper licensure, ignoring non-licensure of employees and third party securities promoters, and insider trading related to improperly and/or illegally purchased securities, including, but not limited to, Navitrak Intl., Mexoro, Vectr Systems, Synova Healthcare, Teflomi and Synthesis Energy Systems.

f. These activities took place by mail and/or wire as follows:

   i.    UBS AG sent a statement from Switzerland on July 30, 2002 via facsimile to Plaintiffs in Orange County, California at 5:48 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:  2,300 shares of UBS (CH) Equity Fund-USA, 7,000 shares of UBS 9LUX) Equity SICAV-USA Value; 7,000 shares of UBS (LUX) Equity Fund-Technology; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

   ii.   UBS AG sent a statement from Switzerland on  March 5, 2003 via facsimile to Plaintiffs in Orange County, California at 6:34 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 17 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, Nokia, Carrefour, St Microelectronics, 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

   iii.  UBS AG sent a statement from Switzerland on  July 9, 2003 via facsimile to Plaintiffs in Orange County, California at 4:52 p.m. (CET) detailing the account status and showing holdings and

**THIRD AMENDED COMPLAINT**

dividends in numerous stocks, including 19.22 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, BNP Paribas, and Veolia Environmental; 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

iv.     UBS AG sent a statement from Switzerland on August 5, 2003 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:  130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

v.      UBS AG sent a statement from Switzerland on January 13, 2004 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 22.58% holdings in U.S. stocks and funds:  130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

vi.     Neue Bank sent a Statement of Assets on March 26, 2002 from Liechtenstein to Orange County, California via facsimile at 11:04 a.m. (CET) detailing purchases of U.S. stocks including:

    aa.     1,000,000 shares of Lehman Brothers at $103.813 per share

    bb.     2,000,000 shares of Freddie Mac at $103.656 per share

    cc.     1,000,000 shares of Unilever at $104.896 per share

**THIRD AMENDED COMPLAINT**

dd.   1,000,000 shares of Countrywide Home Loans at $101.962 per share

ee.   2,000,000 shares of MBNA Master Credit Card Trust II Class 1 at $100.487 per share

ff.   1,000,000 shares of Vodafone Airtouch at $106.183 per share

gg.   1,000,000 shares of Ford Motor Credit Co. at $103.777 per share

hh.   2,000,000 shares of American Express Credit Card at $101.548 per share

ii.   1,000,000 shares of American Express Co. at $101.642 per share

jj.   1,000,000 shares of Bank of America Corp. at $99.201 per share

kk.   1,000,000 shares of Wells Fargo & Co. global at $99.983 per share

ll.   2,000,000 shares of Fannie Mae at $104.781 per share

mm.   1,000,000 shares of AT&T Corp at $84 per share.

vii.   October 27, 2006 Statement of Assets sent by Neue Bank on October 31, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 6:13 p.m. (CET);

viii.   November 11, 2006 Statement of Assets sent by Neue Bank on December 5, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 4:48 p.m. (CET);

**THIRD AMENDED COMPLAINT**

ix..    December 31, 2006 Statement of Assets sent on January 7, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:34 p.m. (CET);

x.    July 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:46 p.m. (CET);

xi.    August 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:48 p.m. (CET);

xii.    October 31, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on November 6, 2007 at 11:07 a.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 8:12 p.m. (CET);

xiii.    November 30, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET);

xiv.    December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:58 p.m. (CET).

193.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under 18 U.S.C. §§ 1341, 1343, and 1346 and are within the

- 85 -

**THIRD AMENDED COMPLAINT**

1   scope of 18 U.S.C. § 1961(a)(A) and (1)(B).   As set out more fully herein, the

2   commission of at least two of those related predicate acts over the last 10 years

3   constituted a continuous and related pattern of racketeering activity as defined in 18

4   U.S.C. §§ 1961(1) and (5).

5          194.   As part of, and in further of, the fraudulent schemes and artifices

6   previously described, said Defendants made repeated use of, or had reason to believe

7   that others would use, the U.S. Postal Service, interstate overnight couriers, and the

8   interstate wires to transmit various documents, including, without limitation, letters,

9   financial statements, account statements, contracts, and miscellaneous records.

10         195.   Each transmission constituted either the transmittal by means of wire

11  communication in interstate commerce of signals, sounds or writings; the use of the U.S.

12  Postal service; or the use of interstate overnight couriers for the purpose of executing or

13  in connection with the aforementioned schemes and artifices to defraud Plaintiffs, and

14  other third parties.  The foregoing Defendants knew, or had reason to believe, that these

15  transmissions were in furtherance of advancing the aforementioned corrupt enterprises

16  or were incidental to an essential part of the aforementioned corrupt enterprise.

17         196.   As described in Paragraphs 78, 94, 103, 107 said Defendants made or

18  caused these transmissions to be made with the specific intent of defrauding Plaintiffs

19  and other investors and potential investors in UBS AG, Neue Bank, New Haven Trust,

20  Union Charter, SES, GM Capital, Knight Financial, Navitrak Intl., Synova, Mexoro, and

21  Vectr Systems, and other yet-to-be-identified entities.   Each of these transmissions

22  furthered the aforementioned schemes and artifices to defraud, which were intended to,

23  and did, proximately cause injury to Plaintiffs and others in their business and property.

24  Those acts constituted offenses indictable as crimes under, the "mail fraud" and "wire

25  fraud" statutes, 18 U.S.C. §§ 1341, 1343 and 1346.

26         197.   Plaintiffs reasonably relied upon the oral and written statements made

27  to them by said Defendants in connection with the aforementioned schemes or artifices

28  to defraud.

**THIRD AMENDED COMPLAINT**

198.   As a result of the foregoing, Plaintiffs have sustained substantial damages and/or irreparable harm in the approximate amount of $500 million.

## COUNT XI

(Violation of 18 U.S.C. § 1962(d) – Federal RICO Conspiracy Against All Defendants; and DOES 1 through 10, inclusive)

199.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

200.   As more specifically set forth in the factual allegations above, since 2001, through and including 2008, Defendants unlawfully and willfully combined, conspired, confederated and agreed between and amongst each other to jointly violate 18 U.S.C. § 1962(c), i.e. to conduct and participate, directly and indirectly, in the affairs of UBS, Neue Bank, New Haven Trust, Union Charter, SES, GM Capital, Knight Financial, Navitrak Intl., Synova, Mexoro, and Vectr Systems, and other yet-to-be identified entities through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d).

201.   As part of this conspiracy, each of the foregoing Defendants personally agreed to commit and, in fact, committed two or more predicate racketeering acts within the last 10 years, including, but not limited to, bribery, embezzlement, fraud, and securities fraud, including insider trading, and agreed to conduct and, in fact, conducted the affairs of UBS, Neue Bank, New Haven Trust, Union Charter, SES, GM Capital, Knight Financial, Navitrak Intl., Synova, Mexoro, and Vectr Systems, and other yet-to-be identified entities through a pattern of racketeering activity in violation of U.S.C. § 1962(c). More specifically, Defendants engaged in the following:

    a. Bribery between the Michie Defendants and the UBS AG, Neue Bank Defendants and New Haven Trust Defendants for the transactions occurring between 2001 and 2008, including, but not limited to purchases that occurred on 11/9/07, 7/19/06, 7/4/06, 5/24/06, and 6/7/06;

**THIRD AMENDED COMPLAINT**

b. Bribery between the SES Defendants and the Union Charter Defendants and New Haven Trust Defendants in or around June 2006 for illegally funding SES;

c. Embezzlement by the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants, and Union Charter Defendants continuously and repeatedly between 2001 and 2008;

d. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG, Neue Bank, New Haven Trust, Union Charter and SES continuously and repeatedly between 2001 and 2008 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, intention to invest in conservative, low-risk liquid equities and AA debt investment securities, and true use of assets;

e. Securities fraud continuously and repeatedly between 2001 and 2008, including intentional statutory and governmental violations of selling securities without proper licensure, ignoring non-licensure of employees and third party securities promoters, and insider trading related to improperly and/or illegally purchased securities, including, but not limited to, Navitrak Intl., Mexoro, Vectr Systems, Synova Healthcare, Teflomi and Synthesis Energy Systems.

f. These activities took place by mail and/or wire as follows:

   i.   UBS AG sent a statement from Switzerland on July 30, 2002 via facsimile to Plaintiffs in Orange County, California at 5:48 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:  2,300 shares of UBS (CH) Equity Fund-USA, 7,000 shares of UBS 9LUX) Equity SICAV-USA Value; 7,000 shares of UBS (LUX) Equity Fund-Technology;

**THIRD AMENDED COMPLAINT**

300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

ii.     UBS AG sent a statement from Switzerland on March 5, 2003 via facsimile to Plaintiffs in Orange County, California at 6:34 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 17 per cent holdings in U.S. stocks and funds, and including, but not limited to: Daimler Chrysler, Nokia, Carrefour, St Microelectronics, 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

iii.    UBS AG sent a statement from Switzerland on July 9, 2003 via facsimile to Plaintiffs in Orange County, California at 4:52 p.m. (CET) detailing the account status and showing holdings and dividends in numerous stocks, including 19.22 per cent holdings in U.S. stocks and funds, and including, but not limited to: Daimler Chrysler, BNP Paribas, and Veolia Environmental; 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

iv.    UBS AG sent a statement from Switzerland on August 5, 2003 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds: 130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

**THIRD AMENDED COMPLAINT**

v.     UBS AG sent a statement from Switzerland on January 13, 2004 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 22.58% holdings in U.S. stocks and funds:  130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

vi.    Neue Bank sent a Statement of Assets on March 26, 2002 from Liechtenstein to Orange County, California via facsimile at 11:04 a.m. (CET) detailing purchases of U.S. stocks including:

        aa.   1,000,000 shares of Lehman Brothers at $103.813 per share

        bb.   2,000,000 shares of Freddie Mac at $103.656 per share

        cc.   1,000,000 shares of Unilever at $104.896 per share

        dd.   1,000,000 shares of Countrywide Home Loans at $101.962 per share

        ee.   2,000,000 shares of MBNA Master Credit Card Trust II Class 1 at $100.487 per share

        ff.   1,000,000 shares of Vodafone Airtouch at $106.183 per share

        gg.   1,000,000 shares of Ford Motor Credit Co. at $103.777 per share

        hh.   2,000,000 shares of American Express Credit Card at $101.548 per share

        ii.   1,000,000 shares of American Express Co. at $101.642 per share

        jj.   1,000,000 shares of Bank of America Corp. at $99.201 per share

**THIRD AMENDED COMPLAINT**

kk.  1,000,000 shares of Wells Fargo & Co. global at $99.983 per share

ll.  2,000,000 shares of Fannie Mae at $104.781 per share

mm.  1,000,000 shares of AT&T Corp at $84 per share.

vii.  October 27, 2006 Statement of Assets sent by Neue Bank on October 31, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 6:13 p.m. (CET);

viii.  November 11, 2006 Statement of Assets sent by Neue Bank on December 5, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 4:48 p.m. (CET);

ix..  December 31, 2006 Statement of Assets sent on January 7, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:34 p.m. (CET);

x.  July 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:46 p.m. (CET);

xi.  August 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:48 p.m. (CET);

xii.  October 31, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on

**THIRD AMENDED COMPLAINT**

November 6, 2007 at 11:07 a.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 8:12 p.m. (CET);

xiii.   November 30, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET);

xiv.   December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:58 p.m. (CET).

202.   As a result, Plaintiffs have sustained substantial damages and have been irreparably harmed in the approximate amount of $500 million.

## COUNT XII

(Professional Malpractice Against the UBS Defendants; Neue Bank Defendants; New Haven Trust Defendants; Union Charter Defendants; and DOES 1 through 10, inclusive)

203.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

204.   As Olenicoff's investment and tax advisers, Defendants and DOES 1 through 10, and each of them, owed Olenicoff undivided duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

205.   Said Defendants also owed a duty to Olenicoff to meet the applicable standard of care for accountants and financial advisors. Said Defendants failed to meet the applicable standards of care, which proximately caused damages to Olenicoff as set forth elsewhere in this Complaint.

**THIRD AMENDED COMPLAINT**

206. During the course of their representation of Olenicoff, said Defendants each made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of material fact and gave numerous recommendations, advice, instructions, and opinions to Olenicoff, including, but not limited to, the following:

207. Defendants breached their respective fiduciary duties to Olenicoff by, *inter alia*, the following acts and/or omissions:

    a.    Taking advantage of a relationship of trust and confidence and using their respective and collective knowledge of Olenicoff's confidential information to solicit him to transfer assets to UBS AG and Neue Bank and give control to the UBS AG Defendants, the Neue Bank Defendants, the New Haven Trust Defendants and Union Charter;

    b.    Charging and collecting unreasonable, excessive, and unethical fees;

    c.    Failing to disclose the QI Agreement and other disclosure and tax requirements;

    d.    Breaching the QI Agreement;

    e.    Planning and implementing a scheme by which Defendants could manipulate their clients, including Olenicoff, into keeping their assets in UBS AG and Neue Bank;

    f.    Advising Olenicoff that the investments and transactions were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

    g.    Recommending, advising, instructing, and assisting Olenicoff in the formation of unnecessary business entities and incurring unnecessary fees and criminal investigation related thereto;

**THIRD AMENDED COMPLAINT**

h.     Transferring assets to the names of said "shell" entities thereby causing additional unnecessary fees;

i.     Investing Olenicoff's money in corporations controlled and operated for the benefit of Defendants without authority and without advising Olenicoff of said investments;

j.     Serving on the boards of said entities in direct conflict to the interest of their client to whom they owed a fiduciary duty;

k.     While serving on the board of the self-created entities, unilaterally awarding themselves large salaries comprised of Olenicoff's "investments," to serve as board members of said entities;

l.     Promoting and selling unregistered and illegal tax shelters;

m.     Failing to obtain and ensure licensure of Birkenfeld, Staggl, and others regarding the provision of banking services, investment advice and/or soliciting the purchase or sale of securities through contact with clients in the U.S.;

n.     Failing to ensure that the advised transactions complied with applicable federal rules and regulations;

o.     Failing to comply with their respective ethical obligations to Olenicoff and violating their respective professional rules of conduct;

p.     Providing erroneous legal and tax opinions and advice;

q.     Providing personal financial information as well as erroneous financial information to third parties while maintaining that such information would be held in strict confidence and/or that Olenicoff would be advised of any intent to disclose such information; and

**THIRD AMENDED COMPLAINT**

      r.  Permitting or participating in bribery, embezzlement and insider trading.

   208. Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Olenicoff of the omissions set forth above, was intentional, negligent, grossly negligent, and reckless. Accordingly, said Defendants failed to exercise the requisite standard of care for tax advisers.

   209. Olenicoff fully performed his obligations to Defendants under their respective contracts and, thus, did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

   210. In reasonable reliance on Defendants' advice, Olenicoff paid millions of dollars for tax and legal advice, paid millions of dollars for the execution of his investment transactions, purchased unnecessary investments to effectuate Defendants' scheme, did not avail himself of legitimate investments and tax savings opportunities, and was subjected to criminal investigation in connection with Defendants' scheme.

   211. But for said Defendants' failures to meet their respective applicable standards of care described above, Olenicoff would never have transferred his assets to UBS AG and Neue Bank, allowed unnecessary investments and transactions, filed improper federal and state tax returns, and otherwise failed to avail himself of the proper investments and tax savings opportunities in which he was already engaged.

   212. As a result of said Defendants' conduct, Olenicoff has suffered injury in that Olenicoff has paid Defendants millions of dollars, purchased unnecessary investments, suffered unnecessary transactions, had funds converted, incurred tax penalties and interest, incurred, and continuing to incur, substantial additional costs in hiring new tax and legal advisors to rectify the situation, and otherwise foregone legitimate investment and tax savings opportunities.

**THIRD AMENDED COMPLAINT**

213.   As proximate cause of the foregoing, Olenicoff has been injured in an actual amount to be proven at trial, but at least $500 million dollars, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT XIII

(Disgorgement of Unethical Excessive & Illegal Fees Against the UBS Defendants; Neue Bank Defendants; New Haven Trust Defendants; Union Charter Defendants; and DOES 1 through 10, inclusive)

214.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

215.   Defendants charged Olenicoff for repeated work which had no true value and expended little, if any, additional time or effort in providing necessary, useful and/or productive advice, products, opinions and/or services to Olenicoff.  These charges were not consistent with the agreed-upon one-fee system promised to Olenicoff. Instead, he was charged a management fee as well as "per transaction" fees. Additionally, said Defendants were not licensed to conduct any of the transactions, give advice, sell, and/or invest his assets.

216.   In addition to the meritless advice, opinions and document preparation provided to Olenicoff, Defendants' respective fees, which he paid out of his assets, are unethically excessive and in violation of both federal and state statutes.

217.   Moreover, because Defendants did not disclose information they were required to disclose, as provided hereinabove, their fee and/or compensation agreements with Olenicoff are not enforceable.

218.   Accordingly, all fees, profits, commissions, received by Defendants either directly from Olenicoff or from any and all other Defendants and/or third parties, in the preparation of and formation of business entities, and "salaries" obtained from entities using the Olen assets, must be disgorged.

/ / /

**THIRD AMENDED COMPLAINT**

## COUNT XIV

(Civil Conspiracy Against All Defendants and DOES 1 through 10, inclusive)

219.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

220.   Between 2001 and 2008, Defendants engaged in several civil conspiracies with each other which consisted of:

(a)   an agreement between and amongst Defendants to

(b)   misrepresent to Olenicoff, and similarly situated existing and prospective customers, the true nature of the investment scheme and to defraud Olenicoff into paying unnecessary and excessive fees for a fraudulent product and fraudulent services and to convert assets from Olenicoff,

(c) which agreement resulted in injury to Olenicoff.

221.   As previously described in detail above, Defendants knowingly acted in concert to market and implement the fraudulent and manipulative scheme.  In doing so, Defendants acted with full knowledge and awareness that the asset transfers, investments, entity formations and unauthorized transfers were designed to give the false impression that a well-planned and complex series of transactions were legitimate business transactions which had economic substance from a tax-savings, privacy and investment standpoint, when in fact they lacked those and other features necessary for a successful tax and investment strategy and were further in direct contravention to the QI Agreement and designed to skirt Olenicoff's best interests for their collective gain.

222.   Prior to the marketing and consummation of the asset transfers and investment scheme, Defendants entered into an agreement, association and union associated, in fact, to devise, design, facilitate, promote, and manage the asset transfers and investments of Olenicoff for the express purpose of generating and sharing in millions of dollars in fees and converted monies.  Upon the transfer of the Olen assets to Neue Bank, Defendants agreed with the Union Charter Defendants to perpetuate the

THIRD AMENDED COMPLAINT

original scheme and further to divert funds to affiliated entities including but not limited to the SES Defendants.

223.  Not only did Defendants know that their expressly marketed strategies were abusive and illegal tax shelters, but they expressly stated to Olenicoff that the transactions were going to net Olenicoff better investment results while providing additional privacy and security.  This was patently false as the Defendants knew.

224.  Defendants further knew, or were reckless in not knowing, that they were charging Olenicoff excessive, unnecessary and/or imaginary fees for all transactions conducted, as described above.

225.  The acts of the Defendants violated both federal and state law, as well as rules governing professional standards.

226.  The Defendants acted in their respective roles as described above according to a predetermined and commonly understood and accepted plan of action all for the sole purposes of obtaining professional fees and converting monies from Olenicoff, and other customers, all in contravention to the QI Agreement and/or U.S. Tax laws.

227.  As co-conspirators, each of the Defendants, and DOES 1 through 10, during the previously-described time periods, aided the other in the implementation and execution of said Defendants' joint deceptive scheme by causing Olenicoff to invest the Olen funds with them and/or by taking advantage of their powers over said funds.  A meeting of the minds existed between and amongst said Defendants to commit the unlawful acts alleged herein.  These conspiracies to commit said unlawful, overt acts, proximately caused and continue to cause Olenicoff damages as previously set forth herein.

228.  As a consequence of Defendants' conduct, Olenicoff has suffered injury to himself, the business and assets in that he has paid Defendants millions of dollars in fees and actual damages and losses in an amount to be proven at trial, has

**THIRD AMENDED COMPLAINT**

incurred tax penalties and interest and disallowance of certain other deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; has foregone legitimate tax savings and investment opportunities; has been criminally investigated by the Department of Justice; and has suffered, and will continue to suffer, relentless negative press causing him and his family great personal and professional embarrassment and effecting his business reputation.

229.   Olenicoff has been injured in an actual amount to be proven at trial, but at least $500 million dollars as to all Defendants, including Michael Storey, but excluding the SES Defendants, and at least $5 million dollars as to the SES Defendants, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT XV

(Unfair Business Practices Act, Cal. B&P Code §17200, Against All Defendants; and DOES 1 through 10, inclusive)

230.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

231.   Based on the wrongful act of Defendants, and DOES 1 through 10, and each of them, as set forth full in the factual allegations above and incorporated herein by this reference, both against Olenicoff and in violation of federal and state laws, Olenicoff has suffered, and will continue to suffer, substantial pecuniary losses as well as irreparable injury to Olenicoff's business reputation and goodwill.

232.   By reason of said wrongful acts, including, but not limited to, fraud, bribery, embezzlement and securities fraud, including insider trading, said Defendants have violated California Business & Professions Code § 17200, et seq., by consummating an unlawful, unfair, and fraudulent business practice designed to deprive Olenicoff of money and investment profits.   More specifically, Defendants engaged in the following:

**THIRD AMENDED COMPLAINT**

a. Bribery between the Michie Defendants and the UBS AG, Neue Bank Defendants and New Haven Trust Defendants for the transactions occurring between 2001 and 2008, including, but not limited to purchases that occurred on 11/9/07, 7/19/06, 7/4/06, 5/24/06, and 6/7/06;

b. Bribery between the SES Defendants and the Union Charter Defendants and New Haven Trust Defendants in or around June 2006 for illegally funding SES;

c. Embezzlement by the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants, and Union Charter Defendants continuously and repeatedly between 2001 and 2008;

d. Fraudulent misrepresentation and concealment by the previously described individuals on behalf of UBS AG, Neue Bank, New Haven Trust, Union Charter and SES continuously and repeatedly between 2001 and 2008 relating to fund management, tax legalities, liabilities, and filing requirements, privacy, quality of securities, true price of securities, intention to invest in conservative, low-risk liquid equities and AA debt investment securities, and true use of assets;

e. Securities fraud continuously and repeatedly between 2001 and 2008, including intentional statutory and governmental violations of selling securities without proper licensure, ignoring non-licensure of employees and third party securities promoters, and insider trading related to improperly and/or illegally purchased securities, including, but not limited to, Navitrak Intl., Mexoro, Vectr Systems, Synova Healthcare, Teflomi and Synthesis Energy Systems.

f. These activities took place by mail and/or wire as follows:

   i. UBS AG sent a statement from Switzerland on July 30, 2002 via facsimile to Plaintiffs in Orange County, California at 5:48 p.m. (CET) detailing the account status and showing holdings in numerous

**THIRD AMENDED COMPLAINT**

stocks, including U.S. stocks and funds:  2,300 shares of UBS (CH) Equity Fund-USA, 7,000 shares of UBS 9LUX) Equity SICAV-USA Value; 7,000 shares of UBS (LUX) Equity Fund-Technology; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

ii.      UBS AG sent a statement from Switzerland on  March 5, 2003 via facsimile to Plaintiffs in Orange County, California at 6:34 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 17 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, Nokia, Carrefour, St Microelectronics, 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

iii.      UBS AG sent a statement from Switzerland on  July 9, 2003 via facsimile to Plaintiffs in Orange County, California at 4:52 p.m. (CET) detailing the account status and showing holdings and dividends in numerous stocks, including 19.22 per cent holdings in U.S. stocks and funds, and including, but not limited to:  Daimler Chrysler, BNP Paribas, and Veolia Environmental; 2,300 shares of UBS 9CH) Equity Fund-USA, 7,000 shares of UBS (LUX) Equity SICAV-USA Value, 130,000 shares of SHS GAM Star fund American Focus, 300 shares of UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

iv.      UBS AG sent a statement from Switzerland on August 5, 2003 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including U.S. stocks and funds:   130,000 shares of SHS

**THIRD AMENDED COMPLAINT**

GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

v.      UBS AG sent a statement from Switzerland on January 13, 2004 via facsimile to Plaintiffs in Orange County, California at 5:50 p.m. (CET) detailing the account status and showing holdings in numerous stocks, including 22.58% holdings in U.S. stocks and funds:  130,000 shares of SHS GAM Star Fund, American Focus, Class USD; 300 shares of SHS UBS Luxembourg SICAV Dynamic Return (USD) Capitalisation;

vi.     Neue Bank sent a Statement of Assets on March 26, 2002 from Liechtenstein to Orange County, California via facsimile at 11:04 a.m. (CET) detailing purchases of U.S. stocks including:

aa.   1,000,000 shares of Lehman Brothers at $103.813 per share

bb.   2,000,000 shares of Freddie Mac at $103.656 per share

cc.   1,000,000 shares of Unilever at $104.896 per share

dd.   1,000,000 shares of Countrywide Home Loans at $101.962 per share

ee.   2,000,000 shares of MBNA Master Credit Card Trust II Class 1 at $100.487 per share

ff.   1,000,000 shares of Vodafone Airtouch at $106.183 per share

gg.   1,000,000 shares of Ford Motor Credit Co. at $103.777 per share

hh.   2,000,000 shares of American Express Credit Card at $101.548 per share

ii.   1,000,000 shares of American Express Co. at $101.642 per share

**THIRD AMENDED COMPLAINT**

        jj.     1,000,000 shares of Bank of America Corp. at $99.201 per share

        kk.    1,000,000 shares of Wells Fargo & Co. global at $99.983 per share

        ll.     2,000,000 shares of Fannie Mae at $104.781 per share

        mm.  1,000,000 shares of AT&T Corp at $84 per share.

    vii.    October 27, 2006 Statement of Assets sent by Neue Bank on October 31, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 6:13 p.m. (CET);

    viii.   November 11, 2006 Statement of Assets sent by Neue Bank on December 5, 2006 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 4:48 p.m. (CET);

    ix..    December 31, 2006 Statement of Assets sent on January 7, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:34 p.m. (CET);

    x.     July 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:46 p.m. (CET);

    xi.    August 31, 2007 Statement of Assets sent on September 10, 2007 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:48 p.m. (CET);

**THIRD AMENDED COMPLAINT**

xii.   October 31, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on November 6, 2007 at 11:07 a.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 8:12 p.m. (CET);

xiii.   November 30, 2007 Statement of Assets apparently faxed from Neue Bank in Liechtenstein to New Haven Trust in Liechtenstein on December 3, 2007 at 3:11 p.m. (CET), then from Liechtenstein to Orange County, California on the same date via facsimile at 6:34 p.m. (CET);

xiv.   December 31, 2007 Statement of Assets sent on January 10, 2008 from Liechtenstein to Plaintiffs in Orange County, California and/or to New Haven Trust in Liechtenstein to be sent to Plaintiffs in Orange County, California via facsimile at 5:58 p.m. (CET).

233.   Accordingly, Olenicoff is entitled to restitution in an amount to be proven at trial, but at least $500 million dollars as to all Defendants, including Michael Storey, but excluding the SES Defendants, and at least $5 million dollars as to the SES Defendants.

## COUNT XVI

(Breach of Contract Against the UBS AG Defendants, the Neue Bank Defendants, the New Haven Trust Defendants; and DOES 1 through 5, inclusive)

234.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

235.   Olenicoff entered into implied, oral and written contracts with Defendants to provide him with professionally competent investment advisory and execution services, tax and legal advice and services, and accounting services.  In connection therewith, Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with

**THIRD AMENDED COMPLAINT**

all applicable rules of professional conduct. Moreover, as previously stated, Olenicoff gave specific guidelines regarding the quality of investment vehicles and the overall goals for growth, and that parties agreed that any fees paid would be based on a "transparent system" and that Olenicoff would only be charged a periodic fee.

236. Defendants ignored their obligations and Olenicoff's guidelines and instead materially breached their contracts by, among other things, providing Olenicoff with advice, opinions, recommendations, representations, instructions, and services that Defendants either knew or reasonably should have known to be wrong and in furtherance of the conduct described above. Additionally, the rendering of such advice, opinions, recommendations, representations, instructions and services was intentional, negligent, grossly negligent and reckless. Olenicoff further believes and thereon alleges, that Defendants charged Olenicoff fees, costs, and expenses that were not chargeable or agreed to by Olenicoff. Accordingly, Defendants failed to exercise the standard of care required of them and materially breached their contracts with Olenicoff. Alternatively, to the extent that no express contract existed for the services described herein, Olenicoff has been damaged under the theory of implied contract.

237. Olenicoff fully performed his obligations to Defendants under these contracts and did not contribute to Defendants' material breaches in any way.

238. As a result of said material breaches, Olenicoff has suffered injuries in that Olenicoff has suffered injury to his business and assets in that Olenicoff has paid Defendants millions of dollars in fees and actual damages and losses in an amount to be proven at trial; has incurred tax penalties and interest and disallowance of certain other deductions; has incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; has foregone legitimate tax savings and investment opportunities; has been criminally investigated by the Department of Justice; and has suffered, and will continue to suffer, weekly relentless press causing him and his family great embarrassment and effecting his business reputation.

**THIRD AMENDED COMPLAINT**

239.   By reason of the foregoing, Olenicoff is entitled to recover actual damages, including prejudgment interest, plus attorneys' fees and costs.

## COUNT XVII

(Breach of Contract Against the Union Charter Defendants, the Neue Bank Defendants,
the New Haven Trust Defendants; and DOES 6 through 10, inclusive)

240.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

241.   Olenicoff entered into implied, oral and written contracts with Defendants to provide Olenicoff with professionally competent investment advisory and execution services, tax and legal advice, and accounting services.   In connection therewith, Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct.   Moreover, as previously asserted, Olenicoff gave specific guidelines regarding the quality of investment vehicles and the overall goals for growth and that parties agreed that any fees paid would be based on a "transparent system" and that Olenicoff would only be charged a periodic fee.

242.   Defendants ignored their obligations and instead materially breached their contracts by, among other things, providing Olenicoff with advice, opinions, recommendations, representations, instructions, and services that Defendants either knew or reasonably should have known to be wrong and in furtherance of the conduct described   above.     Additionally,   the   rendering   of   such   advice,   opinions, recommendations, representations, instructions and services was intentional, negligent, grossly negligent and reckless.   Olenicoff further believes and thereon alleges, that Defendants charged Olenicoff fees, costs, and expenses that were not chargeable or agreed to by Olenicoff as well as caused funds from his account to be fraudulently converted for Defendants own use.   Accordingly, Defendants failed to exercise the standard of care required of them and materially breached their contracts with Olenicoff.

**THIRD AMENDED COMPLAINT**

1  Alternatively, to the extent that no express contract existed for the services described
2  herein, Olenicoff has been damaged under the theory of implied contract.

3       243.  Olenicoff fully performed his obligations to Defendants under these
4  contracts and did not contribute to Defendants' material breaches in any way.

5       244.  As a result of said material breaches, Olenicoff has suffered injuries
6  to his business and assets in that he has paid Defendants millions of dollars in fees and
7  actual damages and losses in an amount to be proven at trial; has incurred tax penalties
8  and interest and disallowance of certain other deductions; has incurred and will continue
9  to incur substantial additional fees and costs in hiring new tax and legal advisors to
10 rectify the situation; has foregone legitimate tax savings and investment opportunities;
11 has been criminally investigated by the Department of Justice; and has suffered, and will
12 continue to suffer, consistent, relentless negative press causing him and his family great
13 embarrassment and affecting his business reputation.

14      245.  By reason of the foregoing, Olenicoff is entitled to recover actual
15 damages, including prejudgment interest, plus attorneys' fees and costs.

16 **<u>COUNT XVIII</u>**

17 (Conversion Against All Defendants; and DOES 1 through 10, inclusive)

18      246.  Plaintiffs repeat and reallege each and every prior allegation, as if
19 fully set forth herein.

20      247.  Defendants wrongfully interfered with Olenicoff's interests in his
21 investment assets by undertaking the following acts:

22           a.  Defendants UBS AG, Union Charter, Neue Bank and New
23               Haven Trust charged millions of dollars in excessive and
24               unauthorized fees against Olenicoff's accounts;

25           b.  Defendants UBS AG, Union Charter, Neue Bank, New Haven
26               Trust and the Michie Defendants, and each of them, created
27               unnecessary "shell" corporations and/or charged unnecessary
28               transaction fees and referral fees to all parties involved;

**THIRD AMENDED COMPLAINT**

c.    Defendants placed themselves on the boards of some of these corporations and paid themselves large, unearned salaries; and

d.    Defendants, and each of them, converted approximately $40 million dollars in the days leading up to transferring the entire account back to the United States, alleging a diminution in value of the investments and the assessment of fees as the cause. Accordingly, after approximately 6 years of "investing" Olenicoff's money, Defendants returned $20 million less than the initial $200 million for a net loss of $20 million.

248.  Defendants conspired with each other to convert the above-listed property, so that the activities of one are attributable to all.

249.  As a result of Defendants' acts of conversion, Olenicoff has been damaged in an amount to be proven at trial, but at least $500 million as to all Defendants, including Michael Storey, but excluding the SES Defendants, and at least $5 million dollars as to the SES Defendants, including all compensatory damages.

250.  In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in conscious disregard of the rights of Olenicoff, and Olenicoff is therefore entitled to punitive damages according to proof at the time of trial.

251.  Olenicoff is further entitled to the imposition of a constructive trust on the converted assets and their fruits and is entitled to a tracing and accounting with respect to said funds.

252.  Olenicoff is further entitled to the imposition of an equitable lien on the converted goods.

## COUNT XIX

(Breach of Duty to Timely Register Securities Transactions Against the SES Defendants [UCC §8-401]; and DOES 1 through 10, inclusive)

253.  Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

254.   Pursuant to the Uniform Commercial Code ("UCC") §8-401, the SES Defendants had a duty to timely remove transfer restrictions on Plaintiffs' shares and cause such transfer without unreasonable delay.

255.   As pled in the factual allegations above, in or around May 2008, Plaintiffs demanded that the SES Defendants return the converted funds related to the SES stock.  At the time, the value of the SES stock was approximately $14 per share.

256.   At that time, David Eichinger initially agreed to transfer the stock from Teflomi to Plaintiffs.  However, Eichinger delayed and eventually refused to liquidate any of Plaintiffs' shares.

257.   Eventually, the SES Defendants caused the transfer and registration of the shares into Plaintiffs' name; however, several months had passed during which time the SES defendants caused the issuance of additional shares into the market at a decreased initial offering price causing the stock to suffer a large reduction in value, ranging from between $4.00 per share and $6.00 per share at the time of the transfer to Plaintiffs.  The SES Defendants failed to disclose in the registration of said stock offering of Plaintiff's demand for registration of what amounted to a substantial holding of restricted shares of the SES stock.

258.   As a result of Defendants' acts of conversion, Olenicoff has been damaged in the approximate amount of $9 million.

## COUNT XX

(Accounting Against the UBS AG Defendants; Neue Bank Defendants; New Haven Trust Defendants; Union Charter Defendants and Michie Defendants; and DOES 1 through 10, inclusive)

259.   Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

260.   As a result of the foregoing breaches, conversions, unnecessary fees, and unauthorized transactions, Defendants have received money, a portion of which is still due to Olenicoff.

**THIRD AMENDED COMPLAINT**

261.  However, the amount of money due cannot be ascertained and/or verified without an accounting, i.e., transaction statements, receipts, ledgers, as they pertain to, *inter alia*, investments, trusts, purchases, entity formations, fraudulent salaries, referrals, and related fees and costs.  As such, Olenicoff cannot even verify account fees and/or that transactions were conducted pursuant to the agreements and his guidelines.

262.  Olenicoff is informed and believes and thereon alleges that the amount due and owing are in excess of $100 million dollars.

263.  Olenicoff has repeatedly demanded accountings of all aforementioned transactions from Defendants and payment of all amounts due; however, Defendants have failed and refused, and continue to fail and refuse, to provide such accountings and pay such sums.

## COUNT XXI

(Declaratory Relief Against the UBS AG Defendants; Neue Bank Defendants; New Haven Trust Defendants; Union Charter Defendants; and DOES 1 through 10, inclusive)

264.  Plaintiffs repeat and reallege each and every prior allegation, as if fully set forth herein.

265.  The IRS audited Olenicoff's tax returns regarding the above-described transactions.  As a result, Olenicoff incurred and continues to incur professional fees and expenses, and other costs, rectifying Defendants' wrongdoing.

266.  Defendants are legally responsible for:

    a.    Interest and/or tax penalties assessed by the IRS and/or state tax authorities;

    b.    Professional fees and costs incurred by Olenicoff in connection with federal and/or state investigations and audits; and

    c.    Professional fees and expenses incurred by Olenicoff on account of Defendants' violations of law and other actionable conduct.

THIRD AMENDED COMPLAINT

267.   Pursuant to 28 U.S.C. § 2201, Olenicoff is entitled to a declaration that Defendants are liable to him for such penalties, interest, costs, professional fees, expenses and damages.   There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

268.   Pursuant to 28 U.S.C. § 2201, Olenicoff is also entitled to a declaration that the agreements entered into with Defendants are void and unenforceable and are, in any event, inapplicable in all respects to the claims asserted herein.

## JURY DEMAND

Plaintiffs herein demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Igor M. Olenicoff and Olen Properties, Corp. demand judgment against all Defendants, and each of them, as follows:

### AS TO COUNTS I, II, IV and V, VII through XII:

1.   For rescission of any and all contracts, plus all damages proximately caused by the wrongful acts and/or omissions of the UBS AG Defendants, the Neue Bank Defendants, the New Haven Trust Defendants, the Union Charter Defendants, and the Michie Defendants in an amount to be proven at trial, but at least $500 million;

2.   For reasonable attorney's fees and costs pursuant to California Corporations Code § 25501.5, et seq.;

3.   For exemplary and punitive damages in an amount to be proven at trial;

### AS TO COUNTS III and VI:

4.   For rescission of any and all contracts, plus all damages proximately caused by the wrongful acts, duty breaches, and/or omissions of the UBS AG Defendants, the Neue Bank Defendants, and the New Haven Trust Defendants, in an amount to be proven at trial, but at least $500 million;

5.   For reasonable attorney's fees and costs pursuant to California Corporations Code § 25501.5, et seq.;

THIRD AMENDED COMPLAINT

6.  For a constructive trust against Bradley Birkenfeld regarding all accounts and any future "whistleblower reward" payments;

**AS TO COUNT XIII:**

7.  For the disgorgement of all fees paid to each of the Defendants for all transactions according to proof, but no less than $200 million;

**AS TO COUNTS XVI and XVII:**

8.  For compensatory damages against the UBS AG Defendants, the Neue Bank Defendants, the New Haven Trust Defendants, and the Union Charter Defendants, in an amount to be proven at trial, but no less than  $500 million;

**AS TO COUNTS XI, XIV and XVIII:**

9.  For restitution of all monies converted by all Defendants, plus all fees paid for services, in an amount to be determined at trial, but at least $500 million dollars as to all Defendants, including Bradley Birkenfeld, David Schwedel and Michael Storey, but excluding the remaining SES Defendants, and at least $5 million dollars as to those remaining SES Defendants, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

10.  For compensatory damages for lost investment opportunities in amount to be determined at trial, but not less than $150 million;

**AS TO COUNT XIX:**

11.  For compensatory damages in the amount of $9 million against the SES Defendants.

**AS TO COUNT XX:**

12.  For an order requiring Defendants UBS AG, Neue Bank, New Haven Trust, and Union Charter to provide a full and complete accounting of all transactions, all fees charged, and all commissions paid;

**THIRD AMENDED COMPLAINT**

**AS TO COUNT XXI:**

13.      For a declaration that, pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the UBS AG Defendants, Neue Bank Defendants, New Haven Trust Defendants, Union Charter Defendants, and Michie Defendants are liable to him for all tax penalties, interest, costs, professional fees, expenses and damages related to the tax assessments levied against Plaintiff;

**AS TO ALL COUNTS:**

14.      For attorneys fees as permitted by statute;

15.      For costs of suit incurred herein; and

16.      For such other and further relief as the court may deem proper.

DATED:  August 24, 2009

**<u>RESPECTFULLY SUBMITTED,</u>**

_/s/ William J. King_____
William J. King, Esq. (Bar No. 199908)
William C. Hoggard, Esq. (Bar No. 192329)
HORIZON LAW GROUP LLP
1920 Main Street, Suite 210
Irvine, CA 92614


_/s/ Julie A. Ault_____
JULIE A. AULT, Esq. (Bar No. 186914)
7 Corporate Plaza
Newport Beach, CA 92660

Attorneys for Plaintiffs, Igor Olenicoff &
Olen Properties Corp.

**THIRD AMENDED COMPLAINT**
