William J. King, Esq. (Bar No. 199908)
William C. Hoggard, Esq. (Bar No. 192329)
HORIZON LAW GROUP LLP
17991 Cowan
Irvine, CA 92614
Tel.:  (949) 261-2500
Fax:  (949) 261-2515
Email:      wking@horizonlawgroup.com

Julie A. Ault, Esq. (Bar No. 186914)
Marisa Poulos, Esq. (Bar No.
7 Corporate Plaza
Newport Beach, CA 92660
Tel.:  (949) 719-7212
Fax:  (949) 719-7210
Email:      jault@olenproperties.com
                 mpoulos@olenproperties.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IGOR OLENICOFF et al.,<br><br>                     Plaintiffs,<br><br>        v.<br><br>UBS AG et al.,<br><br>                     Defendants. | Case No. SACV08-01029 AG (RNBx)<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF WILLIAM J. KING IN SUPPORT OF PLAINTIFFS' MOTION TO DISTRICT JUDGE FOR REVIEW OF DISCOVERY ORDER**<br><br>Discovery Cutoff: November 7, 2011<br>Pretrial Conf.:    January 23, 2012<br>Trial Date:         February 7, 2012 |

I, William J. King, declare as follows:

1.    I am of legal age, have personal knowledge of the following facts, and if called as a witness to testify, I could and would competently testify to each fact contained in this declaration.  I am an attorney, licensed to practice in the State of California and am a partner of Horizon Law Group LLP, co-counsel of record for Plaintiffs Igor M. Olenicoff ("Olenicoff") and Olen Properties Corp. ("Olen").

1

2.     On May 11, 2011, I and co-counsel John Marshall participated in a meet-and-confer conference at the Irvine office of UBS AG's counsel. We met with Kristopher Diulio and his associate to discuss the entire list of documents, among other discovery topics. During this meeting, as we discussed UBS AG's efforts to narrow the scope of production, Mr. Diulio stated to me that UBS AG was arbitrarily categorizing Mr. Olenicoff as belonging *outside* the category of the affected investors and the tax-evasion scheme to UBS AG admitted. This position has caused UBS AG to take the inappropriate position that its instructions and communications related to its scheme to defraud the IRS and manipulate its clients is somehow *outside* the scope of discovery. Mr. Diulio further stated it would take a court order to force them to produce the relevant information.

3.     During this same conference, Mr. Diulio further verbally stated to me that UBS AG refuses to produce any documents which do not contain the names of Olenicoff or Olen Properties, even though he acknowledged that UBS AG fully knew Plaintiffs were the beneficiaries to the other third party trust accounts -New Guardian Bancorp and Landmark Settlement Trust- *which UBS AG helped set up with Defendants New Haven Trust and Neue Bank as part of its IRS-defrauding scheme*. He has repeatedly stated in this and prior meet-and-confer meetings that he "wants us to have the documents related to these accounts."

4.     Should UBS AG assert that Plaintiffs may execute these waivers instead of the New Haven Trust trustees, UBS AG would be acknowledging Plaintiffs' ownership of the accounts thereby contradicting its own position. Indeed, UBS AG has already produced documents related to these trusts. Attached hereto as **Exhibit "A"** is a true and correct copy of an August 4, 2002 handwritten letter from Mr. Olenicoff to Defendant Bradley Birkenfeld regarding a transfer of money into one of the "third party" accounts, New Guardian Bancorp. This was in turn handled and stamped by former UBS AG Executive Director and former Defendant Christian Bovay.  Additionally, attached as **Exhibit "B"** is a true and correct copy of the Deferred Prosecution Agreement ("DPA") whereby UBS AG admitted to allegations

of using third party co-conspirators to set up third party trust accounts (the most well-known being Matthias Rickenbach).

5.   UBS AG was sending monthly status reports on the third party trust account investments to Plaintiffs for a considerable time during the relevant time period. UBS AG knows exactly what accounts it created relative to plaintiffs and the suggestion that the request is too ambiguous for UBS AG to comprehend is inappropriate.  Included in these accounts were Plaintiffs' names and third party trusts created by UBS AG and its cohorts, which trusts are named as follows: Landmark Settlement Trust and New Guardian Bancorp. Attached hereto as **Exhibit "C"** are true and correct copies of the following:

    a.   A November 2004 (redacted) account statement for the subject "third party" Landmark Settlement account indicating Client No. 0240-00428096. This is the same account number referenced by the SFTA and UBS in their 2010 and 2009 letters, respectively, to Plaintiffs regarding disclosure to the IRS;

    b.   An August 2002 letter from Igor Olenicoff to UBS AG banker and Defendant Bradley Birkenfeld regarding a bond and cash transfer into the subject "third party" account New Guardian Bancorp APS. This is then stamped and signed by UBS AG's Executive Director –and former Defendant--Christian Bovay; and,

    c.   A June 2002 email from Defendant New Haven Trust's Mario Staggl (also a Defendant) to Igor Olenicoff with a "cc" to UBS banker and Defendant Bradley Birkenfeld.

6.   In fact, Plaintiffs have received correspondence from the Swiss Federal Tax Administration ("SFTA") and UBS AG indicating that the bank intends to, or already has, provided the very details Plaintiffs seek by virtue of this discovery by the U.S. Attached hereto as **Exhibits "D"** and **"E"** are true and correct copies of said correspondence, respectively. As noted in Par. 5, above, the Account Number 0240-

1    00428096 is consistent with the account statement regarding Landmark Settlement in

2    **Exhibit "C."**

3        7.    The relevant time period began in 1999 when UBS AG corresponded

4 with the IRS and other U.S. governmental institutions regarding the QI Agreement and

5 the basis for requiring it as well as UBS AG's board having specific meetings to

6 implement their scheme. I obtained this information through an in-person meeting

7 with a former employee at UBS whose name shall remain confidential until such time

8 that he will be used as a rebuttal witness (hereinafter "John Doe"). Mr. Doe advised

9 me that beginning in 1999, after UBS merged with Swiss Bank, meetings were held

10 which included directors on the board and high level employees to address the IRS's

11 demand that UBS reveal the names of its U.S. investors. This was the precursor to the

12 2001 QI Agreement between UBS AG and the IRS. During this meeting specific

13 strategies were planned regarding how UBS would engage in the dichotomous action

14 of representing compliance to the IRS while engaging in specific conduct to

15 manipulate U.S. investors and avoid said compliance. Said board and

16 employees/directors had the option to proceed with a program to comply with the IRS,

17 but chose the deceitful option. This first-hand testimony is consistent with the

18 admission of UBS and the scheme-description provided in the Deferred Prosecution

19 Agreement. Nevertheless, the details of how U.S. investors were to be approached are

20 not clear without the sought-after discovery. Based on the foregoing, the requested

21 documents are indeed relevant dating all the way back to at least 1999.

22        8.    In an attempt to hide behind the inapplicable Hague Convention

23 requirements and Swiss laws, UBS AG insists that Plaintiffs obtain waivers from the

24 trustees of the very entities UBS AG created. Unfortunately, Plaintiffs cannot obtain

25 such waivers, nor should they be required to. Letters have been sent to the Swiss

26 Federal Tax Authority, though Plaintiffs expect no response. Plaintiffs also have been

27 unable to reach the listed trustees at New Haven as they have avoided personal service

28 of the TAC and also avoided communications.

9. The following provides a history of the meet-and-confer efforts conducted by and between counsel for Plaintiffs and UBS AG:

    a. In June 2010 Plaintiffs served its Request for Production of Documents, Set One, on UBS AG;

    b. Over the next six months, UBS AG promised a "rolling production" in response as the parties addressed issues such as search terms in UBS AG's database;

    c. Meanwhile, on October 14, 2010, Plaintiffs served a meet-and-confer letter addressing issues they had with UBS AG's written responses. Attached hereto as **Exhibit "F"** is a true and correct copy of Plaintiffs' meet-and-confer letter. This process was concurrent with UBS AG's own meet-and-confer correspondence with Plaintiffs responses to its discovery. Due to the holidays, counsel for both parties agreed to engage in a face-to-face meeting the first week of January 2011. In or around December 17, 2010, UBS AG sent its second "rolling production" of documents with promises of further production. Search terms for computer files were being discussed through the end of December 2010, so Plaintiffs were patient in addressing UBS AG's production until future "rolling productions."

    d. In January 2011, I and my co-counsel John Marshall met with Kris Diulio with Dean Kitchens on speaker phone whereby we each discussed the respective discovery issues;

    e. Thereafter, and while Plaintiffs were awaiting additional documents through UBS AG's promised "rolling production," Mr. Marshall sent letters on March 10, 15, and 28, 2011 in attempts to meet-and-confer on UBS AG's insufficient production. Attached hereto as **Exhibit "G"** are true and correct copies of said correspondence.

f.  On May 3, 2011 my co-counsel, John Marshall, sent a letter to Mr. Diulio detailing the extent of the parties' meeting and conferring and calling out Mr. Diulio's disingenuous position regarding properly meeting-and-conferring.  Attached hereto as **Exhibit "H"** is a true and correct copy of said letter;

g.  On May 11, 2011, following no meaningful additional "rolling production," the parties met-and-conferred again at which time Mr. Marshall and I proceed to go through all 160 document requests. The general tone was that UBS AG would not produce documents without a court order as they hid behind a purported Swiss Tax Law and the Hague Convention. It was at this time that Mr. Diulio advised me that UBS AG was arbitrarily placing Mr. Olenicoff in his own special category such that he could not be viewed in the same position as the other U.S. investors caught up in the scheme against the IRS that UBS AG admitted. This served as a basis for refusing to produce any documents related to the scheme, a subject that is well-asserted in the TAC;

h.  In preparing for UBS AG's motion to compel, I suggested combining motions so that counsel and the Court could address these issues concurrently. UBS AG's counsel declined;

i.  Then, on June 15, 2011, following Magistrate Block's ruling on UBS AG's motion, I suggested that the parties take Magistrate Block up on his suggested informal discovery process. UBS AG's counsel asserted it was ignorant as to what Plaintiffs' position was and requested a further meet-and-confer. Attached hereto as **Exhibit "I"** is a true and correct copy of Mr. Diulio's incredulous correspondence in that regard. Nevertheless, in the interest of reducing the number of at-issue document categories, on July 15, 2011, I sent Mr. Diulio one final letter and scheduled another

6

meet-and-confer.   Attached hereto as **Exhibit "J"** is a true and correct copy of said letter.

j.   On July 19, 2011, my co-counsel Marisa Poulos and I met face-to-face with Dean Kitchens, Kris Diulio and two other associates for one final effort to obtain its requested documents, particularly following Magistrate Block's statements at UBS AG's motion to compel hearing that the "broad production of documents" would "cut in both directions." During that meeting, Mr. Kitchens made it clear that UBS AG would not compromise at all on the production of the documents listed on *any* basis <u>without a court order</u>. I again proposed meeting with Magistrate Block to seek his advisement and Mr. Kitchens said that a statement by Magistrate Block in an informal "mediation" type setting would be insufficient and a motion would be necessary.

Based on the numerous attempts to at written and face-to-face meet-and-confers on these requests and Plaintiffs attempts to have the number of at-issue Requests reduced, UBS AG has remained entrenched in their position that they *will not* produce anything further without a court order. In fact, UBS AG's counsel indicated they would not engage in the informal "discovery mediation" suggested by Magistrate Block because they require a court order. Accordingly, I do not believe sending the parties out to further meet-and-confer will be productive and I re-emphasize that the numerous set of documents should be reduced to the small number of categories. The court's ruling as to one should be the same ruling as to all in a specified category.

/ / /

/ / /

/ / /

1

2        10.   Pursuant to L.R. 37-2.1, attached hereto as **Exhibit "K"** is a true and

3   correct copy of the Scheduling Order and Amended Schedule Order.

4        I declare under penalty of perjury under the laws of the State of California that

5   the foregoing is true and correct.  Executed this 11th day of August, 2011, at Irvine,

6   California.

7

8                                    William J. King

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28