UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| IGOR OLENICOFF et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UBS AG et al.,<br><br>Defendants. | CASE NO.: SACV08-01029 AG (RNBx) |

## DECLARATION OF PROFESSOR DR. ISABELLE ROMY ON SWISS LAW

I, Isabelle Romy, pursuant to 28 U.S.C. § 1746, declare the following:

### I. INTRODUCTION

1.  I am a member of the bar of the Canton of Zurich, a partner at the Zurich law firm Niederer Kraft & Frey AG, and I was, until the end of 2008, a Deputy Judge at the Swiss Federal Supreme Court. I have attached my resume and CV as Exhibit A.

2.  I am submitting this declaration in support of UBS AG's ("UBS") Opposition to Plaintiffs' Motion to Compel the Production of Documents from UBS AG. UBS has asked that I set forth my views as an expert on whether Swiss law would permit UBS and its employees and representatives to respond to requests for information about the bank's customers, their accounts, or transactions in those accounts, or other information protected from disclosure by Swiss law.

3.  I address Plaintiffs' Motion to Compel only insofar as Plaintiffs' requests seek documents or information located in Switzerland, i.e., documents that would need to be gathered, processed and produced by UBS employees or UBS representatives in Switzerland.

1

4. I have made this declaration based on my own personal knowledge and a review of the statutes, treaties and other authorities cited herein. I have also reviewed the Complaint in this matter and the Motion to Compel. I note that I am not personally aware whether any of the persons or entities enumerated in the Motion are, or are not, UBS customers. I am further aware that UBS is a banking corporation organized under the laws of Switzerland with its headquarters in Basel and Zurich.

## II. CONCLUSIONS

5. In summary, it is my opinion that:

   a. Swiss financial privacy law prohibits Swiss banks from revealing any information about the bank's customers, or customers' accounts, or transactions related thereto. Requests for Production ("RFP") Nos. 3-8, 10-13, 15-19, 29, 35, 51-53, 85, 110-14, 117-121, 124-125, 127-128, 134-135 and 138-139 seek, *inter alia,* documents that, if the documents exist in Switzerland and the persons or entities listed in those requests are UBS customers in Switzerland, would be protected by Swiss financial privacy law. If UBS were to reveal in any way, other than pursuant to an order of a Swiss court or pursuant to an applicable client waiver, any confidential information about its customers or accounts or transactions on their behalf, even if pursuant to an order of a foreign court:

      i. Bank officers and employees would be subject to criminal prosecution under Article 47 of the Swiss Banking Act ("BA") that provides for imprisonment of up to three years or for monetary fines;

      ii. The Bank would be exposed to serious administrative sanctions by its Swiss bank supervisor, the Swiss Financial Market Supervisory Authority ("FINMA"); and

      iii. The Bank's officers and employees who provided such confidential information would be subject to administrative sanctions including

an order from FINMA disqualifying them as employees of a licensed financial institution (which would make it practically impossible for such employees to find new jobs in the Swiss financial sector).

b. Swiss business/trade secrets law prohibits any person from revealing to a foreign authority, person or company any Swiss business or trade secrets. In particular, Art. 273 of the Swiss Penal Code ("SPC") protects bank customer information of the type described in paragraph 5(a) above (e.g., RFP Requests Nos. 3-8, 10-13, 15-19, 29, 35, 51-53, 69, 79, 85, 124-125, 127-128, 134-135 and 138-139) and certain internal bank information maintained in Switzerland (e.g., RFP Requests Nos. 3-8, 10-13, 15-19, 20-23, 25-28, 29-49, 51-54, 58-61, 70-75, 85-98, 110-121, 124-125, 127-128, 134-135, and 138-139) to the extent they seek information that is not generally known and is not freely accessible to the public. Bank officers and employees who disclose such information in response to the RFP will be exposed to criminal prosecution under Art. 273 SPC (economic espionage; business and trade secrets), which provides for imprisonment of up to three years and/or a monetary fine.

c. Switzerland subscribes to the typical civil law view that the taking of evidence is a judicial function to be carried out by domestic courts or authorities. If the Bank produces in this action documents that are protected by Art. 47 BA or Art. 273 SPC, the Bank will not only violate those provisions, but also Art. 271 SPC (making it unlawful for any person or entity to take any action reserved to the public authorities in Switzerland), which places bank officers and employees at risk of imprisonment of up to three years, or a monetary fine.

d. The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of March 18, 1970 (the "Hague Convention"), provides a procedure that is fully consistent with Swiss sovereignty through

3

which Plaintiffs may obtain information that is maintained in Switzerland and that otherwise would be protected by Swiss financial privacy or trade/business secrets laws.

e. Each of these conclusions is discussed in more detail below.

## III. BACKGROUND AND QUALIFICATIONS

6. I am a partner at the Zurich law firm Niederer Kraft & Frey AG, one of the larger business law firms in Switzerland. I was admitted to the bar of the Canton of Vaud, Switzerland in 1991. I am registered with the Attorney's Register of the Canton of Zurich and am a member of the Swiss Arbitration Association ASA, the Zurich Bar Association, the Vaud Bar Association and the Swiss Bar Association. My practice centers in the areas of international litigation, arbitration and private international law.

7. In addition, I am an Associate Professor of Law at the University of Fribourg (Switzerland) and at the Federal Institute of Technology in Lausanne, Switzerland. I have held these positions since 1996. Prior to that, from 1994 until 1996, I was a teaching assistant for criminal law at the University of Lausanne (Switzerland). Currently, I teach a series of classes, including among other things, Transnational Litigation as well as European and Swiss Private International Law. I have supervised several master and doctoral candidates in various areas, including transnational litigation.

8. I was a Deputy Judge at the Swiss Supreme Court from 2003 until 2008. From 2003 until 2005, I served as a Deputy Judge assigned to the Criminal Chamber (Cour de Cassation pénale). From 2005 until 2008, I was assigned to the 1st Civil Chamber (Première Cour Civile) adjudicating, among other things, cases involving contract, tort and commercial law.

9. I also am the Vice Chairman of the Sanction Commission of the SIX Swiss Exchange.

10. I studied law at the University of Lausanne (graduating in 1986). I then completed my doctorate degree at the University of Lausanne in 1990 (PhD equivalent). Later, in connection with my Professorial degree, I was a visiting scholar at Boalt Hall School

4

of Law, University of California at Berkeley from 1992 to 1994, and I completed my Professorial thesis ("Habilitation")[1] at the University of Fribourg (Switzerland) graduating in 1996, on enforcement actions in environmental law and on mass tort litigation and class actions under U.S. and Swiss law.

11. Based on the foregoing experience, I believe that I am fully competent to opine authoritatively on the matters discussed herein.

## IV. SWISS FINANCIAL PRIVACY LAW

### A. Financial Privacy Has a Long and Valued History in Switzerland

12. Even before Art. 47 BA was enacted in 1934, Switzerland recognized that a banker's obligation to keep customer information confidential is an inherent element of the banker-customer contract even if no reference to that obligation was set out in the contract. For nearly as long, Switzerland has recognized that financial privacy is part of the fundamental rights of personality of an individual. Switzerland's adoption in 1934 of the Swiss Banking Act, including Article 47, underscores the importance of rights of financial privacy by imposing a criminal penalty for their violation. In fact, Art. 47 BA provides for the punishment of a banking official who even negligently discloses a customer's confidential information.

13. The legislative roots of Art. 47 BA as well as those of Arts. 271 through 273 of the Swiss Penal Code, lie in the events that occurred in the aftermath of the world economic crisis in the late 1920's, when measures were taken by the Swiss government to protect both Swiss sovereignty (politically, commercially and economically) and the individuals' privacy rights (irrespective of their nationality) against infringements on Swiss soil by or on behalf of foreign states (such as activities in support of foreign investigations that became increasingly frequent in the 1930's).

14. The 1999 Swiss Constitution, which replaced the prior Swiss Constitution of 1874, recognizes an explicit "Right to Privacy" that provides that "Everyone has the right to privacy in their private and family life and in their home, and in relation to their mail and

---

[1] Acceptance of this thesis allows me to teach as a professor of law.

telecommunications" and that "Everyone has the right to be protected against the misuse of their personal data."[2] This Right to Privacy provides a modern constitutional underpinning for earlier enacted statutes protecting the right to privacy (see Art. 28 of the Swiss Civil Code that was enacted in 1907) and earlier recognized contractual privacy protections. Article 47 BA criminalizes violations of the foregoing privacy rights.

15. The Swiss people have always expressed their view that Swiss sovereignty must be defended against foreign intrusion. This includes intrusion on financial privacy rights from abroad without an order of the appropriate Swiss authority.

16. Swiss financial privacy laws are not "blocking statutes." I understand that blocking statutes are procedural laws that have been enacted by some countries to shield their nationals from foreign discovery. In contrast, Swiss financial privacy laws are substantive laws designed to protect the right of privacy and apply equally to these rights no matter whether the information is sought through legal processes from within or outside of Switzerland.

17. Likewise, Swiss financial privacy laws apply to all persons irrespective of their nationality and/or residence, and not only – and selectively – to foreign persons who hold accounts with a bank in Switzerland. They protect a right the Swiss Federal Supreme Court has deemed fundamental to all persons.

    **B.    Article 47 BA**

18. Article 47 BA provides penalties for banks' employees or their agents who violate the duty of confidentiality by disclosing customer information without either the customer's consent or express direction from a competent Swiss cantonal or federal authority.

19. Article 47 BA provides:

> *1. Whoever intentionally:*
>
> > *a.    discloses secret information confided to him in his capacity as officer, employee, agent, or liquidator of a bank, as*

---

[2] Bundesverfassung der Schweizerischen Eidgenossenschaft [BV], Constitution Fédérale de la Confédération Suisse [Cst] [Constitution] Apr. 18, 1999, SR 101, RO 101, art. 13 (Switz.), available at http://www.admin.ch/ch/e/rs/101/a13.html.

6

>> *officer or employee of an auditing firm, or if he has acquired knowledge in such a capacity,*
>
> b. *attempts to induce another person to violate the professional secrecy,*
>
> *shall be punished with imprisonment of up to three years or monetary penalty.*
>
> *2. If the act has been committed by negligence, then the penalty shall be a fine of up to 250,000 Swiss Francs.*
>
> *3. In case of a repetition of such act within five years following the final sentence, the fine shall be a minimum of 45 daily income units.*
>
> *4. The breach of professional secrecy remains punishable after termination of the public or private employment relationship or practice of the profession.*
>
> *5. Federal and Cantonal provisions concerning the obligations to testify and to furnish information to a public authority shall remain applicable.*
>
> *6. The prosecution and adjudication of the acts under this article are left to the Cantons. The general provisions of the Penal Code are applicable.*

20. Under Art. 47 BA, a banker's duty of confidentiality prohibits, inter alia, the disclosure of: the existence of a relationship between the bank and its customer; the type of accounts held and any transactions on these accounts; any information provided by the customer to the bank on personal or financial matters; information analyzing or describing the customer relationship; and any further disclosures that could facilitate the determination of the customer's identity or other confidential information about the customer.

21. The duty of confidentiality prohibits disclosure of customer information not just by revealing documents, but also through other means such as through the Answer to the Complaint in this litigation. Further, the Bank may not confirm that certain persons/entities are not customers in circumstances where doing so would amount to a confirmation that other persons/entities are customers.

22. A banker's duty of confidentiality under Art. 47 BA continues even after the person or entity whose information is at issue is no longer a customer of the bank.

23. Section 5 of Art. 47 BA provides that "Federal and Cantonal provisions concerning the obligations to testify and to furnish information to a public authority shall

7

remain applicable." Thus, Section 5 reserves to the Swiss Federal or Cantonal legislators the authority to define, on a formal legal basis, the conditions under which information otherwise protected by Art. 47 BA must be disclosed.

24. In a civil matter, these conditions are set forth in Art. 163 (disclosure order directed against a party to the litigation) and Art. 166 (disclosure order directed against a third party witness) of the new Swiss Federal Code of Civil Procedure that entered into force on January 1, 2011 (unofficial translation attached as Exhibit B hereto)[3]. These provisions require the Swiss court to perform a balancing test, to decide whether financial privacy rights, such as banking secrecy, are lifted in a civil proceeding. When proceeding with this balancing test the court must take into account the interests of the bank in either disclosing the information sought or in maintaining its continued confidentiality, the interest of the customer in maintaining confidentiality, and the interest of the party seeking the information in its disclosure request. Considering all these facts, the Swiss court will as a matter of principle lift banking financial privacy unless the interests in keeping the information confidential outweigh the interests in disclosure.

25. The explanatory materials from the Federal Council transmitting this legislation to Parliament explain that under this test: "Holders of secrets such as banking secrecy are obligated to cooperate, and can only refuse if they show that the interest in keeping the information confidential outweighs the interest in disclosure." [Message Concerning the New Swiss Code of Civil Procedure, p. 6929 (June 28, 2006).]

26. Furthermore, a bank may disclose protected information upon a valid waiver by the client. In the case at hand, the Plaintiffs, by filing a lawsuit against UBS and requesting information pertaining to their accounts, to the accounts they have controlled and to their relationship with the Bank have effectively waived their financial privacy rights and UBS is therefore allowed to disclose the requested information with respect to the Plaintiffs without breaching Article 47 BA.

---

[3] In Switzerland, for historical reasons, each Canton had its own Code of civil procedure. The new Swiss Federal Code of Civil Procedure has replaced the cantonal regulations as of January 1, 2011.

### C. Criminal and Administrative Liability for Violation of Article 47 BA

27. Any bank employee and/or representative who intentionally breaches the duty of confidentiality under Art. 47 BA faces criminal punishment of up to three years imprisonment or a monetary fine.

28. Article 47 BA is an ex officio offense, which means that the state will prosecute any violation even if the injured party has not filed a complaint. The ex officio nature of the offense indicates the strong interest under Swiss law in protecting financial privacy against all kinds of intrusion.

29. Under the new Swiss Federal Code of Criminal Procedure (in force since January 1, 2011), the decision to prosecute a violation of Article 47 is not within the discretion of the prosecuting authority. If there are sufficient indications to support a serious suspicion that someone has committed an offense, the prosecuting authority is required by law to bring a case. Only in very limited circumstances (outlined in Article 8 Swiss Federal Code of Criminal Procedure) is prosecution in the discretion of the prosecuting authority and such circumstances typically do not apply in case of a breach of Article 47 BA.

30. Irrespective of whether a foreign court or a foreign authority orders the production of documents located in Switzerland, such production, under Swiss law, is lawful only if it is made pursuant to a request authorized under the provisions of the available legal and/or administrative proceedings, including pursuant to the Hague Convention. As discussed below, there are convictions in Switzerland of persons who have violated Art. 47 BA (as well as Arts. 271 SPC and 273 SPC) in response to disclosure requests by foreign authorities. There is a very general, broad awareness in Switzerland that compliance with non-Swiss court orders, outside of appropriate proceedings, would violate Swiss law. On those infrequent occasions when non-Swiss authorities have not relied upon proper legal assistance channels, the Swiss government has taken strong and decisive action to protect its sovereignty and ensure compliance with its laws.

31. The Swiss government has stated to the U.S. court in United States v. UBS AG, 09-cv20423 (S.D. Fla.), when opposing an IRS summons seeking material protected by

9

Art. 47 from UBS, that, since 1993, there have been 48 convictions for violations of Art. 47 BA.

32. For example, in April 2009, the Court of Appeals of Basel affirmed a former bank employee's sentence to three months imprisonment for violating Art. 47 BA and Art. 273 SPC by disclosing to German authorities – while detained in jail in Germany – data relating to 45 German clients of the Cantonal Bank of Basel.[4]

33. In addition to the criminal sanctions provided for in Art. 47 BA, any violation of financial privacy would expose the bank and its employees to administrative sanctions by the FINMA. In cases of severe violations of Art. 47 BA, the FINMA could even reconsider whether the bank is fulfilling the "fit and proper to do business" requirement that is a requisite to maintaining a banking license in Switzerland.

34. The FINMA may also strip any bank manager responsible for a violation of financial privacy of his or her "fit and proper" status, which is a requisite for FINMA approval to serve as a senior bank manager or board member. The FINMA also may enter an order requiring the termination of a bank employee who has violated financial privacy laws, making it practically impossible for employees so terminated to find new employment in the financial sector in Switzerland.[5]

35. For the reasons set forth above, it is my opinion that compliance with the RFP to produce documents maintained in Switzerland and covered by Swiss financial privacy (I. e., compliance with the RFP as described more specifically in paragraph 5a above) would constitute a violation of Art. 47 BA, and expose all officers and employees of the Bank involved in the disclosure to criminal prosecution and punishment, including imprisonment, and to administrative consequences that may lead to termination. As well, UBS would be exposed to administrative sanctions by its bank supervisor, FINMA.

---

[4] See Neue Zurcher Zeitung Nr. 95, 25/26 April 2009, at page 21.
[5] See article 33 FINMA SA.

## V. SWISS TRADE / BUSINESS SECRECY LAW

36. If UBS officers and employees were to comply with certain RFP requests by disclosing business or trade secrets, they would also violate Art. 273 SPC. Article 273 SPC protects Swiss sovereignty, the Swiss national economy, and the economic interests of private Swiss corporations or individuals by prohibiting the disclosure of trade or business secrets to foreign authorities or private persons.

37. Article 273 SPC provides:

> *Economic Intelligence.*
>
> *Whoever tries to discover a manufacturing or business secret in order to make it accessible to a foreign authority or a foreign organization or a foreign private business enterprise or their agents,*
>
> *whoever makes a manufacturing or business secret accessible to a foreign authority or a foreign organization or a foreign private business enterprise or their agents,*
>
> *shall be punished by imprisonment up to three years or by a monetary sentence, and in serious cases by a prison sentence not below one year. The imprisonment can be combined with a fine.*

38. The Swiss Federal Supreme Court has held that the definition of trade secrets pursuant to Art. 273 SPC must be interpreted broadly to encompass all facts of economic life, in which from a Swiss perspective there is a legitimate interest in confidentiality.[6] Furthermore, they must present a nexus or connection with Switzerland. These facts are regarded as secret and subject to Art. 273 SPC when they are not generally known or are not freely accessible to the public, particularly non-Swiss persons or authorities.

39. Legal precedent indicates that information that a corporation has concerning third parties such as its customers, including bank customer information of the type described above (RFP Requests Nos. 3-8, 10-13, 15-19, 29, 35, 51-53, 85, 110-114, 117-121, 124-125, 127-128, 134-135 and 138-139) is protected by Art. 273 SPC.

40. Legal precedent likewise indicates that internal bank documents – including the bank's correspondence, list of clients, meeting minutes, reports, opinions, recommendations, memos, notes, invoices, agreements and contracts, business processes and

---

[6] Federal State Atty v. Hans and Gisela Wolf, BGE 101 IV 177, page 199.

protocols, internal organization of the entity, and strategy materials – also may fall within the scope Art. 273 SPC. In this case, Plaintiffs' requests (e.g., RFP Requests Nos. 20-23, 30, 54, 56-61, 70, 73-75, 85-98, and 136-139), insofar as they request documents in Switzerland that are not generally known and are not freely accessible to the public, seek information that is protected by Art. 273 SPC. Certain of this information is protected because it would reveal confidential information concerning third parties other than potential customers (e.g., RFP Requests Nos. 25-28, 30-34, 36-49, 71-72, 110 and 117-121).[7] The remainder of the requests (again to the extent they seek documents in Switzerland that are not generally known and are not freely accessible to the public), which refer exclusively to internal bank information (e.g., RFP Requests Nos. 20-23, 30, 54, 56-61, 70, 73-75, 85-98 and 136-139) also are protected by Art. 273 SPC, not only because they are trade/commercial secrets of the Bank, but also because they implicate the Swiss national interest in light of the fact that (1) plaintiffs seek a great breadth of confidential information concerning UBS's internal operations which amounts to extensive economic espionage of (2) an institution, UBS, that is essential to the Swiss economy and that the Swiss government recognizes as such.

41. For a foreign court to obtain production of materials protected by Art. 273 SPC, the non-Swiss court must obtain judicial assistance from a Swiss court. The Swiss court then may issue an order directing that materials protected by Art. 273 SPC be produced, in accordance with which the materials may be produced without violating Swiss law.

42. Violations of Art. 273 SPC are punishable by up to three years in prison and/or a monetary fine.

43. The Swiss Federal Office for Statistics reports 28 cases from 1984 through 2009 in which the defendant was convicted for violating Art. 273 SPC. In one of the most prominent of these cases, the Swiss Federal Supreme Court in 1985 addressed a case in which two bank employees stole a UBS computer program that would have enabled the French authorities to access the accounts held by French account holders.[8] The Supreme Court held that such behavior amounted to a severe violation of Art. 273 SPC, not only because the

---

[7] FINMA documents are also protected by a privilege for government functions under Art. 320 SPC.
[8] See C. v. State attorney of the Canton of Vaud, BGE 111 IV 74, 80 (1985).

private interests of the bank were affected, but more importantly, the economic interests of Switzerland were threatened. The court affirmed the sentence of the UBS employee to 48 months of imprisonment, and the former UBS employee to 27 months imprisonment, for violation of Art. 273 SPC and Art. 47 BA (as well as theft under 137 SPC).

44. I conclude that, with respect to the information described above, compliance with the RFP would constitute a violation of Art. 273 SPC, exposing all officers and employees of the Bank involved in the disclosure to criminal prosecution, incarceration and monetary fines.

## VI. SWISS SOVEREIGNTY AND ARTICLE 271 OF THE SWISS PENAL CODE

45. Switzerland subscribes to the typical civil law view that the taking of evidence is a judicial function to be carried out exclusively by domestic courts or authorities.[9] If evidence were taken by a foreign authority or by parties to a foreign proceeding without the consent of a competent Swiss authority, Swiss sovereignty would be considered to be violated. Article 271 SPC protects Swiss judicial sovereignty by making it unlawful for any person or entity to take any action reserved to the public authorities in Switzerland, including the judicial function.

46. Article 271(1) SPC provides:

> *Whoever takes actions, which are reserved to the public authorities, on Swiss territory without authorization for a foreign state, whoever takes such actions for a foreign party or for any foreign organization, whoever facilitates such actions, shall be punished by prison sentence up to three years or by a monetary sentence, and in serious cases by a prison sentence not below one year.*

47. A unilateral attempt by a foreign court to compel the release of documents from Switzerland without the participation or consent of the Swiss authorities would be an infringement of Swiss sovereignty. To compel a person in Switzerland to produce documents, a foreign court must use the available proceedings for legal and/or administrative assistance, thereby requesting the competent Swiss authorities to exercise their judicial power. Outside of legal and/or administrative assistance proceedings, a unilateral order by a foreign court

---

[9] See H. v. State attorney of the Canton of Zurich, BGE 114 IV 130 E 2c.

affecting a person in Switzerland is considered a violation of international law, and falls within the scope of Art. 271 SPC.

48. Under Swiss law and practice, a party to the proceedings may voluntarily submit evidence to the foreign court that is in its possession to support its pleadings, provided that the disclosure is not inconsistent with third party privacy rights.[10]

49. Based on a U.S. request for judicial assistance, the taking of evidence is ordered by and performed under the supervision of the appropriate Swiss cantonal court. In the course of a legal assistance proceeding, the Swiss court has a duty to verify that the requirements for granting legal assistance are met and the rights of the affected persons are safeguarded as the procedural laws require. By disclosing protected information – e.g., by Art. 47 BA, Art. 273 SPC – outside of proper legal proceedings, UBS employees would perform an activity that is, under Swiss law as described above, an official act reserved to competent Swiss authorities, thereby violating Art. 271 SPC. Like Art. 47 BA and Art. 273 SPC, Art. 271 SPC is not a "blocking statute." It is not intended to thwart foreign discovery; it merely ensures that discovery in aid of foreign proceedings is conducted through official Swiss channels. Parties to domestic Swiss proceedings are subject to similar restraints, in that domestic Swiss discovery also must proceed only through judicial auspices (e.g., parties to domestic litigation must apply to the court for any order seeking the production of documents). Likewise, Swiss law imposes, under Art. 299 SPC, criminal penalties upon persons acting in Switzerland who violate the sovereignty of other nations, for example, by issuing judicial orders directing actions be taken on foreign soil (e.g., gathering evidence, service of process). Instead, Swiss courts must act through international treaties like the Hague Convention.

50. The Swiss Federal Office for Statistics reports 29 cases for the period from 1984 through 2007 in which the defendant was convicted for violating Art. 271 SPC. In a case decided by the Swiss Federal Supreme Court for example, a Swiss lawyer who had interviewed employees of a Swiss bank and used his interview notes (prepared in accordance

---

[10] See BGE 114 IV 131; Basler Kommentar, Thomas Hopf, N 15 ad Art. 271 SPC, page 1668.

with Australian rules of evidence) before an Australian court was convicted for having violated Art. 271 SPC.[11]

51. Here, Plaintiffs' RFP is addressed to UBS, a corporation resident in Switzerland, and seeks documents located in Switzerland. I conclude that UBS's officers and employees would violate Art. 271 SPC if they were to produce any documents sought by Plaintiffs that are protected by Swiss law (as described above) absent an order of a Swiss judicial authority. Doing so would expose them to prosecution, incarceration and monetary fines under Art. 271 SPC.

### VII. PROTECTION OF EMPLOYEES AND DATA PROTECTION

52. Apart from the prohibition to disclose business secrets, a Swiss party is not allowed to produce information that contain personal data of customers, business partners or other companies under the Federal Statute on Data Protection of 19 June 1993 (FADP)[12]. The same rule applies to personal data of employees by virtue of Art. 328 and Art. 328b of the Swiss Code of Obligations.

53. The FADP provides an overall framework of data protection and regulates in detail the treatment of data by federal authorities as well as by private persons and companies in Switzerland. According to Art. 3 LADP, personal data qualifies as any information related to an identified or identifiable person. Names of employees and email addresses of employees, for instance, are personal data that fall within the scope of Art. 3 LADP.[13]

54. The transfer of data abroad is not allowed if an adequate data protection cannot be guaranteed pursuant to Art. 6 § 1 FADP, which reads as follows:

> *"No personal data may be transferred abroad if the data subject's personal privacy could be jeopardized, in cases where there is a failure to provide protection equivalent to that provided under Swiss law."*

55. According to the Federal Data Commissioner, the USA does not fulfill the level of data protection required under Swiss law, therefore, according to Art. 6 FADP, a

---

[11] See H. v. State attorney of the Canton of Zurich, BGE 114 IV 128 seq. (1988).
[12] In German: Datenschutzgesetz.
[13] See VPB 69.106, 2.4, decision of the Federal Commission on Data Protection of April 5th, 2005.

15

transmission of personal data to the USA may only be performed if the requirements of Art. 6 § 2 are fulfilled.

56. According to Art. 6 FADP, personal data may be transferred abroad notwithstanding a lack of equivalent statutory protection in particular if the affected person consents to the transmission of his/her personal data, or an equivalent data protection as required under Swiss law has been stipulated by the parties to a dispute abroad for the specific data transmission or the transmission is essential to the defense of the rights of a party.

57. As of consequence thereof, absent the employee's consent or an adequate protection stipulated by the parties, the Bank is not entitled to disclose personal data from its clients (other than the Plaintiffs), its business partners and its employees not otherwise available to the public, to the Plaintiffs or the court. However, the bank may disclose redacted documents as long as the affected person id not identifiable.

58. According to art. 2 section 2 letter c FADP the statute does not apply to pending (Swiss) civil, penal criminal and international legal assistance procedures as well as public law and administrative regulation with the exception of administrative proceedings of the first instance.[14] Therefore, the above described protection under Swiss data protection law would not apply, in the present case, if the Plaintiffs' Request would be the subject of a request for international legal assistance filed with the Swiss authorities.

59. Violation of the FADP and of Art. 328 and 328b Code of Obligations would expose the bank to a claim for damages that could be brought by the affected employee.

### VIII. THE HAGUE CONVENTION

60. Swiss judicial sovereignty does not preclude a foreign litigant from obtaining evidence from Switzerland. It rather requires that certain procedures be followed in requesting and obtaining the evidence.

61. In a civil matter like the one at hand, Swiss courts may order the production of materials protected by financial privacy and trade/business secrets laws pursuant to the Hague Evidence Convention, to which the United States and Switzerland are both parties.

---

[14] See, e.g., BGE 126 II 126 et seq. [2000].

When ratifying the Convention, the Government of Switzerland made an express declaration that Switzerland regards this Convention as exclusively applicable among the Contracting States. Switzerland reiterated its views recently in its Response to the Questionnaire of May 2008 of the Hague Conference on Private International Law at p. 19 (available at http://tinyurl.com/2av78rl) : "as we clearly stated in the declaration of the Swiss government regarding article 1 CLaH70 Switzerland maintains that the convention is applicable in an exclusive manner between the Contracting States" (unofficial translation).

62. The Hague Evidence Convention provides in relevant part in Articles 9 and 10:

> *9. The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.*
>
> *However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.*
>
> *A Letter of Request shall be executed expeditiously.*
>
> *10. In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings."*

63. Thus, in executing a request that otherwise satisfies the Hague Evidence Convention and the Reservations and Declaration made by Switzerland under Article 23 of the Hague Evidence Convention ("6 ad. Art. 23"), the Swiss court would order production of the requested documents pursuant to, and to the same extent as is permissible, under domestic Swiss law.

64. According to said Reservations and Declaration, a request for judicial assistance shall fulfill the "nexus requirement," i.e., there must be a "direct and necessary link" between the "underlying proceedings" and the evidence requested. To satisfy this requirement, the Hague Evidence Convention request should include a narrative – which the Swiss court will accept as true – explaining the nexus. See 5P.423/2006 at 5.3.3 (Swiss Federal Supreme Court Feb. 12, 2007) (holding that under Art. 12 of the Hague Evidence

Convention, the Swiss judge may not conduct a review of the accuracy of statements in the request, and thus must grant the request if a nexus is described on its face). Second, 6 id. Arts. 23(b) and (c) impose a "specificity requirement": does the request, rather than describing the documents sought, require the person subject to the request "to specify what documents relating to the lawsuit are or were in his/her possession"? The answer should be no. And, does the request seek documents "other than those specified in [the request]"? Again, the answer should be no.

65. Plaintiffs' request pursuant to the Hague Convention would be transferred to the Canton in which the evidence sought (if any) is located or, if it is not known whether/where the evidence at issue would exist, to the Canton where the party whose information is sought is headquartered (in UBS's case, Zurich and Basel-City). The new Swiss Federal Code of Civil Procedure sets forth the conditions under which a judge may order a party to produce documents protected by Swiss financial privacy or trade/business secrets law based on a balancing test pursuant to which the court weighs all of the relevant interests, which includes the plaintiffs' interest in obtaining the materials sought, the customer's interest in privacy, and the bank's own interest, if any (e.g., in submitted documents in its own defense) (see § 24 above).

66. Accordingly, the Hague Convention provides Plaintiffs with a mechanism fully consistent with Swiss sovereignty through which Plaintiffs and the U.S. court can seek – and, upon a favorable balancing of the interests, obtain – documents that are protected, but without requiring UBS to act in violation of Swiss law.

67. Switzerland routinely and expeditiously processes requests under the Hague Convention. According to statistics published by the Swiss government, between 2003 and 2007 Switzerland processed over a hundred requests per year.[15] In 2007 (the most recent year for which statistic have been reported), Switzerland received at least 177 Hague Convention requests, nearly all of which (including requests for bank information) were processed by Switzerland in under four months, and indeed the majority were processed in under two months.

---

[15] Most likely the actual numbers are higher because not all Cantons reported their results for publication.

68. In appropriate circumstances, Swiss authorities have overridden Swiss financial privacy and required production of documents pursuant to Hague Convention requests. For example, in response to a 2007 judicial assistance request arising from a civil case in California, where the U.S. party sought information regarding a Swiss account held by a third party (i.e., not from a party to the California action), the Swiss court lifted privacy and granted the request. On appeal, the bank argued that the Swiss court was not empowered to lift financial privacy in response to a Hague Convention request given that the California case was only at the pretrial stages. The Swiss Federal Supreme Court rejected the bank's position, affirming the production of evidence in response to the Hague Convention request and holding that the Swiss court was permitted to lift protections in response to the Hague Convention request based on a balancing of all the relevant interests.[16]

69. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 2nd day of September, 2011.

_____
Isabelle Romy

---

[16] See 4A_399/2007 of December 4, 2007.