GIBSON, DUNN & CRUTCHER LLP
DEAN J. KITCHENS, SBN 82096
dkitchens@gibsondunn.com
LAUREN A. EBER, SBN 246519
leber@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

GIBSON, DUNN & CRUTCHER LLP
KRISTOPHER P. DIULIO, SBN 229399
kdiulio@gibsondunn.com
3161 Michelson Drive
Irvine, California  92612-4412
Telephone:   949.451.3800
Facsimile:   949.451.4220

Attorneys for Defendant UBS AG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IGOR OLENICOFF, an individual; and OLEN PROPERTIES CORP., a Florida corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UBS AG, a foreign Swiss corporation, et al.,<br><br>                    Defendants. | CASE NO. SACV08-01029 AG (RNBx)<br><br>**DEFENDANT UBS AG'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**<br><br>Pretrial Conf.:     April 23, 2012<br>Trial Date:         May 8, 2012 |

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    CONTENTIONS OF FACT ................................................................ 1

    A.    Olenicoff's tax fraud ................................................. 1

    B.    The Deferred Prosecution Agreement and the Qualified Intermediary Agreement .......................................... 5

    C.    UBS Managed Olenicoff's Accounts Properly, and Olenicoff Made More than $14 Million on his UBS Accounts ............................ 7

    D.    RICO .......................................................... 12

    E.    Olenicoff's Claims Are Barred by Statutes of Limitations ..................... 12

    F.    Plaintiffs Did Not Suffer Any Damages Caused By UBS ....................... 18

II.    CONTENTIONS OF LAW ................................................................. 20

Gibson, Dunn &
Crutcher LLP

i

Pursuant to Local Rule 16-4, Defendant UBS AG ("UBS") respectfully submits the following Memorandum of Contentions of Law and Fact.

## I.    CONTENTIONS OF FACT

Plaintiff Igor Olenicoff[1] pleaded guilty in 2007 to felony tax fraud.  In that proceeding, he admitted that for at least seven years, he purposely lied to the IRS to avoid detection of offshore accounts he set up to evade U.S. taxation.  Despite the fact that Olenicoff's tax scheme predated by at least three years his introduction to UBS, despite the fact that he admitted under oath to a Federal Judge that he purposely, willfully and illegally lied on his tax returns, and despite the fact that UBS had no role whatsoever in preparing Olenicoff's tax returns, this lawsuit seeks to blame UBS for somehow causing Olenicoff's criminal conviction.  The facts show that Olenicoff, not UBS, is responsible for Olenicoff's felony conviction.  Olenicoff did not make any representation to Olenicoff suggesting that it was legal for him to lie on his tax returns about having an interest in foreign accounts.  The facts further show that UBS managed Olenicoff's UBS accounts in accordance with his or his trustees' instructions.  Olenicoff made over $14 million, producing a return of 2.37%, which is squarely within the 2% to 3% rate he alleges in his Third Amended Complaint ("TAC") that he was seeking.

**A.    Olenicoff's tax fraud**

Between 2001 and 2005, Igor Olenicoff had five separate accounts with UBS in Switzerland.  Some of them were in his own name and others were in the names of shell companies and a trust, which he created for the purpose of obscuring the true ownership of the accounts.  Before his UBS accounts were opened in 2001, he had for many years owned more than 20 "offshore" accounts held at Barclays Bank and other institutions in the Bahamas, Cayman Islands, and other offshore locations.  None of

---

[1]  UBS moved for summary judgment against Plaintiff Olen Properties Corp. ("Olen") because it is not a proper party.  Olen does not oppose UBS's motion. Thus, UBS's Contentions of Law and Fact only concern Olenicoff.

those accounts were ever disclosed to the IRS (as required annually on Form 1040), and Olenicoff never paid required taxes on the income from those accounts.  After years of IRS audits of Olen and Olenicoff and related Tax Court litigations (for tax years as early as 1993), in May of 2005, the IRS executed a search warrant on Olenicoff and Olen Properties, looking specifically for evidence of the existence and ownership of these offshore accounts.  Thereafter, Olenicoff was charged with criminal tax fraud for lying on his tax returns from at least 1998 through 2004 by failing to disclose his offshore accounts and failing to pay taxes.  Olenicoff ultimately pleaded guilty in October 2007 to criminal tax fraud (subscribing to a false return), paid $52 million in back taxes, interest, and penalties, and, at least at that time, took personal responsibility for willfully lying on his tax returns.

Notwithstanding all this history, Olenicoff is asserting in this case that he believed throughout his relationship with UBS that his offshore accounts were perfectly proper, that it was all right to deny ownership of these accounts to the IRS when specifically asked, that he did not need to pay taxes on income from these accounts, and that UBS is to blame for his tax fraud because it never informed him of the need to report the accounts and pay taxes.  This contention is absurd on its face, and it is directly contradicted by Olenicoff's unequivocal statements in his prior criminal proceeding—statements made to the IRS, the DOJ and under oath to a Federal Judge in this District.  In fact, Olenicoff's prior statements demonstrate to a moral certainty that he knew it was wrong to lie to the IRS about his foreign accounts and not pay taxes on them.  But the facts revealed in this litigation show that Olenicoff does not feel bound by the truth even when under penalty of perjury; rather, he is willing to change his story to suit his purposes at the time.

In his Plea Agreement, Olenicoff admitted to, among others, the following facts:

- Olenicoff filed individual tax returns for years 1998 through 2004 under "penalties of perjury";

- Each tax return asked at line 7a "At any time during [calendar year], did you have an interest in or a signatory authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?";

- "On each of the 1998 through 2004 Form 1040s, *[Olenicoff] falsely answered 'No' to line 7a . . . even though, as he then well knew and understood, he had an interest in, signatory authority, and other authority over financial accounts in foreign countries during these years.";*

- Olenicoff answered "No" on his 2002 tax return, which "*as [Olenicoff] then and there well knew and believed, was a false statement*, as defendant had ownership, control, and signatory authority over financial accounts in England, Switzerland, the Bahamas, and Lichtenstein."; and

- "When [Olenicoff] signed his 2002 Form 1040 in April 2003, *[Olenicoff] knew that it contained false information as to a material matter, and in filing the false 2002 Form 1040, [Olenicoff] acted willfully.*"

In addition, at his change in plea hearing, Olenicoff stated to Judge Carney of this District—while under oath—that the facts in the factual basis portion of his Plea Agreement were true.  These acknowledgments establish unequivocally that Olenicoff acted knowingly and willfully when he committed his criminal tax fraud.

In this lawsuit, however, Olenicoff disputes the prior version of the facts he repeatedly confirmed (under penalty of perjury) in the criminal action.  At his deposition in this case he denied that he knowingly filed false tax returns as follows:

Q.     It says – and when you filed the [2002 1040 income tax] return in April of 2003 that you then and there well knew and believed it was a false statement?

A.     No, I didn't know at that time.

Q.     Okay.  So you're saying that this is incorrect?

A.     I'm saying I didn't know that that even existed at the time that I signed

1    my tax return.

2    Thus, Olenicoff claims in this case, contrary to the acknowledgment in his Plea

3    Agreement, that he did **not** knowingly commit tax fraud, but rather he was negligent in

4    that he signed his tax returns with no knowledge that his denials of offshore accounts

5    "even existed."  Olenicoff now claims further that the statements in his Plea

6    Agreement are incorrect and that instead they "should say defendant should have

7    known that it contained false information" because "that was my state of mind is that I

8    should have known, and that's what I was advised."

9        The uncontroverted evidence of Olenicoff's tax fraud does not stop with what he

10   has expressly admitted.  For example, one of the many foreign entities controlled by

11   Olenicoff was Sovereign Bancorp Ltd. ("Sovereign").  In 2003, in an earlier tax

12   proceeding against Olenicoff, he claimed before the United States Tax Court that he

13   had no interest in Sovereign and that he "did not have custody or control of, or benefit

14   from, income, assets or accounts held in the name of Sovereign or Sovereign Nevada.

15   Furthermore, [Olenicoff] did not benefit from or control deposits made to accounts

16   held in the name of Sovereign."  Instead, Olenicoff claimed to the IRS, in a petition

17   filed in the United States Tax Court, that:

18          Sovereign Bancorp, Ltd., a Bahamian company (hereinafter referred to as

19          "Sovereign"), was established in 1990 by: the Vozrozhdeniye Fund,

20          which was an agency created by Boris Yeltsin to take control of and

21          manage the development of Russia's economy and the privatization of its

22          industries and properties . . .  Sovereign was not a sham with no valid

23          business purpose or economic substance.

24       Yet, four years later, in his October 17, 2007 Plea Agreement, Olenicoff finally

25   came clean and admitted the truth—that he was the "chairman of Sovereign Bancorp,"

26   that Olenicoff "had signatory authority and controlled" foreign financial accounts in

27   the name of Sovereign, and that Olenicoff "directed and authorized transactions"

28   involving offshore accounts held in the name of Sovereign.  Furthermore, in his

February 8, 2008 closing agreements with the IRS, Olenicoff additionally admitted that he "is or has been a U.S. shareholder or has or had beneficial interest in . . . Sovereign Bancorp Ltd. (a Bahamian company)."  The uncontroverted evidence establishing Olenicoff's prior misrepresentations to the IRS and the Tax Court goes on:  Following his guilty plea, Olenicoff was required to file with the IRS a Report of Foreign Bank and Financial Accounts for the years 1998 through 2004.  For the year 1998, alone, Olenicoff disclosed that he had a ***personal interest*** in 15 foreign accounts, which included ***six accounts in the name of Sovereign*** (five at Barclays in the Bahamas and one at Smith Barney in England).  Yet, on his 1998 individual tax return, Olenicoff affirmatively told the IRS that he had no interest in any foreign accounts and Olenicoff failed to report any interest income from foreign accounts.  UBS was not responsible for Olenicoff's tax fraud, and even Olenicoff cannot blame UBS for the tax fraud he committed years ***before*** he met anyone affiliated with UBS.

**B.     The Deferred Prosecution Agreement and the Qualified Intermediary Agreement**

In February 2009, UBS AG and the United States Government entered into a Deferred Prosecution Agreement ("DPA") in connection with criminal proceedings initiated against UBS for its conduct in aiding and abetting U.S. citizens in their evasion of U.S. taxation.  Specifically, UBS acknowledged that:

> "Beginning in 2000 and continuing until 2007, UBS, through certain private bankers and managers in the United States cross-border business, participated in a scheme to defraud the United States and its agency, the IRS, by actively assisting or otherwise facilitating a number of United States individual taxpayers in establishing accounts at UBS in a manner designed to conceal the United States taxpayers' ownership or beneficial interest in these accounts."

As part of the DPA, UBS agreed to pay $780 million to the United States, which was calculated as (1) disgorgement of profits from the U.S. cross-border business from 2001-2008 ($380 million), and (2) federal backup withholding tax required to be

remitted based on declared and undeclared accounts for U.S. taxpayers who were actively assisted or facilitated by UBS private bankers.  UBS also undertook a broad range of remedial measures including greater transparency in its business, improvement in corporate governance and internal controls, and the adoption of new policies to ensure there would be no repetition of prior conduct.  What is important to understand, and what Plaintiffs have been attempting to obscure throughout the entire course of this litigation, is that the conduct UBS acknowledged in the DPA is not what Olenicoff is claiming in this case.  UBS has never acknowledged, and it is not true, that UBS misled its own clients regarding the need to disclose accounts and pay taxes (which is what Olenicoff claims in this case).  What UBS does acknowledge and what is set forth in the DPA, is that certain private bankers assisted and facilitated U.S. taxpayers (like Olenicoff) in the taxpayers' schemes to avoid U.S. taxation.  Thus, UBS acknowledged its role in aiding and abetting tax evasion by its clients, who, like Olenicoff, were the primary wrongdoers in the scheme.  UBS does not contest its complicity in their scheme.  But what is relevant in this case is that the charge in the DPA is that UBS assisted clients like Olenicoff in their tax evasion.  That is far different from acknowledging that UBS defrauded clients (like Olenicoff) into believing they could lie on their taxes and simply hide their income subject to taxation. For these reasons, the DPA has no relevance to Olenicoff's claims that he was defrauded by UBS.  There simply are no admissions by UBS in the DPA which help Olenicoff prove his case or defeat this Motion.

Just as with the DPA, Plaintiffs attempt to use the Qualified Intermediary Agreement ("QIA") entered into between UBS and the IRS in 2001 as a stand-in for the need to prove that UBS acted improperly toward Olenicoff—which they cannot do. They assert (incorrectly and with no basis) that UBS violated the QIA with respect to Olenicoff's accounts and, if it had followed the QIA properly, Olenicoff would have been caught more quickly and his punishment would have been less severe.  According to Plaintiffs, it is UBS's fault that Olenicoff was allowed to continue lying without

1   detection, and UBS should pay Olenicoff for the damages incurred by his continued

2   deceit before he was caught.  Of course, this theory ignores the fact that Olenicoff had

3   already been lying to the IRS for at least three years before he met UBS, and that he

4   continued to lie about more than 20 other non-UBS off-shore accounts during the years

5   he also had accounts with UBS.  UBS did not violate the QIA with respect to

6   Olenicoff's UBS accounts, and Plaintiffs offer no basis whatsoever to support the

7   theory that it did.

8          UBS employee Markus Weber is a true expert on the QIA.  He has served as a

9   QI auditor for Ernst & Young, and worked with Qualified Intermediaries in

10  Switzerland and across Europe.  He is currently responsible for UBS group-wide QI

11  audit projects involving over 20 entities on four continents.  The QIA is a contract

12  setting forth the rights and obligations of UBS to the IRS in respect of its function as a

13  withholding agent for certain accounts designated as QI accounts.  The application of

14  the QIA to any specific account can only be determined by reference to the details of

15  the specific accounts at issue.  As Markus Weber will testify, for a variety of reasons,

16  the QIA did not impose any reporting or withholding obligations with respect to the

17  Olenicoff accounts at UBS.  Accordingly, the entire QIA issue is a red herring.

18  **C.**   **UBS Managed Olenicoff's Accounts Properly, and Olenicoff Made More**

19          **than $14 Million on his UBS Accounts**

20          Olenicoff makes claims that UBS mismanaged the accounts he held from 2001

21  to 2005, but the evidence does not support those claims.  The management of

22  Olenicoff's UBS accounts and the returns he achieved are consistent with Olenicoff's

23  own admissions in this case and the written directions he gave to UBS.  Olenicoff

24  made approximately $14,759,472 in his UBS accounts over the nearly four year period

25  that they were open, resulting in a 2.37% annual return.  This return is squarely within

26  the 2% to 3% return Plaintiffs allege in the complaint Olenicoff was seeking.

27  Olenicoff was aware of how his accounts were being managed at the time, as by his

28  own admissions, he received regular account statements informing him of the activity

in his accounts.  And his own documents show that Olenicoff or his son, Andrei, took an active role in directing the investments.

Olenicoff, as beneficial owner, held funds in five separate accounts at UBS, either in his own name or the names of companies set up for his benefit ("the Olenicoff Accounts").  The accounts were as follows:

| Name of Accountholder | Account Number[2] | Beneficial Owner | Account Activity |
|---|---|---|---|
| New Haven Treuhand AG as Trustee of the Landmark Settlement ("New Haven UBS") | "Account 096" | Igor Olenicoff<br><br>UBS-OLN-005858 | Open from May 2003 – Oct. 2005<br><br>Total amount earned: $5,268,402.85 |
| Igor Olenicoff | "Account 812" | Igor Olenicoff<br><br>UBS-OLN-003511 – UBS-OLN-003513 | Open from Jan. 2002 – Sept. 2005<br><br>Total amount earned: $4,149,796.18 |
| New Guardian Bancorp ApS. | "Account 933" | Igor Olenicoff | Open from Jan. 2002 – July 2005<br><br>Total amount earned: $5,115,347.60 |
| Igor Olenicoff and Andrei Olenicoff | "Account 937" | Igor Olenicoff and Andrei Olenicoff | Open from Jan. 2002 – Oct. 2002<br><br>Total amount earned: $103,224.67 |
| Guardian Guarantee Company Ltd. | "Account 949" | Igor Olenicoff | Open from Nov. 2001 – Oct. 2002<br><br>Total amount earned: $122,701.00 |

In total, Olenicoff transferred approximately $180,583,319 into the UBS accounts, between November 2001 and October 2005.  These funds came from transfers from non-UBS bank accounts in the names of Guardian Guarantee Co. Ltd.;

---

[2]  For the purpose of respecting the privacy of the accountholders, pursuant to Local Rule 79-5.4, the relevant accounts are referred to only by the last three digits of the account numbers.

1   New Haven Treuhand AG as trustee of the Landmark Settlement; and Swiss Finance
2   Corporation.  Olenicoff used offshore entities to hold funds for his benefit long before
3   he came to UBS, and the account structure at UBS using entities to hold funds for
4   Olenicoff's benefit was not an invention of UBS, but was a continuation of what
5   Olenicoff had already been doing for years.

6          Either on his own or through others acting on his behalf, Olenicoff opened
7   accounts in his own name, in the name of himself and his son jointly, and in the names
8   of entities entitled New Haven Treuhand AG as Trustee of the Landmark Settlement,
9   New Guardian Bancorp ApS., and Guardian Guarantee Company Ltd.  Olenicoff
10  directed transfers of funds both into and between his various accounts at UBS.
11  Olenicoff also gave direction to UBS to close his accounts.

12         The commissions and bank fees that were charged on the five accounts were
13  also consistent with—in fact they were less than—what Olenicoff told UBS was
14  acceptable to him.  Plaintiffs allege that UBS and Olenicoff agreed that one set fee
15  would be charged on Olenicoff's entire portfolio.  The account documents for Account
16  933 show that a flat fee fixed at .7% was agreed to.  On an annual basis, Olenicoff was
17  charged commissions and fees amounting to between approximately 0.014% and
18  0.347% of the value of his accounts, for a total of $1,926,009 over the four year
19  lifespan of his accounts.  Olenicoff's roughly $14.7 million profit and 2.37% annual
20  return on investment for his accounts are net of these commissions and fees.  *Id.*

21         In a last minute effort to bolster their claims in this case, Plaintiffs have
22  attempted to make an issue out of the Double Currency Unit (or DOCU) investments
23  Olenicoff made.  The DOCU is a structured product used by thousands of investors
24  worldwide to manage their liquidity and achieve a potential return above money
25  market investments.  Structured products with the same essential terms are offered by
26  banks and other financial institutions all over the world.  They typically last 30 to 90
27  days and have two essential features.  They combine a money market investment with
28  the sale of a standard call option on the investment currency against a second currency.

Gibson, Dunn &
Crutcher LLP

9

1   The fixed rate of interest is higher than on a traditional money market investment.

2   Depending on the exchange rate on expiry, the investment amount is paid back with

3   interest in the investment currency or in the second currency.  In this action, Olenicoff

4   now says the DOCUs were too risky and should not have been sold to him.  Yet he was

5   told before ever purchasing a DOCU precisely how they worked, signed a disclosure

6   statement setting that forth, and, along with his son Andrei, gave specific directions on

7   when and how much to invest in the DOCUs.

8   　　In total, the Olenicoff Accounts made 128 DOCU investments in two accounts,

9   Account 812 (in the name of Igor Olenicoff) and Account 096 (in the name of New

10  Haven).  Out of those 128 transactions, 117 generated a net gain and 11 generated a net

11  loss.  In other words, over 91% of the 128 DOCU transactions generated a net gain.  In

12  total, according to the account and income statements for Account 096 and Account

13  812, Olenicoff earned approximately $9,183,195 on the DOCU investments, for a total

14  annual internal return on investment of 2.32%.  Account 812, held in the name of Igor

15  Olenicoff personally, had an annual internal rate of return on DOCU investments of

16  4.20%.  Olenicoff claims that he should have gotten the same return on the DOCU

17  investments that he got on the equities and other investments held in his portfolio

18  account managed by UBS.  This assertion ignores Olenicoff's stated goal and

19  instructions to UBS that the funds invested in DOCUs were to be held in liquid, cash

20  investments.  It is inappropriate to expect an equity-level return on cash investments.

21  　　Andrei Olenicoff was very active in managing the DOCU trading in Account

22  812.  The 26 DOCU trades in Account 812 all resulted in net gains and return on

23  investment of 4.2%.  The account documents suggest that, presumably pleased with the

24  performance of the DOCU investments in Account 812, Olenicoff endorsed their use

25  in the New Haven trust account, newly formed for Olenicoff's benefit.  In June 2003,

26  Igor Olenicoff provided written instructions to UBS to "Transfer all existing DOCU

27  instruments and any other remaining funds out of the current [812] account and

28  consolidate them with the DOCU and funds in the recently formed Trust account

[096]."  Pursuant to these instructions, the DOCUs and other funds from Account 812 were transferred to Account 096, where the investment in DOCUs continued.  Staggl and Biedermann, not Olenicoff or UBS, had signatory authority over Account 096 and directed the investments in Account 096.  Staggl and Biedermann had and continue to have no relationship with UBS (other than their role as trustees for Olenicoff to sign on accounts at UBS held for the benefit of Olenicoff (Accounts 096, 933, and 949)).  The facts show that the DOCUs were a successful investment for Olenicoff's accounts, generating a total of over $9 million in income, gains in 117 out of 128 transactions, a 4.2% return in Account 812, managed directly by Igor and Andrei Olenicoff, and a total return of 2.32%, well within Olenicoff's stated goal for investment returns.

Plaintiffs allege that the DOCUs were "churned," but that argument has no merit.  Plaintiffs' expert Jeffrey Gottfredson cites the following definition of "churning," as provided by the SEC: "Churning occurs when a broker engages in excessive buying and selling of securities in a customer's account chiefly to generate commissions that benefit the broker."  But Olenicoff was not charged any commissions in connection with DOCU purchases.  And Olenicoff's flat fee arrangement on his equity account meant that he was not charged extra commissions for additional trades.  The fees Olenicoff was charged on his accounts did not exceed 0.347%, less than the 0.7% flat fee Olenicoff agreed to pay.  Plaintiffs' own expert acknowledged, in fact, that a 0.7% flat fee or "wrap" fee is actually "a little bit less than standard."

Moreover, DOCUs are not the type of product for which a churning analysis is relevant, because the revenue to UBS from DOCUs is calculated on a per annum basis, not a per trade basis.  This means that the revenue to UBS is proportional to the length of the investment.  UBS does not earn any more on the sale of 12 one-month DOCUs than it would earn on the sale of one 12-month DOCU.  Plaintiffs' own expert specifically stated that a churning analysis is not applicable to investments that work like CDs—as do the DOCUs.  In addition, a DOCU is by definition a 30-90 day investment that matures and is redeemed in that timeframe.  It is improper to

1   characterize the maturation of a DOCU after its 30-90 day lifecycle as "churning."

2       Olenicoff's accounts at UBS were very profitable for him.  They preserved and

3   grew his capital, as he wished.  UBS properly managed Olenicoff's accounts and any

4   claims to the contrary have no merit.

5   **D.      RICO**

6       The supposed predicate acts of racketeering that Plaintiffs offer are: (1) that

7   UBS fraudulently put Olenicoff into "account structures" that exposed him to criminal

8   prosecution; and (2) that UBS committed acts of mail or wire fraud by mismanaging

9   his accounts.  Neither of these contentions has any merit whatsoever—they are

10  procedurally barred; they overlook the fact that UBS did not cause Olenicoff's alleged

11  injuries (Olenicoff himself did); and they involve conduct that is actionable, if at all, as

12  securities fraud and therefore cannot support a RICO claim.  Finally, no matter which

13  predicate acts Plaintiffs now allege, UBS never was part of an "enterprise," as is

14  required to prove a claim under RICO.

15  **E.      Olenicoff's Claims Are Barred by Statutes of Limitations**

16      Both Olenicoff's tax fraud claims and account mismanagement claims are

17  barred by the applicable statutes of limitations of two, three, or four years.

18      As to Olenicoff's fraud claims, Olenicoff claims in this case that UBS did not

19  "take care of everything concerning his taxes," and that the promise that it would do so

20  was a fraud on which he reasonably relied.  These claims are time barred, however,

21  because Olenicoff waited until September 16, 2008 to file this action, when he knew or

22  had reason to know of any alleged claims years earlier.  The relevant question is, when

23  would a reasonable person be on inquiry notice of the facts purporting to support his

24  claim for fraud?  The answer, based on the facts, is years before September 16, 2005,

25  and most probably by October 2002.

26      These are the facts that would put a reasonable person in Olenicoff's position on

27  notice that he should investigate whether UBS's supposed assurance it would be

28  "taking care of everything concerning Olenicoff's taxes" was in fact true:

First, at the time Olenicoff was first introduced to UBS in 2001, he had already been lying to the IRS about not having any off-shore accounts.  When he opened his accounts at UBS, he claims he was told not to worry, UBS would take care of everything concerning his taxes.  Yet despite that supposed assurance, the very first time he completed his Form 1040 following the opening of the UBS accounts, he made the precise same false statements he had continually made for years.  On his 2001 Form 1040, Schedule B, he was asked:  "At any time during 2001, did you have an interest in or a signature or other authority over, a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  While the true answer was "yes," Olenicoff gave the same false "no" answer he had given since at least 1998 (before his first UBS account). It cannot be disputed that a reasonable person relying on advice that "UBS had taken care of everything" would have answered "yes," but he did not do so.  Olenicoff obviously had concerns about whether these foreign accounts were taxable, because he perceived that it was necessary to lie to the IRS about their existence.  And Olenicoff admitted in his 2007 Plea Agreement that when he falsely stated "no," "he then well knew and understood, he had an interest in, signatory authority, and other authority over financial accounts in other countries during these years [1998-2004]."  So as early as the filing of his 2001 Form 1040 in 2002, Olenicoff obviously had questions about whether UBS was truly "taking care of everything," because he (or at least a reasonable person) would not be lying on his tax forms if he thought everything was proper and being taken care of by UBS.

Second, during the years he had UBS accounts, Olenicoff had many other off-shore accounts in non-UBS financial institutions.  Even if he truly was told by UBS that it would "take care of everything" and that he did not need to disclose his off-shore UBS accounts, and even if he in fact believed that advice (two incorrect assumptions), he had 21 other non-UBS foreign accounts in calendar year 2001, and he also lied to the IRS about every one of those accounts.  Obviously, he did not believe

UBS was taking care of his Smith Barney, Barclays and Neue Bank accounts, yet he treated every one of them the precise same way, he denied their existence. A reasonable person in Olenicoff's position would have believed he could answer "yes" to the question about foreign accounts, and tell the IRS that UBS was "taking care of everything." And a reasonable person in Olenicoff's position would have questioned by mid-2002 (when completing his 2001 taxes) whether he should be lying on his tax return as to the 21 non-UBS off-shore accounts, and would at that time investigate the legality of making false statements to the IRS on his 2001 Form 1040. A reasonable person of Olenicoff's means who intended to abide by the law would have at that time inquired of his tax lawyer or accountant whether it was lawful to lie on his tax returns. And as to Olenicoff specifically, he had a tax preparer for all of the relevant years and found it necessary to lie to that tax preparer.

Third, on September 19, 2003 the IRS sent Olenicoff a "Notice of Deficiency" stating that he owed $18,275,748 in back taxes and $13,706,811 in penalties from 1996 based on income earned on accounts held off-shore in the name of Sovereign Bancorp, Ltd. ("Sovereign Bancorp"). As of the time the IRS filed its petition in September 2003, Olenicoff had 6 separate off-shore accounts for Sovereign Bancorp, all of which he lied about on his 2002 Form 1040. A reasonable person would have questioned the purported advice that "UBS was taking care of everything regarding his taxes" when, on September 19, 2003, the IRS served a Notice of Deficiency seeking over $31 million dollars in back taxes and penalties for accounts it claimed should have been disclosed, because at that time the reasonable person knew that none of the accounts had been disclosed. And that reasonable person would certainly have investigated that question when completing his 2003 tax return in 2004, *and again* lying about the existence of the Sovereign Bancorp accounts.

Fourth, a reasonable person would also have investigated the purported advice that "everything was being taken care of by UBS" when, on November 22, 2004, that person was informed **by his own lawyers** that the IRS was conducting a criminal

investigation into his tax returns for the years 1999-2002.  In fact, on or about November 22, 2004, Olenicoff learned that the IRS was claiming that Olenicoff's off-shore accounts in the names of Sovereign Bancorp, Guardian Guarantee, Continental Realty Funding Corp., Swiss Finance Corp. and others were "shams," and

> "that the taxpayer, Igor Olenicoff, had custody or control or benefitted from income and assets held in the name of Sovereign, Sovereign Nevada, Continental Realty Funding Corp., Swiss Finance Corporation, National Depository Company and Guardian Guarantee Company Ltd. <u>Consequently, income recorded in the names of these companies is taxable to him</u>."

In 2002, Olenicoff had 25 off-shore accounts in the names of these various entities (and others), 5 of which were held at UBS and 20 of which were held at other institutions.  There is no question that <u>as of November 2004</u>, Olenicoff was aware that the failure to disclose these off-shore accounts and report the income received from them was viewed by the IRS as improper, indeed potentially criminal.  By November 2004, a reasonable person possessed of this information would have questioned the supposed advice from UBS that "it was taking care of everything" regarding his taxes and that he "need not pay taxes on these foreign accounts."

<u>Fifth</u>, on December 5, 2004, Olenicoff emailed his UBS client advisor Brad Birkenfeld to express his regret at not attending a party and explained his absence by stating:

> "The reason for this that has arisen is one that I have had in the back of my mind anticipated but hoped it would not come, but it has and it has to do with my IRS audit.  I would prefer not discussion [sic] this matter here in an email, but if you would call me this week at my Florida home [number], I would like to discuss in detail.  Specifically, as I had thought may happen some day, we will have to defend the ownership issue and the relationship you may have with that entity. This needs immediate attention and will be heard in February of this coming

1   year.  Let me leave it at this for now and probably a call to my cell phone may

2   be fine also, with guarded discussion."

3       A reasonable person who had "anticipated" an IRS audit over an "ownership

4   issue" he "hoped would not come," which then materialized, and who felt it necessary

5   to have a "guarded discussion" about it on a cell phone would certainly have a

6   reasonable basis to inquire into the propriety of the UBS advice that it was "taking care

7   of everything" and there should be no concern over the "ownership issue."

8       Sixth, on or about May 25, 2005 the IRS and FBI executed a search warrant on

9   Olen's offices and Olenicoff's home, seeking categories of documents which included

10  files relating to "Continental Realty," "Sovereign Bancorp," "Swiss Finance

11  Corporation," "Guardian Guarantee," and other off-shore entities with accounts at

12  UBS.  That search warrant also called for documents relating to Vladimir Kalmykov,

13  the supposed owner of Sovereign (Olenicoff was later to admit that he himself owned

14  Sovereign).  When that FBI raid occurred and those documents were targeted, a

15  reasonable person would have investigated the accuracy of the purported advice from

16  UBS that he need not worry because UBS was "taking care of everything."

17      If the foregoing facts would not put a reasonable person on notice to investigate

18  the advice that UBS was "taking care of everything regarding his taxes," it is difficult

19  to imagine what would.

20      The statutes of limitations also bar Plaintiffs' claims of account

21  mismanagement.  Plaintiffs transferred the bulk of their $194 million out of UBS in

22  June 2005, and the final accounts were closed September 30, 2005.  The complaint in

23  this action was filed September 16, 2008.  If a reasonable person would have been on

24  inquiry notice of these purported claims by September 15, 2005, the account

25  mismanagement claims are barred.

26      The question for purposes of the statute of limitations inquiry is, when would a

27  reasonable person be on notice of the account mismanagement claims?  Olenicoff had

28  regular access to his account information (he specifically alleged and testified to that),

1   he knew exactly how the DOCUs worked prior to the time he ever bought one, and he

2   and his son regularly directed the purchase of DOCUs and profited over $9 million in

3   the purchase of them.  And, to the extent Olenicoff is also still claiming that he "lost

4   control" of his accounts (an untrue contention), he testified he was concerned about

5   that issue as early as 2002, and he certainly knew about it when his money was

6   transferred out of UBS supposedly without his approval in May of 2005.

7           Olenicoff was told in 2002 precisely how DOCUs worked, signed a disclosure

8   statement setting that forth, and, along with his son Andrei, gave specific directions on

9   when and how much to invest in the DOCUs.  If the risk profile of DOCUs was too

10  high for this billionaire, he knew that in April 2002 when he authorized their purchase

11  and signed a disclosure form.  Olenicoff knew that the DOCUs were 30 to 90 day

12  investments and that, of necessity, there would be more transactions than if, for

13  example, all the money was held in a one year certificate of deposit.  Consequently,

14  Olenicoff knew from the time that he first started purchasing DOCUs in 2003 that they

15  were a short-term investment that was renewed frequently.  His churning claim is thus

16  time barred.

17          With regard to Olenicoff's claims that UBS took control of Olenicoff's money

18  over his objections (a preposterous claim that is contrary to fact), this claim is also

19  time barred.  UBS never had control of the money; the money was primarily in the

20  hands of a trust Olenicoff set up within a company in Lichtenstein, a company with

21  which UBS had no relationship.  He did that to avoid being overtly connected to the

22  trust so that he could evade U.S. taxation.  In any event, even if you credit his claim

23  that he was defrauded into surrendering control, he testified that, as early as 2002, he

24  was "getting quite concerned" because his trustees were "non-responsive" and when he

25  asked for changes over the control, UBS and the trustees "refused to do it" and "just

26  blew me off."

27          All of Plaintiffs' remaining claims are time barred, because Olenicoff was on

28  inquiry notice of the relevant conduct many years before the first complaint in this case

was filed.

**F.     Plaintiffs Did Not Suffer Any Damages Caused By UBS**

Plaintiffs claim several categories of damages, but the facts do not support any of those damages claims.

First, Plaintiffs' claim for harm to Olen's business from its supposed inability to get a loan following Olenicoff's felony conviction is premised on multiple lies and perjury.  After claiming that Olen was totally unable to get a loan, Plaintiffs and their expert now admit that Olen received more than $300 million in loans in 2010 and 2011.  Moreover, to the extent Olen may have been harmed by Olenicoff's felony conviction, Olenicoff, having pleaded guilty to knowingly and willfully committing that felony, has only himself to blame for its consequences.  And as Olen should no longer be as a party to this action (Olen does not opposed UBS motion for summary judgment against Olen), there is no basis for Olenicoff individually to recover for alleged harm to Olen.

Second, Plaintiffs' benefit of the bargain theory seeking to recover for account mismanagement and fraud fails.  Plaintiffs' instructions for handling the accounts were followed.  Based on those instructions, Olenicoff earned more than $14 million dollars, including more than $9 million on the DOCUs alone.  Plaintiffs mistakenly argue that the funds Olenicoff wanted to keep in liquid investments (i.e., DOCUs) should have earned the same return as the funds invested in equities.  The 2.3% return Olenicoff obtained on DOCUs was an above-market return for a liquid, cash investment—and within the range that Olenicoff said he wanted.  As to Plaintiffs' theory that Olenicoff is entitled to damages because UBS should have submitted a 1099 for Olenicoff, this is belied by the fact that Olenicoff had more than a dozen foreign accounts at other banks both before and during the time he held accounts at UBS, none of which submitted 1099s for their income, and Olenicoff was convicted of a felony for lying on his tax returns which Plaintiffs do not even allege UBS made him do, or, for that matter, suggest that he do.  UBS is not the but-for cause of Olenicoff's felony conviction, no

matter how many allegations of untoward conduct Plaintiffs make about UBS.

Third, Plaintiffs' claim for disgorgement of "secret profits" fails for several reasons. Plaintiffs improperly conflate an undisclosed amount of revenues with "secret profits." Plaintiffs' allegations are irrelevant—there is nothing improper or secret about a bank earning revenue on the products and services it provides to customers. Plaintiffs' reliance on a churning analysis relating to DOCUs is similarly misplaced. Churning is not relevant for investments like DOCUs for which purchasers are not charged commissions and for which the bank earns no more on selling 12 one-month instruments than it would on selling one 12-month instrument. Finally, even if UBS had obtained "secret profits" from Olenicoff or charged excessive fees from churning, which it has not, UBS has already disgorged the profits associated with its cross-border business in its settlement with the U.S. Government, in the amount of $380 million.

Fourth, Plaintiffs concede that back taxes and interest are not recoverable, and courts regularly treat tax penalties in the same manner. Moreover, Plaintiffs cannot overcome the fact that UBS was not the but-for cause of Olenicoff's tax penalties. The IRS had been investigating Olenicoff's tax deficiencies for years, in multiple investigations, before Olenicoff ever came to UBS. The majority of the penalties Olenicoff paid were for years before he ever had accounts at UBS, and Olenicoff maintained offshore accounts at other banks throughout the time he had accounts at UBS. The undisputed facts show that Olenicoff cannot prove that but-for some conduct of UBS, he would not have owed tax penalties to the IRS.

Fifth, Plaintiffs' damages claims for RICO and conspiracy fail for the same reasons as the claims above. Because Plaintiffs cannot establish that UBS was the but-for cause of damages arising from any predicate act, they cannot show RICO or conspiracy damages.

In sum, UBS did not give Olenicoff tax advice. UBS did not tell Olenicoff to lie on his tax returns about having an interest in foreign accounts. Olenicoff knowingly and willfully lied on his tax returns. Olenicoff's felony conviction for subscribing to a

1   false tax return is no one's fault but his own—and certainly not the fault of UBS.  UBS

2   followed Olenicoff's (or his trustees') instructions in the handling of the Olenicoff

3   accounts and managed those accounts responsibly.  As a result, Olenicoff made a profit

4   of more than $14 million dollars.  Olenicoff was charged fair and reasonable fees for

5   the services UBS performed on his behalf.  The DOCUs were a profitable investment

6   for Olenicoff that earned him an above-market return on a highly liquid, cash

7   investment (more than 2.3% and over $9 million).  Olenicoff and his son were heavily

8   involved in directing the trading of the DOCUs and were aware of the risks associated

9   with the product.  UBS did not "churn" the DOCUs.  But even if all of Olenicoff's

10  claims were true (which they clearly are not), they would all be barred by the relevant

11  statutes of limitations.  And finally, Olenicoff has not suffered any damages that were

12  proximately caused by UBS.

## II.    CONTENTIONS OF LAW

14          Plaintiffs cannot prove at least one (and usually more than one) of the necessary

15  elements of every one of their causes of action.  Plaintiffs cannot prove damages for

16  any of their causes of action.  And all of Plaintiffs' claims are time-barred.

17          Plaintiffs cannot prove their claims of fraud (Count 1), constructive fraud (Count

18  2), and negligent misrepresentation (Count 3).  Plaintiffs cannot prove the necessary

19  element of justifiable reliance for their tax fraud claims, and they cannot prove that

20  UBS committed fraud, made a material misrepresentation, or breached a duty in its

21  management of Olenicoff's accounts.  *Agosta v. Astor*, 120 Cal. App. 4th 596, 603

22  (2004); *Shamsian v. Atlantic Richfield Co*., 107 Cal. App. 4th 967, 983.  Nor can

23  Olenicoff prove damages for Plaintiffs' account management claims.  *North American*

24  *Chemical Co. v. Superior Court*, 59 Cal.App.4th 764, 786 (1997).

25          Plaintiffs cannot prove their claims of breach of fiduciary duty (Count 9) and

26  professional malpractice (Count 12).  *Mosier v. Southern California Physicians Ins.*

27  *Exchange*, 63 Cal. App. 4th 1022, 1044 (1998).  *Shopoff & Cavallo LLP v. Hyon*, 167

28  Cal. App. 4th 1489, 1509 (2008).  UBS filled the traditional role of a banker and did

Gibson, Dunn &
Crutcher LLP

1   not owe a fiduciary duty with respect to the accounts holding DOCUs and did not

2   breach any fiduciary duty. *Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 476 (Cal.

3   App. 1st Dist. 1989); *see also Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d

4   1068, 1075 n.32 (C.D. Cal. 2007).

5          Plaintiffs cannot prove their claims for civil conspiracy (Count 14), unfair

6   business practices (Count 15), breach of contract (Count 16), and conversion (Count

7   18). *Mosier v. Southern California Physicians Ins. Exchange*, 63 Cal. App. 4th 1022,

8   1044; *Acoustics, Inc. v. Trepte Construction Co.*, 14 Cal. App. 3d 887, 913 (1971);

9   *Plummer v. Day/Eisenberg*, LLP, 184 Cal. App. 4th 38, 45 (2010); Cal. Bus. & Prof.

10   Code § 17200.  Plaintiffs cannot prove their claims for RICO.  *Rezner v. Bayerische*

11   *Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010).

12          All of Plaintiffs' claims are also barred by the related doctrines of unclean hands

13   and *in pari delicto* because Olenicoff seeks redress for a wrong resulting from his own

14   wrongful conduct, and because this litigation is not benefitting society.  Additionally,

15   Plaintiffs' tax claims must be dismissed because they are tainted by Olenicoff's

16   wrongful conduct.  Under principles of judicial estoppel, Olenicoff cannot now deny

17   admissions he made to the Court when he pleaded guilty to tax fraud.  *New Hampshire*

18   *v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001); *Chapman v. Superior*

19   *Court*, 130 Cal. App. 4th 261 (2005); *Precision Instrument Mfg. Co. v. Auto Maint.*

20   *Mach. Co.*, 324 U.S. 806, 814 (1945).

21          All of Plaintiffs' claims are barred by the applicable statutes of limitations.  Cal.

22   Civ. Proc. § 338(d); *Averbach v. Vnescheconombank*, 280 F. Supp. 2d 945, 956 (N.D.

23   Cal. 2003); Cal. Civ. Proc. Code § 338(c); *Daly v. Pearl Spirits, Inc.*, 438 Fed. Appx.

24   664 (9th Cir. 2011); Cal. Civ. Proc. Code § 339; *Menefee v. Ostawari*, 228 Cal. App.

25   3d 239, 246 (1991); *Rotella v. Wood*, 528 U.S. 549 (2000); *Cortez v. New Century*

26   *Mortg. Corp.*, 2012 U.S. Dist. LEXIS 13469, at *11 (N.D. Cal. Feb. 3, 2012).

27          Plaintiffs' fraud claims (Counts 1, 2, and 3) are barred by the three-year statute

28   of limitations.  The evidence is clear that Plaintiffs' tax fraud claims accrued at

Gibson, Dunn &
Crutcher LLP

21

1   multiple points prior to September 2005 and are barred by the three-year statute of

2   limitations.  The evidence is clear that Plaintiffs' account management claims are also

3   time-barred because they began running well before September 2005.  Likewise,

4   Plaintiffs' conversion claim (Count 18) is barred by the three-year statute of

5   limitations.  Plaintiffs' breach of contract claim (Count 16) is barred by the two-year

6   statute of limitations for implied or oral contracts.  Plaintiffs' professional malpractice

7   claim (Count 12) is barred by the two-year statute of limitations.

8        Plaintiffs' RICO claims (Counts 11 and 12) are barred by the four-year statute of

9   limitations because Plaintiffs' RICO claims rest on facts Plaintiffs knew about before

10   September 2004.  Plaintiffs' breach of fiduciary duty claim (Count 9) is barred by the

11   three-year statute of limitations if based on fraud, and the four-year statute of

12   limitations if not based on fraud.  Plaintiffs' unfair business practices claim (Count 15)

13   is barred by a four-year statute of limitations.  Thus, Plaintiffs' civil conspiracy claim

14   (Count 14) is barred by the applicable statutes of limitations underlying the conspiracy

15   claim.

16        Plaintiffs cannot prove damages in support of any of their claims.  First,

17   Plaintiffs cannot prove that UBS was the "but for" cause of Olenicoff's tax liability to

18   the IRS because Olenicoff had been committing tax fraud for years before he met

19   UBS.  Second, binding precedent holds that damages constituting back taxes, interest,

20   and penalties are not recoverable as a matter of law on policy grounds.  Third,

21   Olenicoff did not in fact suffer damages because his UBS accounts returned the

22   investment he sought.  Fourth, UBS did not collect excessive fees because it charged

23   less than the fee Olenicoff claims he negotiated with UBS.  Fifth, Olenicoff can only

24   blame himself for his felony conviction.  And the \ evidence shows that Olenicoff

25   testified falsely in claiming damages resulting from an inability to obtain loans.  *North*

26   *American Chemical Co. v. Superior Court*, 59 Cal.App.4th 764, 786 (1997); *Piscitelli*

27   *v. Friedenberg*, 87 Cal.App.4th 953, 989 (2001); St. Paul Fire & Marine Ins. Co. v.

28   Am. Dynasty Surplus Lines Ins. Co., 101 Cal. App. 4th 1038, 1060 (2002).

Plaintiffs do not have sufficient evidence to support their claims of RICO violations (Counts 10 and 12).  Plaintiffs are unable to identify actionable predicate acts under RICO.  Controlling Ninth Circuit law holds that Plaintiffs cannot base their RICO claims on the facts in UBS's Deferred Prosecution Agreement.  Because there is no evidence that UBS agreed with others to commit RICO violations, Plaintiffs' claim of RICO conspiracy fails as well.

The undisputed facts show that Olen cannot state any claim against UBS because it never had a relationship with UBS.  Olen cannot claim fraud by UBS because it never held accounts with UBS, and therefore never received advice from UBS, was not subject to misrepresentations by UBS, and could not have relied on any representations or actions by UBS.  Olen lacks standing to pursue other claims because it never had a fiduciary relationship with UBS, it never acted in reliance on UBS's representations, never had business dealings with UBS, never entered into contracts with UBS, and never lost any property to UBS.

Respectfully submitted,

Dated:  April 2, 2012

GIBSON, DUNN & CRUTCHER LLP
DEAN J. KITCHENS
KRISTOPHER P. DIULIO
LAUREN A. EBER


By:  /s/ Dean J. Kitchens
                    Dean J. Kitchens

Attorneys for Defendant UBS AG

2012-04-02 - CONTENTIONS OF LAW AND FACT.DOCX

Gibson, Dunn & Crutcher LLP

23

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2012, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| David M. McDonald | dmcd@mmlawmiami.com |
| John W. McLuskey | jmcl@mmlawmiami.com |
| Julie Ann Ault | jault@olenproperties.com |
| Thomas F. Newmeyer | tom.newmeyer@ndlf.com |
| Jennifer C. Lyons | jennifer.lyons@ndlf.com |
| Douglas J. Rovens | drovens@rovenslamb.com |
| John D. Cline | cline@johndclinelaw.com |
| Richard J. Grad | rgrad@sidley.com |
| Marisa D. Poulos | mpoulos@olenproperties.com |

/s/  Lauren A. Eber

Lauren A. Eber

1   
2   
3   
4   
5   
6   
7   
8   
9   
10   
11   
12   
13   
14   
15   
16   
17   
18   
19   
20   
21   
22   
23   
24   
25   
26   
27   
28